IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PELOTON INTERACTIVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. ______________ |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| ICON HEALTH & FITNESS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT,**
**FALSE ADVERTISING, AND UNFAIR BUSINESS PRACTICES**

Plaintiff Peloton Interactive, Inc. ("Peloton") brings this action against ICON Health & Fitness, Inc. ("ICON"), and alleges as follows:

**SUMMARY OF THE ACTION**

1. Since its inception in 2012, Peloton has changed the fitness industry, becoming the largest interactive fitness platform in the world with a loyal community of over 2.6 million members. In fiscal year 2019 alone, its members completed over 58 million Peloton workouts. Peloton makes fitness entertaining, approachable, effective and convenient while fostering social connections that encourage its members to be the best versions of themselves. Peloton delivered its first bikes (the "Peloton Bike") in 2014 and received near-universal adulation, with *Men's Health* naming the Bike "the best cardio machine on the planet," and fitness experts hailing it as "revolutionary," and "category creating." Peloton currently employs more than 1,900 people across the country.

2. The Peloton Bike is the first ever at-home exercise bike that incorporates a sophisticated graphical user interface—presented on a 22-inch HD, multitouch tablet—that displays live and on-demand cycling classes led by some of the world's best instructors. The

Peloton Bike uses sensors to measure a rider's performance and can display a dynamically-updating leaderboard comparing the rider's performance at each point in the class with the performance of every other rider that is currently taking—or has ever taken—the same class, anywhere in the world. This "leaderboard" utilizes Peloton's patented technology to show Peloton riders how their performance stacks up against all other riders that have taken that same class, past and present, at every point during a class.

3. Before Peloton invented and released the Peloton Bike, the fitness industry had struggled with an intractable divide: consumers could either (1) go to in-studio fitness classes to obtain the competitive thrill and engagement of working out with others, or (2) choose to use at-home exercise equipment—which had seen virtually zero innovation in over a decade—to gain flexibility and time. They could never do both. Peloton solved that problem, and others, with its revolutionary new product and patented technology.

4. *First*, Peloton solved the biggest problem associated with in-studio and in-person exercise classes—that they are offered only at fixed locations and times—by allowing users to bring that experience into their own home and on their own schedule. *Second*, Peloton solved the biggest problem associated with previous at-home fitness products—user boredom due to lack of engagement, community, and class variety—by providing live and on-demand classes with a leaderboard on an improved and more efficient graphical user interface that not only recreates but *significantly enhances* the real-time competition and community engagement that made in-person and in-studio classes so popular.

5. To protect these and other innovations incorporated into the Peloton Bike and the Peloton Tread (Peloton's acclaimed treadmill, released in 2018), Peloton CEO John Foley and Peloton applied for, and received, multiple patents, including U.S. Patent No. 10,486,026 ("the

’026 Patent”) and U.S. Patent No. 10,639,521 (“the ’521 Patent,” and together with the ’026 Patent, “the Peloton Patents”), which are at issue in this lawsuit.

6. With Peloton’s hard-fought success, competitors, including Defendant ICON, have attempted to free ride off Peloton’s innovative technology. Historically, ICON has sold traditional fitness equipment, and it develops and manufactures exercise equipment (including stationary bikes and treadmills) under the brand names NordicTrack, Proform, and FreeMotion (collectively, the “ICON products”).

7. For years, ICON sought to drum up interest in the ICON products with iFit—a functionality encompassing a simplistic suite of fitness offerings designed to operate on, or in tandem with, ICON products. Prior to the actions giving rise to this suit, iFit never delivered live classes—i.e., classes taught by instructors and streamed to users’ devices in substantially real time—or offered its members the ability to participate in competitive classes via a leaderboard. Instead, iFit only allowed subscribers to follow along with pre-recorded exercise classes on their machines, without any sort of community engagement. Although ICON apparently intended for iFit to boost consumer enthusiasm and sales of its products, its actions demonstrate it was not able to reach its goal. Indeed, in July of 2015, just one year after the launch of the successful Peloton Bike, ICON announced that it was laying off 400 workers at the Utah plant where it manufactures much of its equipment.

8. In 2019, Peloton became the unquestioned leader in at-home fitness and continued to achieve lightning-fast growth as it went public on the NASDAQ stock exchange in September 2019. By that point, it had become clear to the market that consumers were tired of the same boring, at-home fitness equipment that had languished in basements for decades—like the ICON

products—and instead wanted the revolutionary new "connected" community fitness experience that Peloton offered through its patented technology.

9. Faced with this grim reality, the *very same month* as Peloton's IPO, ICON announced that it would be releasing a so-called new feature: "the iFit leaderboard," which was nothing more than the Peloton leaderboard grafted onto an iFit interface. On September 27, 2019, ICON published a picture on The Official iFit Member Facebook page making clear that rather than investing in its own technology and innovating from the ground up—as Peloton had done—ICON would simply copy Peloton's patented leaderboard technology. Shortly thereafter, ICON announced that it had raised $200 million in venture capital to help "accelerate" the integration of its copycat technology into ICON's products. As media outlets like Axiom recognized at the time, ICON's actions were plainly intended to allow it to "compete with Peloton," and reflected "how home fitness companies and their investors keep moving toward the Peloton model…."

10. Then, in January of 2020, ICON launched an expensive, glossy video ad campaign for a new Peloton Bike copycat product that ICON calls the NordicTrack S22i Studio Cycle Bike. That ad, entitled "The Duel," shows two actors riding their NordicTrack bikes at the same time and competing against each other for a higher position on the iFit leaderboard. The iFit leaderboard ICON advertised in "The Duel," shown on the NordicTrack S22i Studio Cycle Bike, is an almost exact copy of Peloton's leaderboard.

11. Astoundingly, ICON did not stop there: it introduced Peloton's patented technology across *all* ICON products with iFit functionality[1]—including not only stationary

[1] The list of infringing ICON products include the following: Proform Carbon T7 Treadmill, Proform Carbon CX Bike, Proform Studio Bike Limited, Proform 759R Rower, NordicTrack

bikes and treadmills, but also rowers, ellipticals, and high-intensity interval training machines. It also advertised for sale exercise systems that, among other things, detect, synchronize and compare the exercise metrics of remote users on a graphical user interface, just like Peloton.

12. ICON, and ICON products with iFit functionality, infringe the Peloton Patents because, among other reasons, they display archived exercise class content to remote users, track a remote user's performance, and compare that remote user's performance against the performance of other remote users via a time-synced leaderboard. Critically, ICON is profiting immensely from this infringement; indeed, in March 2020, ICON's Chief Executive Officer told the Wall Street Journal that its recent sales were up over 200%. And in May 2020, ICON's President reported to the New York Times that it was experiencing sales that were "absolutely bigger than any other boom time we've had."

13. Having discovered just how lucrative it was to mimic Peloton, ICON doubled down on its unlawful scheme. In May 2020, ICON set its sights on yet another Peloton innovation—live classes with a real-time leaderboard—and decided that it would copy this aspect of the Peloton experience, as well. In all its years of existence, ICON had never offered live classes on iFit. Yet in early May 2020, on the heels of its copycat leaderboard roll-out, ICON enabled live classes on iFit for users operating ICON bikes and treadmills. ICON's introduction of live classes and the leaderboard is calculated to perfect its theft of market share from Peloton, who has set the standard for both technologies in the at-home fitness space.

---

Commercial X321 Incline Trainer, NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack FS10i Elliptical, NordicTrack Fusion CST Pro, NordicTrack Fusion CST Pro with Rower, NordicTrack RW900 Rower, NordicTrack RW500 Rower, Freemotion T10.9b Reflex Treadmill, Freemotion E10.9b Elliptical and Freemotion R10.96b Recumbent Bike. Upon information and belief, each of these products became available for public purchase after May 22, 2017.

14. As if its patent infringement were not enough, ICON has additionally engaged in an unlawful false advertising campaign to further undercut Peloton's business. Specifically, to unfairly increase its market share, ICON employs a practice known as false reference pricing. Pursuant to this practice, ICON represents to consumers a false, inflated "original" price of a product, and then informs consumers that the product is currently on sale for a significantly lower, discount price. This false and deceptive practice misleads consumers into making purchases of products which they were led to believe were of a higher quality, and unlawfully diverts sales away from competitors who truthfully advertise their products, like Peloton. Peloton is uniquely harmed by ICON's unlawful and unfair conduct because ICON has repeatedly advertised itself as an alternative to Peloton and directly sought to compare its offerings to Peloton's.

15. Peloton brings this suit to protect its rights and put an end to ICON's patent infringement, false advertising, and deceptive business practices.

## THE PARTIES

16. Peloton is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 125 West 25th Street, 11th Floor, New York, New York, 10001.

17. ICON is a corporation organized and existing under the laws of the State of Delaware. ICON's principal place of business is at 1500 South 1000 West, Logan, Utah, 84321. ICON sells its products online and through third-party retailers all across the United States, and additionally operates an outlet store in California, located at 630 Nicholas Road, Beaumont, CA 92223.

## JURISDICTION AND VENUE

18. Certain claims in this civil action arise under the patent laws of the United States, 35 U.S.C. § 1 et seq. This Court has subject matter jurisdiction over the patent claims pursuant to 28 U.S.C. §§ 1331 and 1338. Certain claims in this civil action also arise under the Lanham Act, 15 U.S.C. § 1125. This Court has subject matter jurisdiction over the Lanham Act claims pursuant to 15 U.S.C. § 1121 and under 28 U.S.C. §§ 1331 and 1338. Subject matter jurisdiction over related state law claims is proper pursuant to 28 U.S.C. §§ 1338 and 1367. The state law claims are integrally interrelated with Peloton's federal claims and arise from a common nucleus of operative facts such that the administration of the state law claims with the federal claims furthers the interest of judicial economy.

19. This Court has personal jurisdiction over ICON pursuant to the laws of the State of Delaware and the United States Constitution because ICON is a Delaware corporation. ICON also regularly and continuously transacts business in the jurisdiction, including marketing and selling ICON services and products throughout the State of Delaware. ICON places infringing products within the stream of commerce, which stream is directed at this district, with knowledge and/or understanding that those products will be sold in the State of Delaware. ICON has also disseminated false and misleading information in the State of Delaware about its products and services as part of its false advertising campaign.

20. ICON has infringed or caused infringement in the State of Delaware by, among other things, promoting, offering for sale and selling infringing ICON products with iFit functionality in the District. ICON also provides services and assembles products that are and have been used, offered for sale, sold, and purchased in the State of Delaware. Therefore, the

exercise of jurisdiction over ICON is appropriate under the applicable jurisdictional statutes and would not offend traditional notions of fair play and substantial justice.

21. Venue is proper for claims of patent infringement in this district under 28 U.S.C. §§ 1391(b) & (c) and 1400(b) because ICON is incorporated in the State of Delaware and has committed, and continues to commit, acts of patent infringement within the district.

22. ICON actively markets and sells ICON products with iFit functionality to customers across the United States, including in the District of Delaware.

23. ICON intends to and does advertise, demonstrate, offer for sale, and sell the infringing products and services to customers in the District of Delaware. ICON intends for customers to use the infringing products with iFit functionality within the District of Delaware.

## FACTUAL ALLEGATIONS

### I. Disrupting the Fitness Category with the Peloton Bike

24. Unlike the at-home bikes that came before it, the Peloton Bike is a sleek, technologically advanced system that combines a first-in-class exercise bike with state-of-the-art technology that allows riders to experience live and on-demand cycling classes—led by some of the world's best instructors—from the comfort of their own homes.

25. Featuring a 22-inch, high-definition, sweat resistant, multitouch tablet, the Peloton Bike measures and displays a rider's performance metrics and presents those metrics for live and time-synced comparison with other Peloton riders. This new technology allows Peloton riders to see where their performance stands against all other riders on a leaderboard throughout the cycling class, re-creating the energetic and competitive in-studio cycling experience at home on their own schedule.

26. In fact, not only does Peloton recreate the in-studio experience in the user's own home, it significantly improves it. To illustrate the unprecedented user experience Peloton created, a rider taking a regular in-studio class may (at best) see his or her performance compared only against the other riders in the same class at the same time, whereas the same rider taking a class on a Peloton Bike can see his or her performance compared, at every point in the class, against tens of thousands (for a live class) or even hundreds of thousands (for an on-demand class) of other riders from around the world, regardless of when the rider takes the class.

27. Further, Peloton's leaderboard allows each user to filter and control who they see on the leaderboard by a variety of characteristics, including age and gender. Peloton's leaderboard also enables filtering by "All Time," which allows the user to participate against all users who have ever taken the same class, or by "Here Now," which displays only those users who are presently attending the same class at another remote location.

28. In addition, Peloton allows its users to interact with other remote users during a class, for example, by giving a virtual "high five" to another user, encouraging a friend via live video chat, or, with one touch, saving a song heard in class to their favorite streaming service. These features are not available (nor would they be useful) for in-studio-only cycling classes.



*Above: The Peloton Bike*




*Above: The Peloton Bike Graphical User Interface and Leaderboard*




*Above: Peloton Leaderboard Filters – "All Time" and "Here Now"*

29. Peloton's success has been remarkable. *Men's Health* has called the Peloton Bike "the best cardio machine on the planet." *USA Today* has said it is "attractive, addictive, and seriously whips you into shape." And in a comparison of numerous at-home bikes, *The Wall Street Journal* concluded that "the best bike, by far, was [the] Peloton." The Peloton Bike also received the award for the Best Health and Fitness Device at the Consumer Electronics Show in 2018.

30. The Peloton Bike retails for $2,245, and owners pay $39 per month for a subscription to Peloton's exclusive live and on-demand exercise classes.

31. As of March 31, 2020, Peloton has built its member base from zero to over 2.6 million in six years. Its revenue has been growing rapidly as a result. For example, in fiscal year 2017, Peloton's revenue shot to over $200 million, and in fiscal year 2018, revenue doubled to over $400 million. In fiscal year 2019, its revenue more than doubled again to approximately $900 million. In the last quarter alone (ending March 31, 2020), Peloton generated $524.6 million in revenue, representing 66% year-over-year growth. Peloton has also won countless awards, including being named one of the World's Most Innovative Companies by *Fast Company* every year since 2016.

32. Peloton continues to expand both nationally and internationally. Most importantly, Peloton is doing what it set out to do—allowing more people than ever to participate in high-energy, state-of-the-art exercise classes on their own schedule, and empowering Peloton users to maximize their most valuable resource: time.

## II. <u>The Journey to Inventing the Peloton Bike</u>

33. When Peloton was founded, fitness studios that provided studio cycling classes were becoming tremendously popular. SoulCycle and Flywheel had multiple studios and were

growing quickly. While such in-studio classes provide a great consumer experience, they start at predetermined times, have limited space per class, and may meet at inconvenient locations for some customers. As a result, in-studio classes can be hard to attend for people with busy work schedules and families at home. Peloton CEO John Foley was one of those people.

34. After realizing that countless others undoubtedly faced the same challenge, Foley began a journey that would see him and his co-founders invent a new category of fitness equipment that provides the immersive, fun and competitive in-studio cycling class experience, at home, at any time.

35. Having majored in industrial engineering at Georgia Tech and studied business at Harvard Business School, Foley then worked in e-commerce and the tech industry for over a decade. This gave him a sophisticated understanding of the intersection of business and technology. Foley also realized that this project would require a team of smart, savvy leaders in different fields to bring it to consumers, and he therefore started recruiting other tech leaders who shared his vision.

36. In September 2011, Foley shared his vision with Hans Woolley, co-inventor of the Peloton Patents, at a conference for media executives in Sun Valley, Utah. The two bounced ideas back and forth during the weekend conference and began planning next steps shortly after arriving home from the conference.

37. Foley also approached his friend and former colleague Tom Cortese. Over dinner one night in December 2011, Foley told Cortese that he believed there was a large, untapped market available if they could just figure out how to allow cycling fans to access the best instructors and have an in-studio cycling class experience at any time, no matter where they live

and no matter how busy their schedules are. Cortese joined and has been with Peloton ever since, currently serving as Peloton's Chief Operating Officer.

38. Foley also recruited three others, whom he asked to join as co-founders of Peloton: technology guru Yony Feng, to help design and build a prototype Peloton Bike; accomplished lawyer Hisao Kushi, to guide Peloton through the legal and regulatory framework facing the new start-up; and internet executive Graham Stanton, to help guide the company through its early years and to manage the company's finances and growth strategy. All accepted, and all three remain involved with the company to this day. Feng is Peloton's Chief Technology Officer; Kushi is Chief Legal Officer; and Stanton still advises Peloton in a consulting capacity.

39. With a strong team in place, Foley was able to raise an initial seed investment of $350,000, along with $50,000 of Foley's own savings. This allowed the young start-up to rent a small office in New York City from which it could develop and create the first prototype of the Peloton Bike.

40. To create the product that Foley and his co-founders envisioned, Peloton developed (1) a visually appealing, sturdy, and technologically advanced exercise bike; (2) a large, sweatproof, wi-fi enabled, high-definition touchscreen tablet computer; (3) an attractive graphical user interface and related software and backend systems to integrate the bike and tablet and track, synchronize, and dynamically display metrics to connect a community of riders; and (4) first-in-class cycling class content and the systems to deliver that content. All equipment needed to be durable, lasting for years of use with minimal maintenance.

41. Start-ups often partner with existing companies and products to custom build as little as possible. Building one's own hardware and software from the ground up, by contrast, is expensive, time-consuming, and fraught with obstacles, known and unknown. However, Peloton

quickly discovered that no existing exercise bike had all the required characteristics: sturdiness, durability, visual appeal, efficiency, and technological capability. Nor was there any touchscreen tablet available on the market at the time that would suit its needs. In addition, Peloton realized that no existing products could communicate with the bike hardware, or track and analyze rider performance in the way they envisioned. In short, the Peloton team quickly realized that it would need to create virtually the entire Peloton Bike from scratch, including the bike, tablet, and software.

42. What's more, to effectuate its vision of immersive studio cycling at home, Peloton also needed to figure out how to integrate the hardware (the bike and tablet) with its own software so that the software could communicate with the bike to track performance metrics, store those metrics, communicate those metrics back to the rider, and transfer those metrics to a server so that they could be synchronized and compared with other riders' metrics.

43. The technological challenges and unknowns faced by the Peloton team also created a significant financial hurdle. Investors viewed Peloton's plan to build its own hardware and software as too costly and difficult, and were not convinced there was a viable market for the product or that the technology would work. Dozens of investors declined the opportunity to invest in Peloton because they were not willing to take the risk of investing up front in such a new and challenging endeavor.

44. Yet, through research, ingenuity, and persistence, Peloton pushed on, working with two core manufacturing partners to design and produce the necessary high-tech, sleek bikes and tablets. To build the first prototype, Feng, the Chief Technology Officer then and now, created a proof-of-concept apparatus using a standard off-the-shelf stationary bike, then attaching sensors with a stripped-down electronics board running the Android-based app that he developed

and a computer monitor rigged to the bike's front. As reflected in the images below, Feng went through a long, iterative process to develop a successful hardware-software integration.





*Above: Testing the software with an early version of Peloton Bike*

*The early version of the Peloton Bike, left, compared with the version at launch, right:*





*The progression of hardware-software integration development for the Peloton Bike:*




45. This unique hardware-software integration would be the basis for Peloton's prototype. By the end of 2012, after a year of hard work, investment, and development, Peloton finally had a prototype in hand to show investors.

46. But even after the Peloton Bike prototype was created, Peloton struggled to raise money. Foley was rejected by countless investment firms and was repeatedly told that the Peloton Bike simply was not viable.

47. Yet, despite these repeated rejections, Foley persisted—continuing to take risks, making significant personal investments, and dedicating more time to developing the best possible product. He did so because of his belief that at-home fitness equipment simply had not

evolved at the same pace that group exercise classes had. He continued to pitch potential investors until, many rejections later, he found a group of investors who believed in Peloton and invested the first $10 million that helped launch the Peloton Bike on a commercial scale.

## III. Bringing the Peloton Bike to Market

48. After additional troubleshooting and tinkering on the early prototype bikes, Peloton was ready to take the important step of manufacturing the bike and selling it to its first customers. Peloton held a Kickstarter campaign with the goal of raising enough capital to start manufacturing the bike. As Peloton explained, "[t]his involves building the 'tools' required to create each unique part (yes, we first have to build the machinery that will build the bike!) and pre-purchasing lots of steel, aluminum, plastic, microchips (there are 17 in our console alone)." The Kickstarter campaign raised more than $300,000 and generated initial orders for 188 bikes.

49. Sales were initially slow—188 bikes was far from Peloton's target, and far from the demand Foley knew existed. Peloton was a new product, and people were wary of the product and how useful it would be. Like every other phase of their journey, Peloton was not going to become successful overnight—they were going to have to work for it. With intensive and creative marketing efforts, including pop-up stores in choice locations, and as word of mouth spread, sales began to pick up.

50. In January 2014, two years after Peloton was founded, the first bikes were delivered to customers.

51. By now, Peloton has designed in-house almost everything that other companies outsource to third parties: hardware, software, content, and logistics. As an Inc.com article reported, "Peloton has defied every aspect of the prevailing startup ethos of doing it fast and lean, buying off the shelf, partnering and, above all, custom-building as little as possible."

## IV. Continued Innovation with the Peloton Tread

52. Encouraged by the groundswell of consumer support for the Peloton Bike, Foley and the Peloton team wasted no time in bringing the Peloton experience to a new platform. In 2016, Peloton began developing a treadmill. The finished product, called the Peloton Tread, was introduced to the public in 2018.

53. The Peloton Tread is a natural extension of the Peloton Bike. Like the Peloton Bike, the Peloton Tread is a sophisticated, internet-integrated exercise system that combines a state-of-the-art treadmill featuring a customized, low-impact, shock-absorbing slat belt, with Peloton's patented interactive technology, allowing users to experience engaging live and on-demand classes with others from the comfort of their own homes.

54. With its immersive, 32-inch full high-definition, sweat resistant tablet and a 20 watt soundbar, the Peloton Tread was designed to maximize and enhance the ultra-realistic, competition-based, and interactive user interface that people have come to associate with the Peloton experience. Just like on the Peloton Bike, the patented technology on the Peloton Tread allows users to participate in exercise classes led by world-renowned fitness experts and view, on a dynamically-updating leaderboard, how their performance stands, at any given point in a class, against all other users who have taken the class, past or present.

55. With the Peloton Tread, Peloton dramatically reconceptualized the limits of traditional treadmills in two ways. *First*, Peloton found a way to turn exercising on a treadmill—usually a solitary enterprise—into a class form with competition. While competitive running has long existed in the form of outdoor or indoor races, Peloton was the first to implement competitive running on at-home treadmills by offering live and on-demand classes with a leaderboard. Prior to the Peloton Tread, it was not well-known for treadmills to offer a

leaderboard or comparative display enabling multiple users to see, at every point during the run, how their performance compares to all the other runners that have experienced, or are presently experiencing, the same class.

56. *Second*, the Peloton Tread also reimagined the types of workout classes that can be adapted for a treadmill. In addition to classes conducted entirely on the machine, the Peloton Tread offers a panoply of high-energy, instructor-led bootcamp and circuit training options which utilize the features of the Peloton Tread. For example, some classes invite the user to split time between the Peloton Tread and exercises off the Tread that incorporate the user's bodyweight, free weights, and resistance bands. Other classes instruct the user to compete against other users in "free" mode, a setting on the Peloton Tread that disengages the motor and lets the user drive the slat belt, for an intense, truly full body workout.



*Above: The Peloton Tread*




*Above: The Peloton Tread Graphical User Interface and Leaderboard*

57. Like the Peloton Bike, the Peloton Tread has received numerous accolades for its innovation. When it premiered at the Consumer Electronics Show, PC Mag named the Peloton Tread the “Best Health and Fitness Device” of the year. Elle Magazine praised the Peloton Tread for “technology [that] surpasses any workout machine on the market.” Similarly, Mashable.com profiled the Peloton Tread and rated it as the best treadmill for runners looking for a new experience.

58. The Peloton Tread retails for $4,295 (including delivery and set-up) and users pay $39 per month for a subscription to Peloton’s exclusive live and on-demand classes.

## V. Peloton Patents Its Intellectual Property

59. After years of investment, risk, and innovation, Peloton has become the leader of the at-home fitness world. To protect its intellectual property, Peloton applied for, and received, several patents, including the ’026 and ’521 Patents, covering its inventions.

60. The ’026 Patent, entitled *Exercise System and Method*, was duly and lawfully issued to Peloton on November 26, 2019. A true and correct copy of the ’026 Patent is attached hereto as Exhibit 1.

61. The ’521 Patent, entitled *Exercise System and Method*, was duly and lawfully issued to Peloton on May 5, 2020. A true and correct copy of the ’521 Patent is attached hereto as Exhibit 2.

62. The Peloton Patents are continuations of U.S. Patent No. 9,174,085, entitled *Exercise System and Method*, which duly and lawfully issued on November 3, 2015; U.S. Patent No. 9,233,276, entitled *Exercise System and Method*, which duly and lawfully issued on January 12, 2016; U.S. Patent No. 9,861,855, entitled *Exercise System and Method*, which duly and lawfully issued on January 9, 2018; U.S. Patent No. 10,022,590, entitled *Exercise System and Method*, which duly and lawfully issued on July 17, 2018; and U.S. Patent No. 10,322,315, entitled *Exercise System and Method*, which duly and lawfully issued on June 18, 2019.

63. ICON has known about this family of patents since at least June 2018. As of the filing of this complaint, ICON has cited Peloton’s U.S. Patent No. 9,174,085 and/or U.S. Patent No. 10,022,590 in at least 23 different patent applications.

64. Since at least March 16, 2020, Peloton has given the public, including ICON, notice of its patented technology by marking the Peloton Bike and Peloton Tread with a sticker

that directs the user to its virtual patent marking website, https://www.onepeloton.com/legal/patents, pursuant to 35 U.S.C § 287(a).

65. Plaintiff Peloton Interactive, Inc. is the current owner of all rights, title, and interest in the Peloton Patents. The Peloton Bike and Peloton Tread practice the Peloton Patents because, among other things, they provide exercise systems for computer-augmented use at home by a user participating in archived exercise classes accessible over a computer network. The Peloton Bike and Tread comprise sensors configured and operable to generate first user performance data based on a first user's activity. The Peloton Bike and Tread also comprise computers configured to: cause a display screen to present a plurality of available exercise classes; accept from the first user, via a user input interface, a selection of one of the available archived exercise classes; receive, via a computer network, data representing content of the selected class; and cause the display screen to display the content of the selected archived exercise class while the first user participates in that class. The Peloton Bike or Tread computer can also receive, via a sensor input interface, the first user's performance data from the sensors during the selected exercise class, and generate, on the basis of that first user's performance data, first user performance parameters. The computers can also receive, via the computer network, archived performance data representing archived user performance parameters for a plurality of other users over at least a portion of the selected class. The computers further synchronize this archived performance data with the first user's performance data, such that archived user performance parameters are synchronized with the first user's performance parameters. The Peloton Bike and Tread computers further cause the display screen to display a dynamically-updating ranked list of the first user's performance parameter and at least some of the archived

user performance parameters, to thereby simulate the first user competing with at least some of the other users.

66. Peloton thus manufactures and sells commercial embodiments of the Peloton Patents, including the Peloton Bike and Peloton Tread with a subscription to Peloton classes.

## VI. **The Peloton Patents Recite Inventive Concepts That Were Not Well-Understood, Routine, Or Conventional, At The Time**

67. As described herein, the Peloton Bike and the Peloton Tread were revolutionary, category-creating devices that: (1) solved significant problems in the prior art; (2) experienced immense market success; (3) received near-universal market praise; (4) overcame significant technological hurdles in development; and (5) overcame initial market reservations about their viability. It is thus clear that the Peloton Bike and the Peloton Tread implemented inventive concepts that were not well-understood, routine, or conventional at the time they were developed. These inventive concepts are incorporated into the claims of the Peloton Patents. And it is the inventive concepts contained in the claims of the Peloton Patents that account for the leaps-and-bounds improvement achieved by the Peloton Bike and Peloton Tread over the prior art, as well as Peloton's resulting economic success.

68. The Peloton Patents describe and claim concepts that were not well-understood, routine, or conventional at the time of the Peloton Patents.

69. For example, Claim 1 of the '026 Patent describes "an exercise system for computer-augmented use at home by a first user participating in an archived exercise class accessible over a computer network" comprising, among other things, a computer configured to "cause the display screen to display the content of the selected archived exercise class" while a user participates in that class. Claim 1 of the '521 Patent recites similar language. As described above, this alone represents an unconventional improvement over the prior art, because prior art

in-studio classes did not offer any capability for a user to access and participate in archived exercise classes. And it was not well-understood, routine, or conventional to provide a home bike or home treadmill with networked access to archived exercise classes. By providing remote users with networked access to archived exercise classes, the Peloton Patents allowed remote users to have the experience of an in-studio exercise class, in the comfort of their own home and on whatever schedule they chose. This offering was a major advancement over both live in-studio classes and at-home exercise machines in existence at that time. Further, the specifications of the Peloton Patents detail this advancement. *See, e.g.*, Exhibit 1 at 1:37–2:4; Exhibit 2 at 1:40–2:7.

70. Claim 1 of the ’026 Patent also describes “a sensor operable to generate first user performance data based on activity by the first user,” “receiv[ing], via a sensor input interface, the first user performance data from the sensor,” “generat[ing], on a basis of the first user performance data, a first user performance parameter,” “receiv[ing] archived performance data” from other users, “synchroniz[ing] the archived performance data with the first user performance data,” and “display[ing] a dynamically updated ranked list of the first user performance parameter and at least some of the synchronized archived user performance parameters, to thereby simulate the first user competing with at least some of the other users.” Claim 1 of the ’521 Patent recites similar language. These functionalities, which allowed a remote user taking an archived class to experience the feeling of “live” competition with hundreds, or even thousands, of previous riders, was evolutionary at the time, and critical to solving the “rider boredom” problem described in this Complaint. No prior art system allowed a user to do that, whether at home or in-studio. The specifications of the Peloton Patents also detail this

advancement over the prior art. *See, e.g.*, Exhibit 1 at 1:37–2:4, 13:49-64; Exhibit 2 at 1:40–2:7, 13:43-58.

71. Independent Claim 11 of the Peloton Patents recites unconventional technological advancements over the prior art that are similar to the unconventional technological advancements recited in independent Claim 1.

72. The dependent claims of the Peloton Patents add additional inventive concepts to what is recited in independent Claims 1 and 11, and offer further unconventional improvements over the prior art, both alone and in combination, which result in increased motivation and engagement for users.

73. For example, Claim 7 of the ’026 Patent recites a system “wherein the computer is further configured to receive the content of the selected archived exercise class and class participant content associated with the selected archived exercise class from a remote server via the computer network, and wherein the content of the selected archived exercise class and/or class participant content includes live content generated in realtime.” This claim adds to the underlying claims the additional inventive concept of allowing content of an archived class, or class participant content, to include live content. As an example, this functionality can permit two people in different locations to take an archived class at the same time and to compete against each other in real time, with their respective performance parameters being displayed to each other. Having a system with this capability is a major advancement over both in-studio classes and existing at-home exercise equipment, and is far from “well-understood, routine, or conventional.” Claim 18 of the ’026 Patent recites similar functionality and was, likewise, unconventional. The specifications of the Peloton Patents detail this advancement over the prior art. *See, e.g.*, Exhibit 1 at 1:37–2:4, 13:49-64; Exhibit 2 at 1:40–2:7, 13:43-58.

74. As another example, Claim 8 of the Peloton Patents adds the concept of "generat[ing] a leaderboard from the [] performance data and the first user performance parameter, the leaderboard representing performance parameters at the same point in the selected archived exercise class." Having a system that could perform this leaderboard functionality for an archived class was revolutionary. Dependent Claim 13 of the Peloton Patents recites essentially this same functionality and was also unconventional. The specifications of the Peloton Patents also detail this advancement over the prior art. *See, e.g.*, Exhibit 1 at 13:49-64; Exhibit 2 at 13:43-58.

75. Yet another example, Claim 20 of the Peloton Patents introduces "receiving video chat data from at least one other user for display to the first user on the display screen at the first location." In a feat of engineering, Peloton was the first to accomplish two simultaneous video feeds on an exercise device. The specifications of the Peloton Patents detail this advancement over the prior art as well. *See, e.g.*, Exhibit 1 at 1:37–2:4; Exhibit 2 at 1:40–2:7.

76. Other claims of the Peloton Patents describe particular types of information to be displayed on the user interface, and the particular ways in which that information should be displayed. *See* Claims 2, 3, 5, and 12. These concepts, as well, were not well-understood, routine, or conventional at the time of the invention of the Peloton Patents.

77. Far from an abstract idea, the claims of the Peloton Patents are also directed to a tangible system with an observable real-world impact. Indeed, the Peloton Patents claim physical and concrete devices that carry forward the inventive concepts described above. For example, Claim 1 incorporates "an exercise device" and "sensor" to generate the previously described performance data. As another example, Claim 1 further incorporates a "display screen" to present the exercise classes, class content, performance data, and time-shifted

leaderboard. Dependent Claim 10, as another example, specifically discloses the use of a "stationary cycle." These physical devices create an improved tangible exercise system, such as a stationary at-home bike or treadmill.

## VII. ICON's Machines With iFit Functionality Infringe Peloton's Patents

78. Because of Peloton's success, competitors have brought copycat products to market that infringe on Peloton's intellectual property.

79. Until recently, ICON hosted only pre-recorded, on-demand classes on its machines via iFit, and did not offer any way for its users to compare their performance during an on-demand class to others who had previously taken or were currently taking the same class.

80. In September 2019, many years after Peloton pioneered the Peloton leaderboard, ICON made an announcement on the Official iFit Member Page on Facebook that it would be releasing a "new" feature, the iFit leaderboard. In that announcement, ICON explained that "[w]ith the new iFit leaderboard you'll be able to compete with friends, the iFit community, or against yourself." A post from Chase Watterson, a marketing director for iFit, included a photo of the iFit leaderboard in beta testing, which advised that the user can "[w]atch the competition in real time."

81. In January 2020, ICON launched an ad campaign titled "The Duel." "The Duel" is a video advertisement demonstrating the competitive and engaging nature of the iFit leaderboard on NordicTrack's Commercial S22i Studio Cycle Bike. The advertisement shows two actors riding their NordicTrack bikes at the same time and competing to outrace each other for a higher position on the iFit leaderboard. The iFit leaderboard ICON advertised in "The Duel" is an almost exact copy of Peloton's leaderboard.




*Above: Image of ICON's "The Duel" advertisement displaying the copycat iFit Leaderboard on an ICON bike*

82. ICON markets the iFit leaderboard by claiming for itself the competitive, real-time, at home leaderboard technology that Peloton pioneered and patented. ICON touts that the iFit leaderboard lets users "[r]ace against friends, family, and even yourself with our all-new, intelligent, competitive feature." Similarly, promotional text for "The Duel" advertises that, "[w]ith NordicTrack, you get a personal trainer in your home . . . . Ride your way to the top of the iFit leaderboard . . . . "

83. Concomitant with "The Duel," ICON implemented the iFit leaderboard across all ICON products with iFit functionality, including its treadmills, incline trainers, ellipticals, rowers, and HIIT machines sold under the brand names NordicTrack, Proform, and Freemotion. As of the filing of this Complaint, at least 17 models of ICON products utilize the iFit leaderboard.

84. With the launch of the iFit leaderboard, ICON products with iFit functionality infringe the Peloton Patents because, among other things, they are operable and configured to:

display archived exercise content to remote users, track a remote user's performance, and compare that remote user's performance against the performance of other remote users.

85. ICON's pivot to copying Peloton's interactive technology is no accident. ICON directly competes with Peloton in the at-home fitness equipment space. Finding middling success with its previous iFit offerings, ICON decided instead to roll out a "new" leaderboard feature—in fact, a feature copied from Peloton—to try and boost sales of its own machines after watching Peloton's rise to the top of the fitness industry. However "new" the leaderboard might have been to the ICON machines, the leaderboard is a well-established touchstone of the Peloton Bike and Peloton Tread experience, and it was the Peloton experience that ICON intended to invoke with its "new" feature.

86. ICON's infringement of Peloton's patented technology has been intentional and knowing.

87. In fact, ICON has drawn direct comparisons between its products and the Peloton Bike, demonstrating its intimate familiarity with Peloton's patented technology.

88. For example, ICON uploaded a video on its NordicTrack YouTube channel on December 31, 2018. The video, titled "Peloton Bike Vs. NordicTrack Bike," features an iFit personal trainer who advises the viewer which bike to buy: a NordicTrack bike, or the Peloton Bike.




*Above: ICON's comparison advertisement, last accessed May 11, 2020*

89. In May 2020, ICON decided to misappropriate yet another Peloton innovation for itself. This time, ICON took aim at Peloton's live classes. On May 11, 2020, ICON announced that it, too, would begin offering live classes. Like Peloton, ICON equipped its live classes with real-time leaderboard functionality. Also, like Peloton, ICON would offer live classes on bikes and treadmills. ICON's decision to roll out live leaderboard classes for only two of its product lines is as strategic as it is telling. Although ICON operates iFit on everything from ellipticals to rowers, ICON chose to implement live classes for the only two types of hardware in which Peloton directly competes—i.e., bikes and treadmills—in order to unlawfully divert sales away from the Peloton Bike and the Peloton Tread.

90. ICON's live class announcement only further highlights the dramatic steps ICON took to replicate Peloton. ICON's announcement touts that users can now "compete in realtime

on the iFit Leaderboard!" It also advises that the iFit Leaderboard has new filters, specifically for Live Workouts, including a "Right Now" filter that shows all the users who are presently taking the class—much like Peloton's "Here Now" filter. A simple comparison of the two reveals that every aspect of the iFit Leaderboard is derived from Peloton's leaderboard—from the user interface and display, to the metrics selected for presentation, to the ability to filter between all users who have ever taken the class and those who are "Here Now."




*Above: Image of the copycat iFit Leaderboard from ICON's May 11, 2020 announcement*

91. As ICON's imitative conduct and its YouTube advertisement illustrate, ICON implemented the iFit leaderboard with full knowledge of Peloton's exercise offerings and its patented technology.

92. ICON actively markets and sells ICON products with iFit functionality to customers across the United States, including in the State of California and the District of Delaware.

93. ICON products with iFit functionality are also available for purchase on websites managed by ICON. ICON offers to ship ICON products with iFit functionality to any location in the United States.

94. ICON and ICON products with iFit functionality (which include the following: Proform Carbon T7 Treadmill, Proform Carbon CX Bike, Proform Studio Bike Limited, Proform 759R Rower, NordicTrack Commercial X321 Incline Trainer, NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack FS10i Elliptical, NordicTrack Fusion CST Pro, NordicTrack Fusion CST Pro with Rower, NordicTrack RW900 Rower, NordicTrack RW500 Rower, Freemotion T10.9b Reflex Treadmill, Freemotion E10.9b Elliptical and Freemotion R10.96b Recumbent Bike) satisfy each and every limitation of one or more claims of the Peloton Patents.

## VIII. <u>ICON's Campaign of False Advertising and Unfair Competition</u>

95. ICON's unlawful actions, however, do not stop at patent infringement. In addition to copying Peloton's patented technologies, ICON also devised a false advertising scheme to mislead and deceive customers into purchasing its products, rather than Peloton's. As a result of its false advertising and unfair competition, ICON unfairly stole customers from Peloton and attracted funding from investment firms that reportedly raised ICON $200 million in equity investments.

96. ICON's scheme is perpetuated through a practice known as "fictitious pricing," or "false reference pricing." A seller's "reference price," i.e., the stated price presented alongside

the seller's "on sale" price, provides consumers a point of reference with which to evaluate the prospective purchase. Fictitious and false reference pricing refers to a seller's act of misrepresenting the original, or former, price of a good that is purportedly offered at a "sale price," in order to increase sales of that good. Sellers, who are well-aware of consumer susceptibility to bargain psychology, have incentives to lie to consumers by falsely claiming that their products have been previously sold at a far higher "original" price. This is done in order to induce customers to purchase merchandise at an apparently marked down "sale" price.

97. Normally, consumers rely on a listed reference price to ascertain important information about the product's worth. S*ee* Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?,* 11 J. of Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); *id.* at 56 ("[E]mpirical studies indicate that as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases.").

98. When sellers engage in false reference pricing, the listed reference price serves no informative purpose. On the contrary, use of a false reference price allows the seller to deceive consumers and deprive consumers of a full and fair opportunity to accurately evaluate the specific sales offer in its relevant market. Indeed, it is the hidden nature of false reference pricing that makes it effective. Consumers are typically unaware of falsity of the reference price, and complete their purchases believing that they got a "good deal," and without any way to access comprehensive pricing information necessary to reveal the fraud.

99. Not only are consumers harmed by this practice, but a seller's use of false reference pricing constitutes an unfair method of competition that injures honest competitors that

sell the same or similar products, or otherwise compete in the same market, using only valid and accurate reference prices.

100. ICON engages in false reference pricing as a regular business practice. ICON conveys its deceptive pricing scheme to consumers through promotional materials and the NordicTrack website. ICON's promotional materials and the NordicTrack website are directed toward consumers in all fifty states, including the States of California and Delaware. In addition, ICON advertises and makes sales of its machines through the outlet store it operates in Beaumont, California.

101. ICON uses false reference pricing to advertise and sell the NordicTrack S22i Commercial Studio Cycle (the "S22i bike") and the NordicTrack Commercial S15i Studio Cycle (the "S15i bike")—two bikes released by ICON in early 2018, years after Peloton introduced the Peloton bike. ICON's S22i and S15i bikes are identical in all ways but for the size of their displays: the S22i bike parrots the Peloton Bike by using a 22 inch screen, whereas the S15i bike




uses a smaller, 15 inch screen.

*Above: The S15i and S22i bikes "on sale" on NordicTrack's website*

102. By stating false reference prices for the S22i and S15i bikes, ICON misleads consumers into believing that they are getting a substantial discount when, in reality, its machines were never intended to be sold at the inflated or original price.

103. ICON's false reference pricing constitutes a material misrepresentation; either because a reasonable consumer would attach importance to it, and/or because ICON, as the maker of the representation, knows, or has reason to know, that its recipient regards, or is likely to regard, the false reference price as important in determining his or her course of action. Upon information and belief, ICON intends for consumers to rely on its false reference pricing and purchase its products, instead of the products of competitors, like Peloton, who price their at-home stationary bikes fairly and transparently. Upon information and belief, ICON's deceptive stratagem has caused consumers to purchase its bikes where they otherwise might have purchased the Peloton Bike, causing, among other things, loss of sales, revenue, and market share to Peloton.

104. To illustrate, ICON represents on its NordicTrack website that the S22i bike, which includes a 1-year subscription to iFit, is currently on sale for $1,999. Prominently displayed under the so-called "sale" price is the number $2,999—the inflated, false reference price that ICON represents is the former price of the machine. By juxtaposing the false reference price of $2,999 with the "sale" price of $1,999, ICON hopes to trick the consumer into believing that she or he is saving $1,000 by purchasing the S22i Bike while it is "on sale." ICON has also repeated its false reference price scheme in mailing list advertisements sent to consumers through email.




*Above: Image of the S22i Bike "on sale" on the NordicTrack website, March 2020*




*Above: Image from a NordicTrack mailing list advertisement, sent December 2019*

105. However, ICON never sold, or intended to sell, the S22i bike at the false reference price, making its advertisement deceptive and false.

106. Indeed, ICON's own representations belie its claimed $2,999 reference price. On February 6, 2018, ICON unveiled its new NordicTrack Commercial Studio Cycle series via press release. In that press release, a representative for ICON stated that the S22i bike with a 1-year subscription to iFit had "an MSRP of $2,295," a price significantly lower than the $2,999 false reference price featured on the NordicTrack website. ICON's press release was issued at, or around, the same time the S22i bike was first pushed to market, which demonstrates that ICON never sold, nor intended to sell, the S22i bike at the false reference price. Indeed, ICON's February 6, 2018 press release confirms that the $2,999 price was not a bona fide price, since it was not the price at which the S22i bike was ever offered for sale. Instead, it was adopted for the sole purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

107. In addition, Peloton's preliminary investigation reveals that ICON has been advertising the S22i bike at the "sale" price of $1,999 since at least November 2018. Upon information and belief, ICON's purported "sale" price of the S22i bike was offered much earlier, either simultaneous to its release date, or very shortly thereafter.

108. ICON has engaged in a similar false reference price campaign with the S15i bike. ICON represents on its NordicTrack website that the S15i bike (which includes a 1-year subscription to iFit), is currently on sale at $1,599. Prominently displayed next to the so-called "sale" price is the number $2,499—the inflated, false reference price that ICON represents is the former price of the machine. By juxtaposing the false reference price of $2,499 with the "sale"

price of $1,599, ICON hopes to trick the consumer into believing that she or he is saving $900 by purchasing the S15i bike while it is "on sale."

109. Upon information and belief, ICON never sold, nor intended to sell, the S15i bike at the false reference price of $2,499. Indeed, it is unlikely that ICON ever offered to sell the S15i bike at $2,499 when the same bike with the bigger screen, i.e., the S22i bike, was listed in ICON's February 6, 2018 press release as having an MSRP of only $2,295. Upon information and belief, the $2,499 price was not a bona fide price, since it was not the price at which the S15i bike was ever offered for sale. Instead, it was adopted for the sole purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

110. In addition, Peloton's preliminary investigation reveals that ICON has advertised the S15i bike at the "sale" price of $1,599 since at least August 2019. Upon information and belief, ICON's purported "sale" price of the NordicTrack S15i was offered much earlier, either simultaneous to its release date, or very shortly thereafter.

111. As the foregoing illustrates, the reference, or original, price listed for ICON's products was never offered to customers in the market and/or, at the very least, not offered for a reasonably substantial period of time in the recent, regular course of ICON's business. Indeed, ICON's reference prices are merely a ploy for misleading consumers into believing they are receiving a substantial discount.

112. ICON's scheme to mislead consumers is as pernicious as it is effective. ICON's misrepresentations are likely to, and have already, deceived reasonable consumers. As reflected in comments left by reviewers online, consumers were in fact induced to believe that ICON was offering products at a time-limited, steep discount, rather than at their ordinary, regular price. For example, a fitness writer at BreakingMuscle.com who reviewed a S22i bike advised readers

that the regular price was $2,999, but that there was a $1,000 discount "currently" available, as demonstrated below.




113. Upon information and belief, consumers were misled, and were likely to be misled, by ICON's false reference pricing scheme and purchased ICON products that they otherwise would not have but for ICON's misrepresentation.

114. ICON's false and deceptive advertising practices have harmed Peloton. ICON is a direct competitor to Peloton in the at-home fitness industry—Peloton and ICON compete to make sales of exercise products in the United States, including in California and Delaware. ICON expressly compares its products to Peloton's in order to divert sales away from Peloton and toward itself. For example, in its "Peloton Bike Vs. NordicTrack Bike" YouTube video, ICON's representative advises customers the following:

> *Here are a few things to look for when you compare the two bikes: First, compare Peloton's price. Be sure to note what is included and what is not included. Pay attention to shipping, warranty, and the cost of a 1-year membership. Then, go to NordicTrack.com and total the same options that Peloton offers: the bike, shipping,*

> *warranty, and a 1-year membership. I think you'll be pleasantly surprised at the value you get from NordicTrack.*

A customer who conducts the price comparison directed by ICON can navigate to Peloton's website and discover the true price of the Peloton Bike, i.e., $2,245. The customer who next visits NordicTrack.com will see that a S22i bike was priced at $2,999, but appears to be currently "on sale" at the price of $1,999, and that a S15i bike was priced at $2,499, but appears to be currently "on sale" at the price of $1,599. ICON's YouTube video has over 2.1 million views as of the filing of this Complaint, indicating that significant numbers of consumers have viewed and considered its advertised message.

115. By claiming a false reference price for the S22i and S15i bikes, ICON misleads consumers into believing that its products were historically sold and valued at a far higher price than they were ever offered in the prevailing market. Implicit in the high reference price is a representation that ICON's products have exceptional features, value, or qualities justifying the stated reference price. By falsely "discounting" the S22i and S15i bikes down to the purported current "sale" price, ICON misleads the consumer into thinking that he or she is getting a "good deal." In so doing, ICON undercuts Peloton by offering what appears to be a temporary sale price for what the consumer wrongly perceives to be a higher-value product.

116. As a result of ICON's violations, Peloton has lost, and will continue to lose, sales and profits and incur increased advertising and marketing costs.

## COUNT I

## (Infringement of the ’026 Patent)

117. Peloton incorporates all other allegations in this Complaint and Exhibits 1 and 2, attached hereto.

118. Peloton is the owner of all rights, title, and interest in the ’026 Patent. The ’026 Patent issued on November 26, 2019.

119. The ’026 Patent is valid and enforceable.

120. In violation of 35 U.S.C. § 271(a), ICON makes, uses, offers to sell, and sells ICON products with iFit functionality (specifically the Proform Carbon T7 Treadmill, Proform Carbon CX Bike, Proform Studio Bike Limited, Proform 759R Rower, NordicTrack Commercial X321 Incline Trainer, NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack FS10i Elliptical, NordicTrack Fusion CST Pro, NordicTrack Fusion CST Pro with Rower, NordicTrack RW900 Rower, NordicTrack RW500 Rower, Freemotion T10.9b Reflex Treadmill, Freemotion E10.9b Elliptical and Freemotion R10.96b Recumbent Bike) and thereby directly infringes the ’026 Patent. ICON and ICON products with iFit functionality satisfy each and every limitation of one or more claims of the ’026 Patent. ICON thereby directly infringes one or more claims of the ’026 Patent.

121. In violation of 35 U.S.C. § 271(b), ICON advertises to, sells to, encourages, and instructs third parties, including ICON customers, to use ICON products with iFit functionality. ICON thereby induces infringement of one or more claims of the ’026 Patent, by having the specific intent to induce its customers to infringe the ’026 Patent, despite knowledge that its customers’ acts infringe the ’026 Patent.

122. In violation of 35 U.S.C. § 271(c), ICON offers to sell, and sells, material components of the ’026 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including ICON’s customers. ICON has thereby contributorily infringed, and continues to contributorily infringe, one or more of the claims of the ’026 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the ’026 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

123. ICON’s ongoing infringement is willful as of the filing of this Complaint.

124. Peloton has suffered, and continues to suffer, damages and irreparable harm because of ICON’s ongoing infringement.

125. Unless ICON’s infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

126. Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

**COUNT II**

**(Infringement of the ’521 Patent)**

127. Peloton incorporates all other allegations in this Complaint and Exhibits 1 and 2, attached hereto.

128. Peloton is the owner of all rights, title, and interest in the ’521 Patent. The ’521 Patent issued on May 5, 2020.

129. The ’521 Patent is valid and enforceable.

130. In violation of 35 U.S.C. § 271(a), ICON makes, uses, offers to sell, and sells ICON products with iFit functionality (specifically the Proform Carbon T7 Treadmill, Proform

Carbon CX Bike, Proform Studio Bike Limited, Proform 759R Rower, NordicTrack Commercial X321 Incline Trainer, NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack FS10i Elliptical, NordicTrack Fusion CST Pro, NordicTrack Fusion CST Pro with Rower, NordicTrack RW900 Rower, NordicTrack RW500 Rower, Freemotion T10.9b Reflex Treadmill, Freemotion E10.9b Elliptical and Freemotion R10.96b Recumbent Bike) and thereby directly infringes the ’521 Patent. ICON and ICON products with iFit functionality satisfy each and every limitation of one or more claims of the ’521 Patent. ICON thereby directly infringes one or more claims of the ’521 Patent.

131. In violation of 35 U.S.C. § 271(b), ICON advertises to, sells to, encourages, and instructs third parties, including ICON customers, to use ICON products with iFit functionality. ICON thereby induces infringement of one or more claims of the ’521 Patent, by having the specific intent to induce its customers to infringe the ’521 Patent, despite knowledge that its customers’ acts infringe the ’521 Patent.

132. In violation of 35 U.S.C. § 271(c), ICON offers to sell, and sells, material components of the ’521 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including ICON’s customers. ICON has thereby contributorily infringed, and continues to contributorily infringe, one or more of the claims of the ’521 Patent, despite its knowledge that material components are especially made, or especially adapted, for use in an infringement of the ’521 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

133. ICON’s ongoing infringement is willful as of the filing of this Complaint.

134. Peloton has suffered, and continues to suffer, damages and irreparable harm because of ICON's ongoing infringement.

135. Unless ICON's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

136. Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## COUNT III

**(Violation of Delaware Deceptive Trade Practices Act, 6 Del. Code § 2531, *et seq*.)**

137. Peloton incorporates all other allegations in this Complaint.

138. ICON made false and misleading statements of fact about ICON's products in violation of the Delaware Deceptive Trade Practices Act, which prohibits the "[m]ak[ing of] false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions," 6 Del. Code § 2532(a)(11), and "any other conduct which similarly creates a likelihood of confusion or misunderstanding." *Id.* § 2532(a)(12). Specifically, ICON misrepresents the reference price of the NordicTrack S22i Commercial Studio Cycle and the NordicTrack S15i Commercial Studio Cycle in order to mislead consumers to buy its products.

139. ICON knew, or should have known, that its advertising was false, misleading, and deceptive because it knew that it has not offered, and did not intend to offer, its products for sale at the false reference price.

140. ICON's products are offered in interstate commerce. Similarly, ICON's false and misleading statements were, and are, made in commercial advertising and promotion in interstate commerce.

141. ICON's false and misleading statements have deceived, and have the tendency to deceive, a substantial segment of its intended audience about matters material to purchasing decisions. ICON's violations have caused harm to the public and, unless restrained, will further damage the public.

142. ICON's violations have proximately harmed Peloton. As a result of ICON's violations, Peloton has suffered, and will continue to suffer, damage to its business and goodwill. Peloton has lost, and will continue to lose, sales and profits and incur increased advertising and marketing costs.

143. Peloton's immediate, irreparable injuries have no adequate remedy at law, and Peloton is entitled to injunctive relief. On information and belief, ICON has willfully engaged in its deceptive trade practices and Peloton is entitled to costs and reasonable attorneys' fees pursuant to 6 Del. Code § 2533(b).

**COUNT IV**

**(Violation of Section 43(a) of the Lanham Act)**

144. Peloton incorporates all other allegations in this Complaint.

145. ICON made false and misleading statements of fact about ICON's products in violation of 15 U.S.C. § 1125(a). Those statements misrepresent the nature, characteristics, and/or qualities of ICON's products, and are expressly false, impliedly false, or both. Specifically, ICON misrepresents the reference price of the NordicTrack S22i Commercial Studio Cycle and the NordicTrack S15i Commercial Studio Cycle in order to mislead consumers to buy its products.

146. ICON knew, or should have known, that its advertising was false, misleading, and deceptive because it knew that it has not offered, and did not intend to offer, its products for sale at the false reference price.

147. ICON's false and misleading statements have deceived, and have the tendency to deceive, a substantial segment of its intended audience about matters material to purchasing decisions. ICON's violations have caused harm to the public and, unless restrained, will further damage the public.

148. ICON's deception is material because it is likely to influence the customer's purchasing decision.

149. ICON's violations have proximately harmed Peloton. As a result of ICON's violations, Peloton has suffered, and will continue to suffer, damage to its business and goodwill. Peloton has lost, and will continue to lose, sales and profits and incur increased advertising and marketing costs.

150. Peloton's immediate, irreparable injuries have no adequate remedy at law, and Peloton is entitled to injunctive relief and up to three times its actual damages, and/or an award of ICON's profits, as well as costs and Peloton's reasonable attorneys' fees under 15 U.S.C. §§ 1116–17.

**COUNT IV**

**(Violation of California's Unfair Competition Law ("UCL"),**
**Business and Professions Code § 17200 *et seq*.)**

151. Peloton incorporates all other allegations in this Complaint.

152. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practices, as well as any "unfair, deceptive, untrue or misleading advertising."

153. ICON has violated (and continues to violate) the UCL by engaging in **unlawful** business acts and practices prohibited by the Federal Trade Commission Act ("FTCA"), and California's Consumer Legal Remedies Act ("CLRA").

154. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1) and prohibits the dissemination of false advertisements, 15 U.S.C. § 52(a). The Federal Trade Commission publishes Guides for the interpretation of the FTCA, and warns that "[f]ailure to comply with the guides may result in corrective action by the Commission under applicable statutory provisions." 16 C.F.R. § 1.5.

155. The Federal Trade Commission provides in its Guides Against Deceptive Pricing that fictitious "former price comparisons"—like the ones made by ICON with respect to its NordicTrack S22i Studio Cycle and NordicTrack S15 Studio Cycle bikes—violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.
>
> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such

> a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

16 C.F.R. § 233.1.

156. ICON violates the FTCA by offering a fictitious, rather than bona fide or genuine, former price comparison with respect to its NordicTrack S22i Studio Cycle and NordicTrack S15 Studio Cycle bikes. ICON established an artificial, inflated price for its products so as to enable the subsequent offer of a large reduction to trick consumers into believing that they were getting a bargain. ICON's former price was a false reference price because its products were never openly and actively offered for sale, or were not offered for sale for a reasonably substantial period of time and in honesty or good faith. Instead, ICON published its false former price for the sole purpose of establishing a fictitious higher price on which a deceptive comparison might be based, in violation of the FTCA and the FTC Guides.

157. The CLRA also prohibits ICON's deceptive and misleading conduct. Section 1770(a)(13) of the California Civil Code forbids businesses from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(13).

158. ICON violated the CLRA because it made false and misleading statements of fact concerning the existence and amount of price reductions for the NordicTrack S22i Studio Cycle and NordicTrack S15 Studio Cycle bikes.

159. In addition, ICON has violated (and continues to violate) the UCL by engaging in the **<u>unfair</u>** business acts and practices of engaging in false reference pricing in connection with

the NordicTrack S22i Studio Cycle and NordicTrack S15 Studio Cycle bikes that ICON sold (and continues to sell), such that ICON gains an unfair advantage over lawfully-competing sellers like Peloton.

160. ICON's unlawful and unfair business acts and practices have proximately harmed Peloton. As a result of ICON's violations, Peloton has suffered, and will continue to suffer, damage to its business and goodwill. Peloton has, and will continue to, lose sales and profits and incur increased advertising and marketing costs.

## PRAYER FOR RELIEF

WHEREFORE, Peloton respectfully asks that the Court enter judgment against Defendant ICON as follows:

161. That Defendant ICON has infringed (either literally or under the doctrine of equivalents) directly, jointly, and/or indirectly by way of practicing, inducing or contributing to the infringement of one or more claims of the Peloton Patents;

162. That ICON's ongoing infringement of the Peloton Patents was willful;

163. For temporary, preliminary, and permanent injunctive relief enjoining Defendant ICON and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with it, from infringing, inducing the infringement, or contributing to the infringement of the Peloton Patents;

164. For an award to Peloton for its damages, costs, expenses, and prejudgment and post-judgment interest for ICON's infringement of the Peloton Patents;

165. For an award to Peloton for enhanced damages equal to treble the amount of actual damages, for the willful nature of ICON's acts of infringement as to the Peloton Patents after the date of this complaint, as provided under 35 U.S.C. § 284 and § 154;

166. For a declaration finding this case exceptional under 35 U.S.C. § 285;

167. That ICON has violated federal and state law by engaging in unfair competition, false advertising, and deceptive trade practices;

168. For temporary, preliminary, and permanent injunctive relief enjoining ICON and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with it, from engaging in further acts of unfair competition, false advertising, and deceptive trade practices;

169. For an award to Peloton for its damages, costs, expenses, and pre-judgment and post-judgment interest for ICON's unlawful acts of unfair competition, false advertising, and deceptive trade practices;

170. For an award to Peloton for profits earned by ICON attributable to its unlawful acts of unfair competition, false advertising, and deceptive trade practices;

171. Reasonable attorneys' fees and costs against ICON; and

172. For any and all other relief to which Peloton may show itself to be entitled.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mflynn@mnat.com

*Attorneys for Plaintiff Peloton Interactive, Inc.*

OF COUNSEL:

Steven N. Feldman
Douglas J. Dixon
Christina V. Rayburn
Karen Younkins
Haoxiaohan Cai
HUESTON HENNIGAN LLP
523 West Sixth Street, Suite 400
Los Angeles, CA 90014
(213) 788-7272

May 15, 2020