IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PELOTON INTERACTIVE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ECHELON FITNESS MULTIMEDIA, LLC, ECHELON FITNESS, LLC, ECHELON STUDIO, LLC and VIATEK CONSUMER PRODUCTS GROUP, INC.,<br><br>Defendants. | ) | C.A. No. 19-1903 (RGA) |
| PELOTON INTERACTIVE, INC.,<br><br>Plaintiff and Counter-Defendant,<br><br>v.<br><br>ICON HEALTH & FITNESS, INC.,<br><br>Defendant and Counterclaimant. | ) | C.A. No. 20-662 (RGA) |

# JOINT CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Michael J. Flynn (#5333)
Anthony D. Raucci (#5948)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mflynn@morrisnichols.com
araucci@morrisnichols.com
amoshos@morrisnichols.com

*Attorneys for Plaintiff Peloton Interactive, Inc.*

RICHARDS, LAYTON & FINGER LLP
Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
920 North King Street
Wilmington, DE 19801
302-651-7700
Cottrell@rlf.com
Haynes@rlf.com

*Attorneys for Defendant and Counterclaimant ICON HEALTH & FITNESS, INC*

OF COUNSEL:

Steven N. Feldman
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
(213) 485-1234

Lawrence J. Gotts
Gabriel K. Bell
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
(202) 637- 2200

Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876- 7700

David F. Kowalski
Patrick C. Justman
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

William J. Trach
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

OF COUNSEL:

David R. Wright
MASCHOFF BRENNAN
111 South Main Street, Suite 600
Salt Lake City, Utah 84111
(801) 297-1850

GREENBERG TRAURIG, LLP
Benjamin J. Schladweiler (#4601)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000
schlwadweilerb@gtlaw.com

*Attorneys for Defendants Echelon Fitness Multimedia LLC, Echelon Fitness, LLC, Echelon Studio, LLC, and Viatek Consumer Products Group, Inc.*

OF COUNSEL:

Douglas R. Weider
James L. Ryerson
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
(973) 360-7900

June 2, 2021

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ....1

A. Plaintiff's Opening Position ....1
B. Defendants' Answering Position ....2

II. REPRESENTATIVE CLAIMS ....3

III. AGREED-UPON CONSTRUCTIONS ....3

IV. DISPUTED CONSTRUCTIONS ....4

A. "Class[es]" ....4
1. Plaintiff's Opening Position ....4
2. Defendants' Answering Position ....8
3. Plaintiff's Reply Position ....10
4. Defendants' Sur-Reply Position ....14
B. "Archived exercise class[es]" ....15
1. Plaintiff's Opening Position ....15
2. Defendant's Answering Position ....17
3. Plaintiff's Reply Position ....17
4. Defendants' Sur-Reply Position ....19
C. "Leaderboard" ....20
1. Plaintiff's Opening Position ....20
2. Defendants' Answering Position ....22
3. Plaintiff's Reply Position ....27
4. Defendants' Sur-Reply Position ....29
D. "Performance data" ....31
1. Plaintiff's Opening Position ....31
2. Defendants' Answering Position ....35
3. Plaintiff's Reply Position ....41
4. Defendants' Sur-Reply Position ....46
E. "Cause[s/ing] [the] movement of [a/the] portion of the exercise device" ....49
1. Plaintiff's Opening Position ....50
2. Defendants' Answering Position ....51
3. Plaintiff's Reply Position ....53
4. Defendants' Sur-Reply Position ....54

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)....................32, 50

*Advanced Cardiovascular Sys. v. Scimed Life Sys.*,
261 F.3d 1329 (Fed. Cir. 2001)....................25

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
228 F.3d 1338 (Fed. Cir. 2000)....................7, 22, 26

*Alcon Research, Ltd. v. Apotex Inc.*,
687 F.3d 1362 (Fed. Cir. 2012)....................20

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011)....................6, 21, 25

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)....................37

*Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*,
No. CV 17-688-LPS-CJB, 2019 WL 3814317 (D. Del. June 28, 2019) ....................5

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
114 F.3d 1547 (Fed. Cir. 1997)....................38

*Echelon Fitness Multimedia, LLC v. Peloton Interactive, Inc.*,
IPR Nos. 2020-1186, 2020-1187, 2020-1541....................2

*Elektra Instrument S.A. v. O.U.R. Scientific Int'l.*,
214 F.3d 1302 (Fed Cir. 2000)....................39

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*,
279 F.3d 1022 (Fed. Cir. 2002)....................38, 39, 43, 48

*Flywheel Sports, Inc. v. Peloton Interactive, Inc.*,
Case No. IPR 2019-00564 ....................26, 29

*Fujitsu Limited v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010)....................39

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014)....................44

*Hill–Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed.Cir.2014)....................24

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
822 F.3d 1312 (Fed. Cir. 2016)....................5, 6, 21

*In re Rambus Inc.*,
694 F.3d 42 (Fed. Cir. 2012)....................50

*Indus. Tech. Research Inst. v. Int'l Trade Comm'n*,
567 F. App'x 914 (Fed. Cir. 2014) ....................6, 21

*Kruse Tech. P'ship v. Volkswagen AG*,
544 F. App'x 943 (Fed. Cir. 2013) ....................24

*Laitram Corp. v. Rexnord, Inc.*,
939 F.2d 1533 (Fed. Cir. 1991)....................11

*Lucent Technologies, Inc. v. Gateway, Inc.*,
525 F.3d 1200 (Fed Cir. 2008)....................39

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (F.3d 1995) ....................10, 11, 14, 40

*McClain v. Ortmayer*,
12 S. Ct. 76 (1891)....................36

*Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*,
520 F.3d 1367 (Fed. Cir. 2008)....................39, 48

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005)....................11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................11

*Paice LLC v. Ford Motor Co.*,
881 F.3d 894 (Fed. Cir. 2018)....................32

*Phillips v. AWH*,
415 F.3d 1303,1312-13 (Fed. Cir. 2005) ....................14

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).................... *passim*

*Phonometrics, Inc. v. Northern Telecom Inc.*,
133 F.3d 1459 (Fed. Cir. 1998)....................38

*Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*,
517 F.3d 1364 (Fed. Cir. 2008)....................24

*ResQNet.com, Inc. v. Lansa, Inc.*,
346 F.3d 1374 (Fed.Cir.2003)....................40, 44

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*,
925 F.3d 1373 (Fed. Cir. 2019)....................32

*SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
983 F.3d 1367 (Fed. Cir. 2021)....................12

*Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015)....................38

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....................11, 12, 35, 50

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008)....................39

*TomTom, Inc. v. Adolph*,
790 F.3d 1315 (Fed. Cir. 2015)....................14, 24

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009)....................7, 22, 26

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
473 F.3d 1173 (Fed. Cir. 2006)....................34

*Wasica Finance GmbH v. Continental Automotive Systems, Inc.*,
853 F.3d 1272 (Fed Cir. 2017)....................36

*World Class Tech. Corp. v. Ormco Corp.*,
769 F.3d 1120 (Fed. Cir. 2014)....................21

**TABLE OF EXHIBITS**

| EX. NO. | DESCRIPTION | PAGE |
|---|---|---|
| JCCC Ex. A[1] | U.S. Patent No. 10,486,026 | |
| JCCC Ex. B | U.S. Patent No. 10,639,521 | |
| JCCC Ex. 1 | Excerpts of U.S. Patent No. 9,174,085 | |
| JCCC Ex. 2 | Excerpts of U.S. Patent No. 9,233,276 | |
| JCCC Ex. 3 | Excerpts of U.S. Patent No. 9,861,855 | |
| JCCC Ex. 4 | Excerpts of U.S. Patent No. 10,022,590 | |
| JCCC Ex. 5 | Excerpts of U.S. Patent No. 10,322,315 | |
| JCCC Ex. 8 | Excerpts of the File History of U.S. Patent No. 10,322,315 (Appl. No. 16/036,894), Notice of Allowance, dated Jan. 3, 2019 | |
| JCCC Ex. 9 | Excerpts of the File History of U.S. Patent No. 10,486,026 (Appl. No. 16/412.327), Notice of Allowance, dated July 10, 2019 | |
| P1 | Merriam-Webster Dictionary 2016 | APPX001 |
| P2 | https://www.dictionary.com/browse/class | APPX006 |
| P3 | Echelon Webpage | APPX008 |
| P4 | ICON's NordicTrack Treadmills Webpage | APPX010 |
| P5 | ICON's NordicTrack Exercise Bike Webpage | APPX012 |
| P6 | ICON's NordicTrack iFit Webpage | APPX014 |
| P7 | IFIT, https://www.ifit.com/ | APPX016 |
| P8 | Echelon, Bike App Experience, https://echelonfit.com/pages/bike-app-experience | APPX018 |
| P9 | IFIT BLOG, https://www.ifit.com/blog/whats-the-leaderboard | APPX020 |
| P10 | IFIT, LEADERBOARD, https://www.ifit.com/leaderboard | APPX023 |
| P11 | https://www.dictionary.com | APPX026 |
| D1 | Excerpts of U.S. Patent Application No. 16/866,499 | APPX028 |
| D2 | Bloomsburg Dictionary of Computing 2010 (definition of dynamic) | APPX035 |
| D3 | IBM Dictionary of Computing 1994 (definition of dynamic) | APPX038 |

[1] "JCCC Ex." refers to exhibits filed with the Joint Claim Construction Chart, D.I. 107 in C.A. 19-1903 and D.I. 76 in C.A. No. 20-662.

| | | |
|---|---|---|
| D4 | Random House Webster's College Dictionary 1999 (leaderboard definition) | APPX042 |
| D5 | Concise Oxford Dictionary 2008 (leaderboard definition) | APPX046 |
| D6 | American Heritage Dictionary 2009 (leaderboard definition) | APPX050 |
| D7 | Collins Online English Dictionary 2013 (leaderboard definition) | APPX052 |
| D8 | *Peloton Interactive, Inc. v. Flywheel Sports, Inc.*, 2:18-cv-00390-RWS-RSP, D.I. 159, Joint Claim Construction Chart, D.I. 159 | APPX055 |
| D9 | *Flywheel Sports, Inc. v. Peloton Interactive, Inc.*, Case No. IPR 2019-00564, Paper 33 | APPX059 |
| P12 | *Peloton Interactive, Inc. v. Flywheel Sports, Inc.*, 2:18-cv-00390-RWS-RSP, D.I. 159, Joint Claim Construction Chart, D.I. 159 | APPX063 |
| P13 | *Echelon Fitness Multimedia, LLC v. Peloton Interactive, Inc.*, IPR2020-01186, Deposition of Kevin Jeffay, Ph.D. dated March 29, 2021 | APPX081 |
| P14 | Oxford English Dictionary (on demand definition) | APPX090 |
| P15 | Compact Oxford English Dictionary (generate definition) | APPX092 |
| D-10 | *Echelon Fitness Multimedia, LLC v. Peloton Interactive, Inc.*, IPR2020-01186, Deposition of Kevin Jeffay, Ph.D. dated March 29, 2021 | APPX096 |
| D-11 | Oxford Concise English Dictionary | APPX103 |
| D-12 | Random House Webster's Unabridged Dictionary | APPX109 |

# I. INTRODUCTION

## A. Plaintiff's Opening Position

There are two related patents at issue: Nos. 10,486,026 (the "'026 Patent," JCCC Ex. A) and 10,639,521 (the "'521 patent,"[2] JCCC Ex. B) (collectively, the "Patents-in-Suit").[3] The Patents-in-Suit, owned by Plaintiff Peloton Interactive, Inc. ("Peloton"), are directed at systems and methods for providing exercise classes using Peloton's revolutionary technology. If a user is participating in an archived class, the patents disclose displaying a dynamically updating ranked list of the user's performance parameter synchronized with those of users who previously took the same class. *See, e.g.*, JCCC Ex. A at 2:43-67. This dynamically updating ranked list simulates competition. *Id.* at 13:19-27.

Seeking to piggyback on Peloton's success, Defendants sell exercise products that embody Peloton's patented technology. Despite copying Peloton's patents—and touting the benefits of those inventions to customers—Defendants nevertheless attempt to manufacture non-infringement and invalidity arguments through incorrect constructions of six terms.

Each of Defendants' proposed constructions departs from the plain and ordinary meaning in light of the intrinsic record and should be rejected under Federal Circuit precedent. And although Defendants in some instances propose "plain and ordinary meaning," they neither explain what that meaning is nor provide meaningful intrinsic support. In other instances, Defendants propose narrowing limitations that are equally without support in the intrinsic record.

---

[2] The '026 patent is at issue in both litigations; the '521 Patent is at issue in *Peloton v. ICON* only. Peloton has sued Echelon on the '521 Patent in a separate suit, No. 21-160-RGA.

[3] Representative citations are made to the specification of the '026 Patent (Ex. A), but incorporate corresponding citations to the '521 Patent specification (Ex. B), which is substantively identical.

By contrast, Peloton proposes constructions that reflect the plain and ordinary meanings in light of the claims, written description, and prosecution history. Where appropriate, Peloton provides limited extrinsic evidence, further supporting the meanings of everyday words that Defendants seek to redefine.

Peloton respectfully requests that the Court adopt its proposed constructions.

**B. Defendants' Answering Position**

The Patents-in-Suit claim systems and methods for home exercise over the Internet. (JCCC Ex. A & Ex. B). While Peloton alleges that Defendants copied its revolutionary patented technology, the undisputed facts tell a different story. The Patent Trial and Appeal Board has instituted *inter partes* review proceedings on all three patents Peloton asserted against the Echelon entities in Civil Action 19-1903 (RGA)—two of which (U.S. Patent Nos. 10,022,590 and 10,322,315) were subsequently dismissed from that case—based in part on a patent issued to ICON Health & Fitness, Inc. ("ICON") whose filing predates Peloton's patents by at least nine years. *See Echelon Fitness Multimedia, LLC v. Peloton Interactive, Inc.*, IPR Nos. 2020-1186, 2020-1187, 2020-1541.

Seeking to salvage its patents and avoid prior art, Peloton asks the Court to construe readily understood terms like "class" and "leaderboard," in order to improperly import limitations from exemplary embodiments into the claims. Similarly, in the hopes of conjuring up infringement claims where none exist, Peloton seeks to rewrite its claims so that "performance data" can be the same as "performance parameters," despite that the claims unequivocally require the latter to be "generate[d] on the basis of" the former. For the reasons that follow, Defendants respectfully request that the Court adopt their proposed constructions of the disputed claim terms.

## II. REPRESENTATIVE CLAIMS

’026 Patent claim 1:

> An exercise system for computer-augmented use at home by a first user participating in an *archived exercise class* accessible over a computer network, the exercise system comprising:
> an exercise device configured for a first user to *cause movement of a portion of the exercise device*;
> a sensor operable to generate first user *performance data* based on activity by the first user when the first user *causes the movement of the portion of the exercise device*; and
> a computer configured to:
> cause a display screen to present a plurality of available *archived exercise classes* for selection;
> accept from the first user, via a user input interface, a selection of one of the available *archived exercise classes*, thereby resulting in a selected *archived exercise class*;
> receive, via the computer network, data representing content of the selected *archived exercise class*;
> cause the display screen to display the content of the selected *archived exercise class* while the first user participates in the selected *archived exercise class by causing movement of the portion of the exercise device*;
> receive, via a sensor input interface, the first user *performance data* from the sensor during at least a portion of the selected *archived exercise class*;
> generate, on a basis of the first user *performance data*, a first user *performance parameter*;
> receive, via the computer network, archived *performance data* representing archived user *performance parameters* for a plurality of other users over at least the portion of the selected *archived exercise class*, wherein the archived *performance data* was previously generated by the other users in one or more locations on the exercise device or at least one other exercise device while participating in the *archived exercise class*;
> synchronize the archived *performance data* with the first user *performance data*, wherein the archived user *performance parameters* represented by the archived *performance data* are synchronized with the first user *performance parameter*; and
> cause the display screen to display a *dynamically updating ranked list* of the first user *performance parameter* and at least some of the synchronized archived user *performance parameters*, to thereby simulate the first user competing with at least some of the other users.

’026 Patent claim 8:

> The exercise system of claim 1, wherein the computer is further configured to generate a *leaderboard* from the archived *performance data* and the first user *performance parameter*, the *leaderboard* representing *performance parameters* at the same point in the selected *archived exercise class*, and to display the *leaderboard* on the display screen.

## III. AGREED-UPON CONSTRUCTIONS

The parties have agreed to the following proposed constructions:

| Term | Claims | Agreed-upon Construction |
|---|---|---|
| Performance parameters | ’026 Patent Claims: 1, 3, 5, 8, 11-14, 19; ’521 Patent Claims: 1, 3, 5, 8, 11-14, 19 | “numerical values relating to a user’s performance in an exercise class” |
| Dynamically updating ranked list[4] | ’026 Patent Claims: 1, 11, 13; ’521 Patent Claims: 1, 11, 13 | Plain and ordinary meaning in light of the intrinsic evidence, which is: “ranked list in which the rankings are dynamically updated during the class” |

## IV. DISPUTED CONSTRUCTIONS

### A. “Class[es]”

| Claims | Peloton’s Construction | Defendants’ Construction |
|---|---|---|
| ’026 Patent Claims 1, 2, 4, 5, 7-9, 11-16, 18; ’521 Patent Claims 1, 2, 4, 5, 7-9, 11-16, 18 | Plain and ordinary meaning in light of the intrinsic evidence, which is: “instructor led course[s] of instruction” | Plain and ordinary meaning |

#### 1. Plaintiff’s Opening Position

The claim term “class[es]” should be given its plain and ordinary meaning in light of the intrinsic evidence, which is “[an] instructor led exercise course[s] of instruction.” Peloton’s proposed construction reflects the overwhelming intrinsic evidence, which indicates—consistent with the normal usage—that the claimed “exercise class[es]” must be led by an instructor. While

[4] Although Defendants originally disputed the construction of this term, Defendants agreed to Peloton’s proposed construction after briefing in a 5/26/21 email. The agreed-upon construction is reflected in this chart.

Defendants also propose "plain and ordinary meaning," they do not explain what that meaning is.[5] Defendants appear to dispute whether the claimed "exercise class" requires an instructor. That position contradicts the intrinsic record as well as the well-understood meaning of this term, and should be rejected.

*First*, the inclusion of an instructor distinguishes the claimed "exercise class[es]" from other forms of exercise activities. This is supported by the written description, which repeatedly and consistently uses "class[es]" according to its plain and ordinary meaning – *i.e.*, including instructors. In describing the prior art, the background section explains that "gyms offer classes such as cycling classes where the instructor and participants exercise on stationary bikes accompanied by music." JCCC Ex. A at 1:52-55.

The written description uses this same meaning in describing the inventions. For example, it describes the "present invention" as an improved way to take classes, referencing the "instructor" that leads them. *See id.* at 1:52-2:4, 4:9-15 ("In various embodiments, the present invention . . . allows the user to fully participate in live instructor-led or recorded cycling classes ...."). The written description similarly references the instructors that lead the "classes." And although certain aspects of what the instructor can see and/or do vary among embodiments, the "classes" always have an instructor. *See id.* at 4:20-26 ("The networked exercise systems and methods may also include one or more studio or other recording locations with cameras, microphones, and audio and/or visual outputs where an instructor can lead cycling classes …."); 6:2-4 ("Trends can also

---

[5] Numerous courts have observed that this approach is unhelpful. *See Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1321 (Fed. Cir. 2016) ("[F]ocusing on a particular term's plain and ordinary meaning may be inadequate, when relying on that meaning does not resolve the parties' dispute."); *Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*, No. CV 17-688-LPS-CJB, 2019 WL 3814317, at *2 (D. Del. June 28, 2019) ("The problem is that Plaintiffs never go on to explain what that widely accepted meaning actually is.") (internal citation omitted).

be determined, stored, and displayed to the user, the instructor, and/or other users."); 7:14-18 ("Referring to FIG. 5, such a home screen may provide direct links to information such as ... instructors 208 ...."); 9:33-36 ("The various video streams may include live or recorded streaming instructor video …."); 12:46-49 ("In various exemplary embodiments, instructors may also be able to set performance targets ….").

Indeed, every figure that depicts a screen and/or users shows instructors. *See id.* at Fig. 6 (displaying a "class schedule" sortable by "instructors" (216 in top right), and depicting all classes with the instructor "Stephanie"); Fig. 7 (displaying menu of instructors and three categories of "classes," for instructor "Stephanie"); Figs. 13 & 14 (displaying menu bar listing "Instructors"). This too supports Peloton's proposed construction. *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1334 (Fed. Cir. 2011) (specification supports limiting construction where "the relevant figures each show" that limitation); *Howmedica*, 822 F.3d at 1321 (adopting construction supported by "every figure in the patent that discusses the issue"); *Indus. Tech. Research Inst. v. Int'l Trade Comm'n*, 567 F. App'x 914, 918 (Fed. Cir. 2014) ("All of the figures and the language of the specification consistently indicate that the entire sheet must be constructed in the shape of an arc."). The figures and written description provide no example of any "class" that is not instructor-led, or even what could constitute such a "class."

*Second*, extrinsic evidence further underscores that a "class" must have an instructor. For certain non-technical words, the plain meaning "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). In such circumstances, reference to general purpose dictionaries is appropriate. *See id.* at 1322-23.

"Class"—particularly in the context of an "exercise class"—is such a term and has a widely-understood meaning that is consistent with its use in the Patents-in-Suit. *See, e.g.*, Ex. P1, Appx005, Merriam-Webster Dictionary 2016 (defining "class" as "a course of instruction"); Ex. P2, Appx007, https://www.dictionary.com (defining "class": as "a meeting of a group of students for instruction").

Moreover, despite apparently disputing that a "class" necessarily includes an instructor, Defendants use the term consistently with Peloton's proposed construction on their client-facing websites. *See, e.g.*, Ex. P3, Appx009, Echelon Webpage, ("Explore thousands of live and on-demand studio fitness classes led by expert trainers to get in-shape from the comfort and safety of home."); Ex. P4, Appx011, ICON's NordicTrack Treadmills Webpage ("As you burn calories in your studio class or trail run through the Grand Canyon your personal trainer controls your speed, incline and decline on your treadmill …."); Ex. P5, Appx013, ICON's NordicTrack Exercise Bike Webpage ("Access on-demand classes with the world's best personal trainers …."); Ex. P6, Appx015, ICON's NordicTrack iFit Webpage ("These classes with our trainers are meant to pump you up and push you to your own personal limits."); Ex. P7, Appx017, iFIT, https://www.ifit.com/ ("Work out with motivating trainers in Studio Classes.").

The Federal Circuit has emphasized that an accused infringer's statements concerning a term are relevant to claim construction. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1348 (Fed. Cir. 2009) (considering accused infringer's use of term for claim construction); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1349 (Fed. Cir. 2000) (affirming construction based on "usage by [defendant] of th[e] term" as well as "the usage of th[e] term by [defendant's manufacturer] in its Owner's Manual for the [accused product]").

Defendants' apparent intention to hide behind the veil of "plain meaning" to assert that "class(es)" need not be instructor-led contradicts the intrinsic record, disregards the plain meaning of "class[es]," and should be rejected. The Court should adopt Peloton's proposed construction to head-off any such arguments under the guise of "plain meaning."

**2. Defendants' Answering Position**

The term "class" should be given its plain and ordinary meaning. Peloton attempts to transform a simple and well understood class into a class that *requires* an instructor. The intrinsic and extrinsic evidence does not support such a limitation and Peloton is simply adding it to avoid prior art. Peloton has not identified lexicography, disclaimer, or any intrinsic or extrinsic evidence that would justify limiting the term "class." And Peloton has not shown a clear and unmistakable attempt to import the additional limitation of "instructor-led" into the class term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

If Peloton wanted to limit the scope of its alleged invention to only "trainer-led" or "instructor-led" classes, it could have done so in the claim language. But the claims are not limited in any such way, even though there are examples of instructor-led classes in the specifications of the asserted patents and in a related and pending application (i.e., Peloton has claimed "instructor-led exercise classes" in its pending U.S. Patent Application No. 16/866,499 at claims 1, 12, 17 (*See* Ex. D1, Appx030-034)). In other words, Peloton knew how to distinguish between classes and instructor-led classes, as demonstrated by its pending claims that specifically include "instructor-led exercise classes" and the sections of the specifications discussed below. But Peloton chose not to claim "instructor-led" classes in the asserted claims. And while there are examples of instructor-led classes in the specifications, that does not mean the scope of all asserted claims is limited to those examples, particularly when the specification identifies other types of classes contemplated by the patentee.

The patents also identify that "[i]n various exemplary embodiments, the system may also be configured to provide for closed classes. This would allow for a private instructor to work with an individual or small group, or for a group of users to ride together with or without an instructor." (JCCC Ex. A at 14:33–41) (emphasis added). The specification clearly contemplates classes that are not instructor-led.

The specification further provides for other types of class content, such as classes that are generated by a local user with no indication of it being an instructor-led environment,[6] competition within or across classes such as "classes or sessions like multi-stage bicycle races,"[7] video streamed content in which "the various video streams may include live or recorded streaming instructor video or any other video content,"[8] or "awarding badges or other honors for completion of a variety of different types of classes or classes led by different instructors."[9] Therefore, the intrinsic record clearly contemplates classes that are: (1) generated by a local user (not an instructor); (2) video streams that may [optionally] include an instructor; and (3) classes that are not instructor-led. The intrinsic evidence does not support Peloton's specialized definition of "class." Peloton is improperly trying to import limitations from the specification.

The extrinsic evidence likewise does not support Peloton's construction. First, neither of the dictionary definitions cited by Peloton actually includes the proposed limitation of "instructor-led." This is consistent with the intrinsic evidence which acknowledges that a class in some

---

[6] "In various exemplary embodiments, content may be also be generated locally by users. For example, stationary bikes 102 may be equipped with recording equipment including microphones and cameras. Users may generate live or recorded classes that can be transmitted, stored in the system, and distributed throughout the network." (JCCC Ex. A at 11:40–46).

[7] (JCCC Ex. A at 15:11–20)

[8] (JCCC Ex. A at 9:30–36)

[9] (JCCC Ex. A at 15:31–33)

instances *may* be "instructor-led" and in some may not be. Second, Peloton's citation to Defendants' webpages does nothing to support that the plain and ordinary meaning of "class" in the patent requires the limitation of "instructor-led" or that Peloton's proposed construction is a special industry term of art. To the extent this type of extrinsic evidence is even persuasive or proper, it actually suggests the opposite. If the plain and ordinary meaning of "class" truly carried with it the inherent requirement of "instructor-led" then neither defendant would not need to clarify to consumers that their classes are "led by expert trainers" or that "trainers" are a featured part of the offered "classes."

**3. Plaintiff's Reply Position**

Defendants do not deny that the weight of the intrinsic evidence indicates that "class" in the term "archived exercise class" is used according to its plain meaning—an instructor-led course of instruction. The specification is replete with references to the instructors who lead the claimed "exercise classes." (Br. at 5-7.)

Defendants nevertheless seek to broaden the scope of "class" (and "archived exercise class") so that an instructor is not required. Defendants leave unanswered what they consider to be the "plain and ordinary meaning" of "class," perhaps recognizing that any attempted explanation of an instructorless class defies common understanding and logic. However, Defendants suggest that a "class" can be any group or collection of users, with or without an instructor or instruction. Defendants provide no explanation of what these instructorless (or instructionless) classes would look like, how they would proceed, or why the Court should disregard the intrinsic record and redefine the term. Defendants' suggestion is unsupported and not based on plain meaning, lexicography, disclaimer, or any other rationale that withstands scrutiny.

Defendants' primary argument derives from a pending Peloton patent application whose claims expressly recite that the "exercise classes" are "instructor-led." Defendants assert that the claims' inclusion of "instructor-led" constitutes an admission that "class" in and of itself requires no instructor (or instruction). (Br. at 8.) But importantly, that application was filed after a litigation where another defendant argued, similar to here, that exercise classes do not require instructors. *See* Ex. P12, Appx064-80.[10] Serially facing such (unmeritorious) arguments, Peloton drafted claims to recite *expressly* that which would be readily understood as the plain meaning of the term "class" to obviate future *Markman* disputes. That prudent decision should not redefine "class" in earlier patents.[11]

Defendants next argue that the following portion of the Asserted Patent specification tacitly redefines "class" (and "archived exercise class") in the Asserted Claims:

> In various exemplary embodiments, the system may also be configured to provide for *closed classes*. This would allow for a private instructor to work with an individual or small group, or for a group of users to ride together with or without an instructor."

(Br. at 8-9, citing JCCC Ex. A at 14:33-4.) But this brief passage does not support that an "archived exercise class," or a "class" generally, is nothing more than a group of users.

*First*, Defendants' reliance on the purported specialized meaning of "closed classes" in the cited passage negates their assertion that the "plain and ordinary meaning" prevails, and that no

---

[10] That case settled before any final *Markman* ruling, but the Court's tentative ruling construed "classes" as "led by an instructor."

[11] Defendants' argument is one of claim differentiation, which is a tool, and nothing more. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). It is inapplicable here where the resulting meaning is inconsistent with the intrinsic evidence. *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (construing "board" as "wood" despite dependent claim reciting "[a] *wood* decking board" and noting "[d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper.").

further construction or explanation is required. Defendants should not be permitted to avoid construction or explanation now, and to assert later their specialized interpretation to the jury. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Defendants' proposal—"plain and ordinary meaning"— without explanation, must be rejected.

*Second*, the cited passage is a far cry from the express definition required to redefine the terms "class" or "archived exercise class" contrary to their common understanding and usage permeating the specification—namely, as requiring an instructor (and instruction). *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning.'"). Rather, the two-sentence passage discusses a system that can be "configured to provide for closed classes" in which a private instructor works with an individual or small group of users. As described, a system so configured would *also* permit users to ride together without an instructor. The paragraph does not "clearly set forth a definition" of the terms "class" or "exercise class" (or for that matter, "closed classes") as any group riding together, with our without an instructor (or instruction). *Id.*

*Third*, even if the term "closed class" was defined by the cited passage, the claim terms "exercise class" and "archived exercise class" are not. And none of the claims recite a "closed class." Although terms share the word "class," if Defendants are correct that a "closed class" does not require an instructor, it falls outside the plain meaning of "exercise class" or "archived exercise class" and represents at most an unclaimed embodiment.[12] *See SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1379 (Fed. Cir. 2021) (citation omitted) ("The

[12] It would make little sense to archive such a "closed class" under Defendants' purported definition (*i.e.*, a closed group of users) for later access by additional live users, and the claims do not support such a reading.

mere fact that there is an alternative embodiment disclosed in the asserted patent that is not encompassed by our claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence.").

Defendants next point to a number of extraneous specification cites that purportedly describe non-instructor-led environments. None suggest that "classes" are instructorless (or instructionless). For example, in the embodiment where "content may also be generated locally by users" (Br. at 9; JCCC Ex. A at 11:40-46), the user who generates the classes becomes the instructor. Indeed, the same paragraph explains that the locations for recording class content can include "amateur and home-based locations," (JCCC Ex. A. at 11:29-33), referencing the situation where the user records instruction for the "class."

Defendants next cite to a disclosure that "video streams that may [optionally] include an instructor." (Br. at 9.) That describes what video streams may be presented simultaneously, and does not state that the "class" need not have an instructor. Rather, the display may show multiple windows, with one always displaying live or archived class content, and additional optional windows displaying video content. The optional other video content may include "instructor video or any other video content," but the first window displays exercise class content regardless. JCCC Ex. A at 9:30-36. Similarly, that mini-competitions *can* be created "within a class" or "across multiple classes" does not mean that an instructor is not required. Indeed, the specification is explicit that such mini-competitions can be created by "*the instructor* or users." *Id.* at 15:10-12. The reference to "the instructor" is consistent with the ordinary meaning of "class" including an instructor. The description of awarding badges or other honors for completion of "different types of classes or classes *led by different instructors*" further supports classes having an instructor.

Defendants appear to ignore the word "different" and to reimagine the sentence as "different types of classes *or classes led by* [] *instructors*."

Finally, Defendants attempt to distinguish their own usages of "class" on their websites as requiring an instructor. Defendants argue that their statements merely "clarify to consumers that their classes are 'led by expert trainers,'" (Br. at 10), suggesting that potential clients would not know whether Defendants' exercise classes include instructors. But Defendants' statements do not clarify *whether* their classes have an instructor. That much is evident from the word "class." Rather, they clarify the *roles* (*e.g.*, "your personal trainer controls your speed, incline and decline) and *quality* (*e.g.*, "led by *expert* trainers") of their classes' instructors.

The plain meaning of "class," as used in the claim term "archived exercise class," requires an instructor. Peloton's proposed construction should be adopted.

**4. Defendants' Sur-Reply Position**

Peloton claims the specification is "replete" with references to classes that are instructor led. However, the specification also includes examples of classes that are "with or without an instructor" and video content that does not require an instructor.[13] It is unmistakable that Peloton contemplated classes that were not instructor-led. However, in the face of prior art, Peloton is now trying to limit classes to "instructor-led"—but the claims include no such limitation and Peloton has not shown a clear and unmistakable attempt to import an "instructor-led" limitation. *Phillips v. AWH*, 415 F.3d 1303,1312-13 (Fed. Cir. 2005). Even the dictionary definitions that Peloton relies upon do not include "instructor-led." Peloton is simply taking an embodiment from the specification and importing limitations from that embodiment into the claims. *See TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1328 (Fed. Cir. 2015).

---

[13] (JCCC Ex. A at 9:30-36; 15:11-20; 15:31-33)

Peloton knows how to claim instructor-led classes, as it is currently doing in pending prosecution. Peloton attempts to construe this as an attempt to deal with “meritless” *Markman* arguments. But using the words “instructor-led” in its pending claims has to mean something, and it must be narrower than simple “classes.”

**B. “Archived exercise class[es]”**

| Claims | Peloton’s Construction | Defendants’ Construction |
|---|---|---|
| ’026 Patent Claims 1, 2, 4, 5, 7-9, 11-13, 15, 16, 18<br>’521 Patent Claims 1, 9, 11, 16 | Plain and ordinary meaning in light of the intrinsic evidence, which is: “stored recording[s] of [an] instructor led exercise course[s] of instruction” | Plain and ordinary meaning, or alternatively, “on-demand classes” |

**1. Plaintiff’s Opening Position**

The claim term “archived exercise class[es]” should be given its plain and ordinary meaning, which is a “stored recording[s] of [an] instructor led exercise course[s] of instruction.” Defendants do not agree that an “archived exercise class” is a “stored recording,” instead proposing that it be merely “on-demand.” That position is inconsistent with the intrinsic evidence and should be rejected.

The written description repeatedly describes “archived exercise classes” as recorded content stored in a database. The summary of the invention explains that “the digital video and audio content are archived content provided from a database.” JCCC Ex. A, at 2:33-35. The detailed description goes on to explain that “[r]emote users… can access recorded classes archived in the system database.” JCCC Ex. A at 4:46-49. Similarly, the written description states that the exercise system displays “video, music, voice, text, or any other data” that “represent[s] a… previously recorded cycling class.” *See* JCCC Ex. A at 12:4-6.

To be sure, the Patents-in-Suit explain that they "relate[] to a system and method for providing" two types of exercise classes: "live streaming" and "on-demand." JCCC Ex. A at 1:31-33. But the written description does not leave open what is meant by "on demand" as Defendants propose. Rather, the written description specifies that these two types of classes are either "live or archived," and uses "archived" interchangeably with "recorded," consistent with Peloton's proposed construction. *See, e.g.*, JCCC Ex. A at 2:15-16 ("Receiving from the first user a selection of one of the available live or archived cycling classes…"); 4:43-45 ("the invention also allows an unlimited number of remote users to view the same live or recorded content simultaneously…"); 8:5-6 ("FIGS. 8-10 show a primary window 220 showing the live or archived class that the user selected."); 9:30-31, ("one video stream may be the live or archived class content shown in the primary window…"); 9:33-35 ("The various video streams may include live or recorded streaming instructor video or any other video content…"); 11:44-46 ("Users may generate live or recorded classes that can be transmitted, stored in the system, and distributed throughout the network."); 12:4-6 ("This primary data stream… may represent a live or previously recorded cycling class."); 13:60-61 ("The timeline for the class itself, whether live or archived…").

Defendants' proposed construction appears to be designed to allow argument that a simulated or computer-generated class—as opposed to one that previously took place live and was recorded—would satisfy the "archived class" limitation. That position is inconsistent with the written description. In addition to using "archived" and "recorded" interchangeably, the written description consistently describes sharing data across classes that were once live—*i.e.*, were recorded, including by referring to "past participants" in the archived classes. *See, e.g.*, JCCC Ex. A at 4:49-54 ("[A] plurality of remote users can simultaneously access the same recorded class and interact with each other in real time, or they can access the same recorded class at different

times and share data and communications about their performance or other topics."); 9:41-44 (the claimed inventions "allow the user to see a range of information regarding other current or past participants to compare performance, and open or close voice or video chat streams or other communication channels").

Defendants' attempt to contradict the intrinsic record and rewrite the plain and ordinary meaning of "archived exercise class[es]" should be rejected. The Court should adopt Peloton's proposed construction.

### 2. Defendant's Answering Position

For the same reasons discussed above for the term "class," the term "archived class" should also be given its plain and ordinary meaning (i.e., not instructor-led and not a stored recording).

In addition to Peloton's instructor-led arguments discussed above, Peloton's also argues that "archived classes" are "stored recordings." The specification does not indicate that a "stored recording" is the only format to store class content. The specification states that "the various video streams may include live or recorded streaming instructor video or any other video content."[14] Peloton's additional limitation for "archived" is unnecessary and only injects confusion.

To the extent a construction is needed for the "archived" portion of "archived class," Defendants have proposed, in the alternative, that "on-demand" be used so that a finder of fact can better understand the asserted patents' distinction between live content and archived content. The specification teaches that the distinction between live classes and archived classes is that archived classes are stored and available "on-demand" as opposed to a scheduled live event. (JCCC Ex. A at 6:57–60; Fig. 5).

### 3. Plaintiff's Reply Position

[14] (JCCC Ex. A at 9:30–36)

Defendants do not dispute that their motivation in proposing that "archived" be construed as "on demand" in the claim term "archived exercise class" is to broaden the claims to embrace simulated or computer-generated sessions. Such simulations were never live and were thus never recorded, but may nevertheless be available "on demand." (Br. at 16.) Defendants' proposal is inconsistent with the intrinsic record and should be rejected.

The specification states expressly that the claimed "archived exercise classes" are "recorded." (Br. at 16.) Defendants do not address that evidence or even contend that Peloton's proposed construction is contrary to the intrinsic record. Instead, they argue that it is "unnecessary and only injects confusion." (*Id.* at 17.) Defendants, however, fail to explain how the phrase "stored recordings" is confusing or why these everyday words could possibly confuse the jury.

Indeed, Defendant Echelon's expert in an *inter partes* review proceeding Echelon brought against a related Peloton patent offered Peloton's proposed construction almost verbatim. When asked "[w]hat does that term '*archived cycling class*' mean in the context of U.S. Patent No. 10,022,590 (Ex. 4), Echelon's expert testified, "archived cycling class content is just simply I think to be understood as *content from a cycling class that was stored*." Ex. P13, Appx082-089, 23:18-24:2; *see also id.*, 27:1-4 ("I said a person of ordinary skill in the art would understand 'archived cycling class content' simply to be content relating to a cycling class that was archived *or stored*.").

Moreover, although Defendants claim that their proposal seeks to help the "finder of fact [] better understand the asserted patents' distinction between live content and archived content," (Br. at 17), it does just the opposite. Defendants' goal is to eliminate the requirement that the claimed "archived exercise classes" were once live by rewriting the claim to cover simulated content. As described above, that position is flatly inconsistent with the intrinsic evidence and should be rejected. (Br. at 16.)

"On-demand" is defined as "done or available when required or requested; providing or requiring a commodity, service, etc., on demand." Ex. P14, Appx091. This definition simply does not reconcile with the claims' requirement of "archived exercise classes." While "archived exercise classes" may be available "on-demand," *i.e.*, in immediate response to a user's press of the button, "on-demand" cannot be used to replace "archived." Indeed, Peloton's live exercise classes could also be considered "on-demand" for a rider using the device while such a class was streaming. The claims use the term "archived" to distinguish from "live" and to refer to classes that were once live, but were recorded and stored for later access by users. "On-demand" does not capture the full scope of this distinction and should be rejected.

The plain meaning of the term "archived" in light of the intrinsic evidence requires a stored recording. Peloton's proposed construction should be adopted.

**4. Defendants' Sur-Reply Position**

The specification discloses more than "stored recordings" to store class content. (JCCC Ex. A at 9:30–36.) For example, "the various video streams may include live or recorded streaming instructor video *or any other video content*." (*Id.*) (emphasis added.) Peloton fails to even address the "any other video content" in its reply brief; instead, Peloton focuses solely upon a type of on-demand class which is "recorded." (Br. at 18-19.) Other video content exists that does not need to be recorded. For example, a virtual course.

Peloton's citation to a dictionary definition of "on-demand" does not undercut Defendants' construction. Specifically, Peloton advances the nonsensical argument that, under the cited definition, its "live exercise classes could also be considered 'on-demand' for a rider using the device while such a class was streaming." (Br. at 19.) But as common sense and the definition cited by Peloton dictates, "on-demand" content must be "available when required or requested." (*Id.*) A "live" class clearly does not satisfy the definition of "on demand" because a

user cannot request or require a "live" class to be available at *any* time the user wants. (JCCC Ex. A at Fig. 6.)

Peloton's argument concerning Echelon's expert's testimony in an *inter partes* review is misleading. (Br. at 18.) Peloton claims this expert testified that archived class content is "stored" content. (*Id.*) However, Peloton failed to include the expert's testimony where he stated that he was not offering an opinion on whether an archived exercise class required "a stored recording of an instructor-led class" (Ex. D-10, APPX099 (Jeffay Deposition) 98:7–10.) In addition, the expert stated that Peloton's definition of "archived exercise class" was "awfully narrow" with respect to requiring the recording of a video of an instructor (*Id.*, APPX099-100 at 98:11–99–21.) And even if the expert had opined on "archived" content, the expert's statement would not support Peloton's construction. Peloton's argument up until the citation to the expert focused on "recorded" classes. (Br. at 18.) The expert stated that archived classes are "stored." (*Id.* at 27:1–4.) On-demand video content must be stored somewhere if it is to be accessible "on-demand." Video content, however, need not be "recorded" at some point to be "stored" (e.g. "simulated or computer-generated sessions" (Br. at 18)).

**C. "Leaderboard"**

| Claims | Peloton's Construction | Defendants' Construction |
|---|---|---|
| '026 Patent Claims 8, 13, 14;<br>'521 Patent Claims 8, 13, 14 | Plain and ordinary meaning in light of the intrinsic evidence, which is: "numerically-ordered list ranking users" | Plain and ordinary meaning |

**1. Plaintiff's Opening Position**

The claim term "leaderboard" should be given its plain and ordinary meaning in light of the intrinsic evidence, which is "[a] numerically ordered list ranking users." Peloton's proposed construction adheres to this plain and ordinary meaning in light of the overwhelming intrinsic

evidence, which indicates that the leaderboard displays a numerically-ordered ranking of users. While Defendant also propose the "plain and ordinary meaning," they apparently dispute that it requires the ranked list of users to be numerically-ordered, while providing no further explanation or alternative. That position contradicts the intrinsic evidence and should be rejected.

*First*, the claims specify that the "leaderboard" depends from the limitation to a "dynamically updating ranked list." *See* JCCC Ex. A at Claim 13 ("display[ing] a dynamically updating ranked list further comprises generating a leaderboard"). Because the dependent claims to the "leaderboard" must be narrower than the claims from which they depend, *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012), the POSA would understand that the leaderboard is a specific type of "dynamically updating ranked list." Moreover, Claim 13's recitation that the "dynamically updating ranked list comprises generating a leaderboard," makes clear that the "dynamically updating ranked list" itself is something broader than a "leaderboard." *See World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1125 (Fed. Cir. 2014) ("The doctrine of claim differentiation creates a presumption that distinct claims, particularly an independent claim and its dependent claim, have different scopes.").

*Second*, the written description and figures consistently describe the leaderboard as a numerically-ordered ranked list of users. Every figure depicting a leaderboard shows a numerically-ordered ranked list. In Figures 8-11, leaderboard 234 is illustrated on the right side of user interface 200. In each figure, the users are assigned a number (displayed on the left side of their name) that corresponds with that user's output such that user 15 has a higher output than user 16, who has a higher output than user 17, etc. Those figures indicate that the claimed "leaderboard" refers to a numerically-ordered list ranking users. *See Am. Piledriving*, 637 F.3d at 1334; *Howmedica*, 822 F.3d at 1321; *Indus. Tech. Research*, 567 F. App'x at 918.

Similarly, disclosures describing optional leaderboard features are all consistent with it being a ranked list of the various users. *See, e.g.*, JCCC Ex. A at 8:33-37 ("leaderboard 234 may also be displayed to allow the user to see their performance in comparison to others taking the same class"); 8:53-53; 8:66-9:2 ("leaderboard 234 may be fully interactive, allowing the user to scroll up and down through the rider rankings" and "the leaderboard will also allow the user to view their position and performance information at all times while scrolling through the leaderboard").

*Finally*, Defendants' use of "leaderboard" on their client-facing websites to refer to numerically-ordered ranked lists of users further confirms that the common understanding of the term requires a numerically-ordered ranked list. *See* Ex. P8, Appx019, Echelon, Bike App Experience, https://echelonfit.com/pages/bike-app-experience (displaying a numerically-ordered ranked list of users over a description that states: "Ride live with the Echelon Community and inspire each other to climb the leaderboard"); Ex. P9, Appx021, IFIT BLOG, https://www.ifit.com/blog/whats-the-leaderboard (ICON defines the iFit leaderboard as "a ranking list of all the participants that competed in a challenge, showing the order of who finished first to last"); Ex. P10, Appx024-025, IFIT, LEADERBOARD, https://www.ifit.com/leaderboard (showing the leaderboard as a numerically-ordered ranked list of users). Defendants' usage of the term is relevant to claim construction. *Ultimax*, 587 F.3d at 1348; *Ajinomoto*, 228 F.3d at 1349.

Defendants' attempt to contradict the intrinsic record, ignore claim differentiation, and deviate from the plain and ordinary meaning of "leaderboard" in the context of an exercise class should be rejected. The Court should adopt Peloton's proposed construction.

**2. Defendants' Answering Position**

"Leaderboard" is a readily understood term and its construction "involves little more than the application of widely accepted meaning of commonly understood words." *Phillips v. AWH*

*Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). Consistent with the words "leader" and "board," the widely accepted meaning of "leaderboard" is a board (or scoreboard) showing the leaders in a competition.[15] Peloton has pointed to no special definition of "leaderboard" in the specification or disavowal in the intrinsic record requiring a construction inconsistent with the plain and ordinary meaning. Indeed, the parties agree that the "plain and ordinary meaning" of the term "leaderboard" should control. Peloton's construction should be rejected because it is vague and improperly reads a limitation from "exemplary" embodiments into the claims. It is also inconsistent with the plain and ordinary meaning of "leaderboard."

Adoption of Peloton's construction—a "numerically-ordered list ranking users"—will only serve to confuse the jury, because it is unclear how the list must be numerically ordered. The claims already require that the system displays a "dynamically updating ranked list" of users' "performance parameters"—a term the parties agree means "numerical values relating to a user's performance in an exercise class." (JCCC at p. 1; JCCC Ex. A & B at claims 1 & 11). It is unclear whether the mere ranking of users based upon their numerical "performance parameter" satisfies Peloton's construction of "leaderboard" or if something more is required.

Based upon its opening claim construction brief, Peloton appears to be arguing that the "leaderboard" must include a numerical ranking corresponding to the users' standing in the competition (e.g., 1st place, 2nd place, 3rd place, etc.). That construction should be rejected because it is inconsistent with the plain meaning of "leaderboard" and improperly imports

---

[15] *See* Ex. D4, Appx045, Random House Webster's College Dictionary 1999 (defining "leaderboard" as "a display of those leading in a contest, as a golf tournament"); Ex. D5, Appx 049), Concise Oxford English Dictionary 2008 (defining "leaderboard" as "a scoreboard showing the names and current scores of the leading competitors, especially in a golf match); Ex. D6, Appx051, American Heritage 2009 (defining leaderboard as "a board that displays leaders in a competition"); Ex. D7, Appx053, Collins Online English Dictionary 2013 ("a scoreboard listing the contestants who are currently leading a golf tournament, auto race, etc.")

limitations from "exemplary" embodiments into the claims. Peloton's arguments to the contrary are unavailing.

First, Peloton asserts that claim differentiation dictates a numerical-ranking requirement be read into the claims, otherwise the dependent claims requiring a "leaderboard" would not be narrower than the independent claims requiring a "dynamically updating ranked list" of user "performance parameters." (Br. at 21.) But that argument incorrectly assumes that the independent claims and the dependent leaderboard claims have the same scope absent importation of a numerical-ranking requirement. They do not. Based upon their inclusion of the term "leaderboard," the dependent claims require a board displaying the leaders of the competition. In contrast, the independent claims only require a "ranked list" (which may or may not be in the form of a board or scoreboard) comparing "the first user's performance parameter" with "at least some of" the "performance parameters of archived users" (who may or may not be among the leaders). (*See*, *e.g.*, JCCC Ex. A at claim 1 (emphasis added.))

Moreover, the doctrine of claim differentiation merely serves as an "aid in interpreting the scope of the claims"; it is not "conclusive." *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008). The "presumption will be overcome where the ordinary meaning of the words" do not support the construction, *Kruse Tech. P'ship v. Volkswagen AG*, 544 F. App'x 943, 951 (Fed. Cir. 2013), or where the written description "dictate[s]" a "contrary construction." *Regents*, 517 F.3d at 1375. Here, the widely accepted meaning of "leaderboard" is a board (or scoreboard) display showing the leaders in a competition; the plain meaning does not require a numerical ranking corresponding to the competitor's standing in the competition. (*See* Leaderboard Definitions, *supra* pg. 23, fn 15.)

Nor does the specification, which only mentions "ranking" once and assigns no significance to numerical rankings, support importing a numerical-ranking requirement into the claims. The Federal Circuit "has repeatedly cautioned against importing limitations from an embodiment into the claims." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1328 (Fed. Cir. 2015). Accordingly, courts should "depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed.Cir.2014). Peloton does not contend that either of those circumstances is present here, and, therefore, the plain meaning of "leaderboard" must govern.

Peloton's reliance upon "exemplary" embodiments and admittedly "optional" features does not dictate otherwise. First, Peloton asserts that "every figure depicting a leaderboard shows a numerically-ordered rank list" (Br. at 21 citing Figures 8-11), but Peloton fails to mention that the specification describes those figures as only "exemplary embodiment[s]." (JCCC Ex. A at 3:33-45). Peloton then cites to disclosures concerning "optional leaderboard features." (Br. at 22). Unfortunately for Peloton, it is improper to import limitations from exemplary figures into claims when the specification assigns no significance to them. *See Advanced Cardiovascular Sys. v. Scimed Life Sys.*, 261 F.3d 1329, 1339 (Fed. Cir. 2001) (all drawings showing "parallel alignment" of elements "does not support adding such a limitation to the claims" where "nothing in specification assigns significance" to the parallel alignment). At bottom, the specification here does not limit the "leaderboard" of "the present invention" in any way (let alone to one that requires numerical rankings); it seeks to broadly cover "various exemplary embodiments" in which the leaderboard "may" include a variety of optional features. (JCCC Ex. A at 8:33-9:10.) This stands in stark contrast to the Federal Circuit authority cited by Peloton holding that statements in the specification describing "the invention *as a whole* can support a limiting construction of a claim

term." *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1334 (Fed. Cir. 2011) (emphasis added).

Finally, the fact that the leaderboards on Defendants' websites happen to include numerical rankings does not "confirm[]" a "common understanding" that the term "leaderboard" as used in the patent claims should be narrowly interpreted to require as much. (Br. at 22.) Indeed, in another prior case, Peloton proposed that the term "leaderboard," as used in related patents, be construed to mean "an ordered list that identifies, during a cycling class, multiple users with at least one numerical value associated with each user that relates to the user's performance in the cycling class." (*See* Ex. D8, Appx057-058, *Peloton Interactive, Inc. v. Flywheel Sports, Inc.*, 2:18-cv-00390-RWS-RSP, D.I. 159, Joint Claim Construction Chart, D.I. 159, at 19-20 (construing leaderboard claims in related U.S. Patent Nos. 9,861,855 ("the '855 patent") and 10,322,315).) Similarly, in an IPR proceeding involving the related '855 patent, Peloton asserted that a POSA would understand "leaderboard" to mean "an ordered list that identifies, during a class, multiple users and a performance parameter." (*See* Ex. D9, Appx061-062, *Flywheel Sports, Inc. v. Peloton Interactive, Inc.*, Case No. IPR 2019-00564, Paper 33, pgs. 43-44.) In sum, prior to the instant cases, Peloton did not believe "leaderboard" should be construed to require a numerical ranking.

Further, the cases Peloton cites concerning defendants' "usage of the term" are inapposite. (*See* Br. at 22.) In each case, the defendant made an affirmative statement supporting the plaintiff's proffered construction. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1348 (Fed. Cir. 2009) (the conclusion that "the patent drafter likely meant 'anhydrite and not anhydride'" is supported by the defendant's use of "the word 'anhydride' when they mean 'anhydrite' with no resulting confusion"); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1349 (Fed. Cir. 2000) (Defendant's statements describing threonine as a chromosome

fragment rebutted defendant's contention as to the proper scope of the claimed chromosome DNA fragments). In contrast, merely displaying numerical rankings on a leaderboard does not serve as an admission that the plain and ordinary meaning of "leaderboard" requires numerical rankings.

**3. Plaintiff's Reply Position**

Defendants' arguments regarding "leaderboard" are premised upon the term having a "widely accepted meaning" that does not require the competitors to be numerically ordered. Defendants are incorrect.

Defendants rely heavily on dictionary definitions, but those dictionaries do not support Defendants' proposed construction. Although Defendants' argue that their cited definitions are silent as to whether a leaderboard must display users in a numerically-ordered ranking, a careful review shows that they do support that requirement, consistent with Peloton's proposal.

Defendants' cite to the Free Dictionary definition of "leaderboard" as "a board displaying the names and current scores of the leading competitors." (Br. at 23, n.15, Ex. D6.) Defendants ignore the phrase "*leading* competitors," which implicitly requires that the competitors be numerically-ranked.[16] In fact, Defendants' Free Dictionary Exhibit goes on to use "leaderboard" in a sentence, referring to golfers "hoping to establish themselves *near the top of the leaderboard* heading into the weekend." (*Id.*) Defendants' cited Collins Online English Dictionary has a similar disclosure, referencing a golfer who "[s]hot himself *right on up the leader board* at the PGA Championship." (Br. at 23, n.15, Ex. D7.)

The dictionaries' references to the "top of" or "up the" leaderboard require the leaderboard to be a numerically-ordered list ranking performers, with the best listed at the top. Thus, even

[16] Defendants' cited Concise Oxford English Dictionary includes the same "leading competitors" language. (Def. Br. Ex. D5)

Defendants' cherry-picked dictionary definitions prove that Peloton's proposed construction reflects the plain meaning of the term. The Asserted Patents use "leaderboard" throughout the specification consistent with this plain meaning. (Br. at 21-22.)

This plain meaning is also consistent with Defendants' usage outside of this litigation. (*Id.*, at 22.) Defendants do not deny that their websites use "leaderboard" to refer to a numerically-ordered list ranking users. They instead argue that their websites do not make *affirmative* statements supporting Peloton's proposed construction. That is false. Not only do Defendants use leaderboard consistently with Peloton's proposed construction, but both Defendants have also made affirmative statements indicating that their leaderboards are numerically-ordered lists ranking users:

- Echelon: "Ride live with the Echelon Community and inspire each other to *climb the leaderboard*." Ex. P8, Appx019, https://echelonfit.com.au/pages/bike-app-experience
- ICON: "The leaderboard is a *ranking list* of all the participants that competed in a challenge, *showing the order of who finished first to last*." Ex. P9, Appx021, https://www.ifit.com/blog/whats-the-leaderboard

Defendants' remaining arguments are equally meritless. Defendants claim that "it is unclear how the list must be numerically ordered." (Br. at 23.) It is hard to imagine what is unclear about "numerical ordering." The "dynamically updating ranked list" requires users to be "ranked." The dependent claims specifying a leaderboard further require that the rankings be numerically-ordered, consistent with the term's plain meaning described above. There is no risk that the jury will be confused by that straightforward concept.

Defendants next argue that the "leaderboard" may simply require that the dynamically updating ranked list be a "*board* displaying the leaders of the competition." That argument merely rehashes Defendants' incorrect construction of the term, and such circular arguments are

unhelpful. Something more than a dynamically updating ranked list is required by the dependent claim. Only Peloton's proposal meets that requirement.

Finally, Defendants cite to Peloton's proposed construction of leaderboard in a different litigation and IPR. Peloton's proposal in those cases described an ordered list with numerical values, and is fully consistent with Peloton's current construction, which adds further clarity. And in any event, the patents at issue in those cases did not claim a leaderboard depending from a "dynamically updating ranked list." As explained above, this claim language further elucidates the scope of the "leaderboard" consistent with Peloton's proposed construction.

Peloton's proposed construction should be adopted.

#### 4. Defendants' Sur-Reply Position

While Peloton attempts to couch its proposal as a "plain and ordinary meaning" construction, Peloton concedes in its reply that its construction actually relies upon other claim language, the "dynamically updating ranked list" limitation, that Peloton contends "elucidates the scope of the 'leaderboard.'" But Peloton's arguments concerning the surrounding claim language are flawed, and its concession that neither lexicography nor disavowal applies here dictates that the plain meaning of "leaderboard" be adopted.

Despite arguing that the plain meaning of "leaderboard" requires that participants receive numerical rankings corresponding to their standing in the competition, Peloton fails to cite any evidence defining "leaderboard" to require as much. Instead, Peloton argues that certain dictionaries "implicitly" require that a "leaderboard" include numerical rankings because (1) their definition references "*leading* competitors" or (2) they include exemplary sentences discussing competitors moving "up" or to the "top" of the "leaderboard." But neither of these examples requires that contestants be *numerically* ranked, as Peloton contends. Moreover, Peloton's admission that a "leaderboard" must show "leading competitors" confirms that its proposed

construction, which does not require the "numerically-ordered list ranking users" to include the leaders, is not correct.

Peloton's contention that the plain meaning of "leaderboard" requires numerical rankings is also directly contradicted by its own construction of "leaderboard" in the *Flywheel* case, where Peloton's proposal—"an ordered list that identifies, during a cycling class, multiple users with at least one numerical value associated with each user that relates to the user's performance in the cycling class" (Ex. D9, Appx062)—did *not* require numerical rankings. Peloton's assertion that its current construction "is fully consistent with . . . [and] adds further clarity" to its prior construction is false: the old construction required numerical values relating to user performance (i.e., performance parameters) whereas Peloton's current construction imports a new limitation (numerical rankings) into the claims.

In attempting to justify its shifting construction, Peloton asserts that "the "dynamically updating ranked list" limitation "elucidates the scope of the 'leaderboard,'" and that "[s]omething more than a dynamically updating ranked list is required by the dependent claims" that add the "leaderboard" limitation. Peloton's claim differentiation argument lacks merit, as one does not have to import a "numerical ranking" requirement into the dependent claims to ensure a difference in claim scope. As Defendants explained in their answering brief, and Peloton failed to respond to, the "leaderboard" claims require a <u>board</u> displaying the <u>leaders</u> of the competition, whereas the independent claims merely require a "ranked <u>list</u>" (which may take any form) comparing "the first user's performance parameter" with "at least <u>some of</u>" the "performance parameters of archived <u>users</u>" (who are not necessarily the leaders).

Finally, Peloton tellingly offers no citation (other than to its opening brief) to support its assertion that the Asserted Patents' use of "leaderboard" throughout the specification requires

numerical rankings. As Defendants argued in their answering brief, and Peloton does not contest, the Figures in the specification that Peloton cites to are expressly described as "exemplary," and it is improper to read limitations from exemplary embodiments into the claims.

At bottom, the jury does not need instruction on the "plain and ordinary" meaning of "leaderboard," and Peloton's construction (which does not even expressly require the numerical ranking requirement it advocates for) will only serve to confuse the jury and import a limitation from exemplary embodiments into the claim.

### D. "Performance data"

| Claims | Peloton's Construction | Defendants' Construction |
| --- | --- | --- |
| '026 Patent Claims 1, 8, 11, 13, 15, 18, 19;<br>'521 Patent Claims 1, 8, 11, 13, 15, 18, 19 | Plain and ordinary meaning in light of the intrinsic evidence, which is: "data reflecting performance" | "data reflecting performance distinct from 'performance parameters'" |

#### 1. Plaintiff's Opening Position

The parties agree that the claim term "performance parameter[s]" refers to "numerical value[s] relating to a user's performance in an exercise class." D.I. 107 at 1. The parties also agree that the claim term "performance data" refers to "data reflecting performance." The only remaining dispute is whether the claimed "performance parameters" and "performance data" must be completely distinct, as Defendants propose. That negative limitation contradicts the intrinsic record and should be rejected.

*First*, the claim language is consistent with Peloton's proposed construction and impossible to square with Defendants' proposal. Nothing in the claims compels a construction that "performance parameters" must be different and distinct from "performance data." Rather, the claim language itself makes clear that "performance parameters" are the "performance data" that are "synchronized" and displayed on the "dynamically updating ranked list." *See, e.g.*, JCCC Ex.

A at Claim 1. The claims further specify that "a first user performance parameter" is "generate[d]" using "performance data" (which, in turn, is generated by the "sensor"). *See, e.g.*, JCCC Ex. A at Claim 1. Dependent Claim 3 lists certain exemplary "performance parameters" – "pedal cadence," "power output," and "heartrate of the first user." JCCC Ex. A at Claim 3.

In some instances, the "performance data" collected at the sensor will need to be transformed to generate a "performance parameter." For example, the claimed "performance parameter" "power output," may be generated using "performance data" such as "pedal cadence" and "resistance." In other instances, the "performance data" collected at the sensor will not require any transformation to generate a "performance parameter." For example, the claimed "performance parameter," "pedal cadence" is generated from the "performance data," "pedal cadence," (*i.e.*, how fast the user is pedaling).

In both examples, the claim language indicates to the POSA that regardless of whether the "performance parameter" in question is calculated, the resulting "performance parameter" is still "performance data." For example, '026 Patent Claim 1 includes the step "receiv[ing], via the computer network, archived performance data ***representing archived user performance parameters***." This language indicates that, consistent with Plaintiff's proposed construction, "performance parameters" are a form of "performance data." On the other hand, Defendants' proposed construction, which treats the two terms as distinct, cannot be reconciled with this claim language and should be rejected. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003); *Phillips*, 415 F.3d at 1314.

Various claims from patents related to the Patents-in-Suit further support this interpretation and contradict Defendants' proposal. For example, Dependent Claim 18 of U.S. Patent No.

9,233,276[17] includes displaying "performance data" in "secondary windows via the user interface." Dependent Claims 19 and 20 further specify that this "performance data" includes "pedal cadence" and "power output," both of which are also claimed as "performance parameters" in the Patents-in-Suit. *See* JCCC Ex. A at Claim 3; JCCC Ex. B at Claim 3. Claiming "pedal cadence" and "power output" as both "performance data" and "performance parameters" makes sense under Peloton's proposed construction, in which "performance parameters" are a type of "performance data," but cannot be reconciled with Defendants' proposed negative limitation, in which the terms are completely separate. Inconsistency with the language of the claims—including in related patents—forecloses Defendants' proposal. *See, e.g.*, *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 902-03 (Fed. Cir. 2018) (using claims of parent patent to aid in construction of term in patent at issue); *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1378 (Fed. Cir. 2019) ("Where multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.") (citation omitted).

*Second*, the written description is consistent with the claim language and indicates that "performance data" include "performance parameters." For example, Figure 17 is described as a "chart showing an exemplary embodiment of a method for synchronizing data among different users participating in the same live or on-demand cycling class." JCCC Ex. A at 3:57-59. The written description describes this figure in further detail:

> Live and past performance data or target *performance data* for the user can also be *displayed simultaneously* to allow users to compare their performance to a benchmark in real time during or after a class.

[17] Both Patents-in-Suit are in the same family as U.S. Patent No. 9,233,276.

JCCC Ex. A at 14:12-19. This "displaying" language mirrors the claimed language; except the claims are directed to displaying a dynamically-updating ranked list of "performance parameters" for comparison, rather than "performance data." The simple explanation is that "performance parameters" are a type of "performance data."

Similarly, the written description discloses that the display may include secondary windows. In one section, it explains that:

> The user interface may also provide additional windows that can be used to display a range of content including additional *performance data*, information about the class, instructor, other riders, etc., or secondary video streams.

JCCC Ex. A at 9:37-40. In a separate section, the written description explains that:

> In various exemplary embodiments, further comprising presenting the *performance parameters* in a secondary window.

JCCC Ex. A at 2:35-37. Again, this is fully consistent with Peloton's proposed construction and irreconcilable with Defendants' proposal.

*Third*, the prosecution history reflects the plain meaning of "performance data" and is inconsistent with Defendants' proposed negative limitation. Issued Claim 1 of related U.S. Patent No. 10,322,315 contains the following limitation:

> dynamically displaying one or more performance parameters for a second user at a second location on the display screen at the first location such that at least one of the *performance parameters for the first user* at the plurality of points in the selected exercise class and *at least one of the performance parameters for the second user* at the same points in the selected exercise class are presented for comparison on the display screen at the first location.

JCCC Ex. 5 at 16:3-11. In allowing that claim, the Examiner characterized certain differences between the claim and the prior art in the following way:

> Neither Schwartz nor the other prior art of record discloses displaying information about live and archived classes which can be digitally accessed and viewed at a first location, and *comparing and displaying exercise data of the first and a second user* at a plurality of points in a selected exercise class.

JCCC Ex. 8 at 6.

The Examiner's reference to the compared and displayed "performance parameters" as "exercise data" is yet another example of intrinsic evidence that is consistent with Peloton's proposed construction. The Examiner understood the claimed "performance parameters" to be a form of "performance data." This, too, cuts against Defendants' proposed negative limitation. *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1183 (Fed. Cir. 2006) (finding the examiner's understanding of the disputed claim term "support[ed] a broad construction").

Defendants nevertheless seek to impose the negative limitation that "performance data" must be "distinct from performance parameters." Importantly, while Defendants assert their constructions of other disputed terms reflect the plain and ordinary meanings, Defendants do not even posit that their proposed construction here reflects the plain and ordinary meaning of "performance data." This is unsurprising, but also fatal to Defendants' proposal. Federal Circuit authority is clear; unless a patentee acts as its own lexicographer or disavows the full scope of a claim term, a term must be given its ordinary meaning. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The few statements Defendants include in the Joint Claim Chart come nowhere close to satisfying the demanding standards for imposing their proposed limitation, which require a "clear and unmistakable" restriction on claim scope. *Id*. at 1367.

Defendants' attempt to contradict the intrinsic record and impose a baseless negative limitation on "performance data" should be rejected. The Court should adopt Peloton's proposed construction.

**2. Defendants' Answering Position**

The drafters of the ‘026 and ‘521 patents claimed “*performance data*” and “*performance parameters*” as distinct elements. The plain language of claims 1 of the ’026 and ’521 patent requires:

- “a sensor operable to generate first user *performance data* based on activity by the first user …”
- “a computer configured to: … receive … the first user *performance data* from the sensor … [and] generate, on the basis of the first user *performance data*, a first user *performance parameter*”

(JCCC Ex. A at Claim 1 and Ex. B at Claim 1 (emphasis added).) The claimed “performance data” cannot also be the claimed “performance parameter” because the claims require one to be generated on the basis of the other.

Peloton seeks to read this unequivocal requirement out of the claims because it has no infringement theory absent a construction under which a single performance metric (i.e., the users’ total power output as displayed on defendants’ accused systems) can be both the claimed “performance data” and the claimed “performance parameters” generated on the basis of that data. Clearly it cannot. The dispute here is not about a negative limitation; it is about whether the claim should be read as written or read as Peloton wishes the claim had been written. Unfortunately for Peloton, it is bound by the claims that it wrote, which unambiguously require “performance data” and “performance parameters” to be distinct claim elements. *See McClain v. Ortmayer*, 12 S. Ct. 76, 78 (1891) (“When the terms of the claim in a patent are clear and distinct … the patentee is bound by it. He can claim nothing beyond it.”).

The hypothetical examples offered by Peloton demonstrate the absurdity of its position. Specifically, Peloton asserts that:

> In *some instances*, the “performance data” collected at the sensor will need to be transformed to generate a “performance parameter.” For example, the claimed “performance parameter” “power output,” may be generated using “performance data” such as “pedal cadence” and “resistance.” In *other instances*, the

> "performance data" collected at the sensor will not require any transformation to generate a "performance parameter." For example, the claimed "performance parameter," "pedal cadence" is generated from the "performance data," "pedal cadence," (i.e., how fast the user is pedaling).

(Br. at 32) (emphasis added). The first example – generating "power output" from the performance data "pedal cadence" and "resistance" – is consistent with the claim language requiring "performance data" and "performance parameters" to be distinct claim elements. The second example—generating "pedal cadence" from "pedal cadence" —is nonsensical, as is the notion of "generating" something without any change or transformation. Peloton's second example would also render superfluous the requirement that the user's "performance parameter" be "generate[d] on the basis of" the user's "performance data." *See Wasica Finance GmbH v. Continental Automotive Systems, Inc.*, 853 F.3d 1272, 1288 n.10 (Fed Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous"); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006) ("allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would … leav[e] … the public to guess about which claim language the drafter deems necessary to his claimed invention.").

If Peloton wanted the claims of the '026 and '521 patents to cover a sensor directly generating a performance parameter without the need for any further transformation, it could have drafted them to require as much. Indeed, Peloton knew how to write such a claim, because it drafted claim 1 of U.S. Patent No. 10,022,590 (which is no longer asserted in these cases) to require "sensors operable to detect activity by the first user and generate first user performance parameters," absent any transformation. (JCCC Ex. 4 at Claim 1.) But the claims of the '026 and '521 patents plainly require the transformative step of a computer receiving the sensor-generated "performance data" and then "generat[ing]" a "performance parameter" "on the basis of" that data.

Not surprisingly, the claim limitations cited in Peloton's brief do not support its reading of the claim. First, Peloton contends that "the claim language itself makes clear that the 'performance parameters' are the 'performance data' that are 'synchronized.'" (Br. at 31.) Tellingly, Peloton fails to quote the claim language it references, which provides that "the archived user performance parameters ***represented by*** the archived user performance data are synchronized with the first user performance parameter." ('026 patent, claim 1 (emphasis added).) Use of the phrase "represented by" makes clear the "performance parameters" and "performance data" are not the same; instead, as the claim language dictates, "performance parameters" are generated on the basis of "performance data." Peloton then cites the language in claim 1 of the '026 patent requiring the computer to "receive… archived performance data ***representing*** ***archived user performance parameters***" to support its argument that the two can be the same thing. (Br. at 32.) But, again, use of the term "representing" confirms the "performance data" and "performance parameters" are not the same.

Peloton seeks to salvage its untenable position that the two can be the same by pointing to related patent claims, exemplary embodiments in the specification, and a related patent's prosecution history. But there is no rescuing Peloton's construction, under which "pedal cadence" can be generated from "pedal cadence." Apart from the additional flaws discussed below, Peloton's construction necessarily fails because the "claim language itself defines the scope of the claim" and "a construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claims themselves." *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997). The claims here leave no doubt that the claimed "performance data" and "performance parameters" must be distinct. *See Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015) ("When claim language

has a plain meaning as the language does here, leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably supports a different meaning.”).

Peloton’s related patent claims argument cites the legal axiom that the common terms in claims of common ancestry should generally be interpreted consistently and contends that the use of the term “performance data” in related U.S. Patent No. 9,233,276 (“the ’276 patent”) forecloses a construction in which “performance parameters” and “performance data” must be distinct. (Br. at 32-33.) But Peloton’s argument fails to consider that “the more precise statement of the axiom [is that] ‘[a] word or phrase *used consistently* throughout a claim should be *interpreted consistently*.’” *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030-31 (Fed. Cir. 2002) (quoting *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (emphasis added in *Epcon Gas*); *see also Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*, 520 F.3d 1367, 1376 (Fed. Cir. 2008) (refusing to construe “condition code” identically in two claims of the same patent because term is “not surrounded by uniform claim language” and would result in an “apparent nonsensical reading under a uniform construction”). Here, the claims of the ’026 and ’521 patents require that “performance parameters” be “generate[d] on the basis” of “performance data” whereas the claims of the ‘276 patent lack any such requirement. Thus, given the differences in the surrounding claim language, the use of “performance data” in the ’276 patent claims is inconsistent with its use in the ’026 and ’521 patent claims and the claims of the patents need not be construed the same.

Peloton’s reliance upon “exemplary embodiments” from the specification also lacks merit (Br. at 33-34) because “the claims of the patent need not encompass all disclosed embodiments. [Federal Circuit] precedent is replete with examples of subject matter that is included in the

specification, but is not claimed." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) (refusing to construe claim to cover an embodiment that would "contradict the language of the claims"); *see also Fujitsu Limited v. Netgear Inc.*, 620 F.3d 1321, 1337 (Fed. Cir. 2010) (rejecting contrary embodiments where claim requires sending "time extension information" and patentee's argument "would have us read time extension information entirely out of the claim"); *Elektra Instrument S.A. v. O.U.R. Scientific Int'l.*, 214 F.3d 1302, 1308 (Fed Cir. 2000) ("unambiguous language of the amended claims controls over contradictory language in the written description"). Indeed, where the claim language is unambiguous, the Federal Circuit has even "construed the claims to exclude all disclosed embodiments." *Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215-16 (Fed Cir. 2008).

While the clear claim language trumps any specific embodiment disclosed in the specification, Defendants' proposed construction conforms with disclosed embodiments in which sensor data is used to calculate distinct performance metrics. For example, the specification describes sensors that can "measure a range of performance metrics" and "[h]ardware and software within the sensors or in a separate package may be provided to <u>calculate</u> and store a wide range of performance information." (JCCC, Ex. A at 5:45-62 (emphasis added).) The "performance metrics can be <u>calculated</u> as current/instantaneous values, maximum, minimum, average, or total over time using any other statistical analysis." (*Id. at* 5:66-6:2 (emphasis added).) Other examples of calculated performance metrics include "custom scores … of the users' performance" "for a particular class" as well as custom scores "<u>calculated using performance data</u> from some or all classes or sessions over a particular period of time." (*Id.* at 9:11-17 (emphasis added).)

Finally, Peloton argues that the Examiner's use of the term "exercise data" in paraphrasing the allowed "performance parameter" claims of related U.S. Patent No. 10,322,315 supports its

rewrite of the plain language. (Br. at 34-35.) It does not. Like its related claims argument, Peloton's prosecution history argument is misplaced because the '315 patent claims lack the requirement that the "performance parameters" be "generate[d] on the basis of" the "performance data." *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed.Cir.2003) ("Although a parent patent's prosecution history may inform the claim construction of its descendent ... prosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language."). Further, like specific embodiments in the specification, the prosecution history cannot overcome the unambiguous claim language requiring "performance data" and "performance parameters" to be distinct. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (F.3d 1995) (the prosecution history "cannot enlarge, diminish or vary the limitations in the claims").

**3. Plaintiff's Reply Position**

Facing overwhelming intrinsic evidence inconsistent with their proposed construction, Defendants argue that the "dispute here is not about a negative limitation" and that Peloton's position is that "performance data" and "performance parameters" are "the same thing." (Br. at 36-38.) Defendants are incorrect on both counts. The intrinsic evidence should control, and Peloton's proposal should be adopted.

There is no basis for Defendants' negative limitation requiring that "performance data" be completely distinct from "performance parameters." As Peloton explained, all performance parameters are performance data, but not all performance data is a performance parameter. Claim 19 of the '521 Patent thus recites "wherein *performance data* content received by at least one of the other users *includes the first user performance parameter*," confirming that performance data includes performance parameters. JCCC Ex. B at Claim 19. And the independent claims tell the POSA which are which. The archived and first user performance data that are synchronized and

displayed in order to "simulate the first user competing with at least some of the other users" are the claimed performance parameters. Other performance data that is not synchronized and displayed does not constitute or represent the claimed performance parameters.

There are many possible examples of performance data—only some of which might be selected for synchronization and display as performance parameters. For example, as Defendants point out, the specification discloses that performance parameters may include "custom scores calculated using performance data from some or all classes or sessions over a particular period of time." (Br. at 40, citing Ex. A at 9:11-17.) This performance data can include the "number of classes in a given time period." (*Id.*) The custom score is itself performance data because it is data reflecting the user's performance. It is also a performance parameter because it will be synchronized and displayed. The number of classes the user has taken in a given time period likewise is performance data because it is data reflecting the user's performance. However, because it will never be synchronized and displayed, it is not a performance parameter.

Another such example would be certain portions of performance data that are not capable of being synchronized and displayed and therefore are not performance parameters. The POSA would understand that the claimed exercise systems may use internet protocol (IP) to send and receive data, including performance data. Such data is sent and received in packets. *See* JCCC Ex. A at 11:24-28 ("performance data may be broken up into small packets or 'pieces' and distributed among user devices"). Each packet contains a small amount of performance data. The POSA would understand that receipt of more than one such packet by the exercise device may be required in order to for it to receive enough data to represent the "performance parameter" as claimed. In this context, although each IP packet is performance data, it is not in and of itself, a performance parameter. However, each IP packet would be performance data representing the

performance parameter, as claimed, and the IP packets collectively would be the performance parameter that is synchronized and displayed.

As Peloton addressed, Defendants' negative limitation makes no sense, and contradicts the express language of claim 1. (Br. at 35-36.) The balance of the intrinsic record similarly refutes Defendants' proposed negative limitation.

*First*, Defendants' proposed construction cannot be reconciled with their own unequivocal admissions regarding '026 Patent claim 3. Defendants admit that "pedal cadence" is an example of "performance data" within the scope of the claims. (*See* Br. at 37 ("generating 'power output' from the performance data 'pedal cadence'....").) However, Defendants ignore that claim 3 specifies that "pedal cadence" is a "performance parameter." JCCC Ex. A at claim 3. Defendants' admission juxtaposed with this unequivocal claim language directly and unambiguously refutes Defendants' proposed negative limitation and demonstrates the overlap in performance parameters and performance data.

*Second*, the claims of the related '276 Patent similarly refute Defendants' proposed negative limitation, and Defendants' attempts to argue otherwise fail. As Peloton explained (Br. at 32-33), the '276 Patent claims identify "pedal cadence" and "power output" as "performance data." The Asserted Patents identify "pedal cadence" and "power output" as "performance parameters" in claim 3. (*See id.*) The intrinsic record thus conclusively demonstrates that the same values may be both "performance data" and "performance parameters." As made clear in '026 Patent claim 1, "performance parameters" are the subset of "performance data" that are synchronized and displayed.

In an attempt to explain away this fatal contradiction of their negative limitation, Defendants rely on *Epcon Gas*. Defendants assert that the usages of the terms in the Asserted

Patents are different than in the ’276 Patent and, therefore, as in *Epcon*, they “should not necessarily be interpreted to have the same meaning in both phrases.” 279 F.3d at 1030. But the ’276 Patent does not use “performance parameter” or “performance data” in a different manner. The ’276 Patent claims specify that the users’ “performance parameters” are displayed at the same points in the exercise class for comparison, just as in the Asserted Patents.[18] *Compare* JCCC Ex. 2, 15:44-52 *with* 16:13-31. The ’276 Patent is intrinsic evidence, and proof positive that Defendants’ proposed negative limitation is unsupportable

*Third*, Defendants disregard the numerous references in the specification indicating that “performance parameters” are a subset of “performance data,” (Br. at 32-34), nonsensically arguing that the Court should ignore this evidence as “unclaimed embodiments.” (*Id.* at 40.) But Defendants never explain how these disclosures, which mirror the Asserted Claims and describe displaying the performance parameters and performance data, fall outside the claims. (*See id.*) The more logical reading—which harmonizes the intrinsic evidence—is that “performance parameters” are the subset of “performance data” that are synchronized and displayed as recited in the claims.[19]

*Fourth*, Defendants rely on *ResQNet.com* to disregard the Examiner’s reference to “performance parameters” as “exercise data.” (*Id.* at 41.) In *ResQNet.com, Inc. v. Lansa, Inc.*, the Federal Circuit held that the prosecution history of a related patent which claimed “every field”

---

[18] In fact, the ’276 Patent dependent claims refer to “*the* performance data.” (Ex. 2, claims 7-9.) The only antecedent basis for “performance data” is the claimed “performance parameters,” further indicating, as Peloton proposes, that “performance parameters” are a form of performance data.

[19] Further, under Federal Circuit precedent, “where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.” *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1311 (Fed. Cir. 2014). Defendants’ approach of presuming their construction and then disregarding the intrinsic record turns that law on its head.

was irrelevant to the claim term "each of a plurality of fields," because the two "patents do not share the same claim language." 346 F.3d 1374, 1382-83 (Fed. Cir. 2003). Here, the Asserted Patents and the '315 Patent use the same exact term—"performance parameters"—that are synchronized and displayed for comparison. The Examiner's understanding that "performance parameters" were performance data is directly relevant to the issue before the Court.

Defendants' principal affirmative argument revolves around the claim language specifying that the "performance parameter" is "*generated* on the basis of the first user performance data." According to Defendants, to "generate" requires "a change or transformation." (Br. at 37.) Putting aside Defendants' improper belated construction of "generate," Defendants are incorrect for multiple reasons.

*First*, Defendants are incorrect that the claimed step of "generat[ing]" a performance parameter requires a "change or "transformation." To the contrary, the POSA would understand "generate" to mean "create or produce." Ex. P15, Appx095. Defendants provide no citation for their proffered definition, and the surrounding claim language forecloses it. For example, '026 Patent claim 1 also uses "generate" in the phrase "a sensor operable to generate first user performance data." Defendants concede that "resistance" is an example of "performance data." (Br. at 37.) The sensor need not make any "change" or "transformation" to "generate" resistance. Rather, the sensor "creates" resistance performance data that is received by the computer.

Dependent claim 3 similarly refutes Defendants' definition of "generate." That claim specifies that the "performance parameters" include "pedal cadence, power output or a heartrate of the first user." JCCC Ex. A at claim 3. Once a user's heartrate is measured, there is no "change" or "transformation" that needs to take place in order to "generate" the performance parameter

heartrate. It is merely a specific category of performance data that will later be displayed and synchronized, consistent with the claim language.

*Second*, Defendants are incorrect that if the "generate" step does not require "change" or "transformation" it would be superfluous. (Br. at 37.) Defendants ignore the balance of claim 1, which requires that the "performance parameters" be "synchronized" and "displayed." The generation step thus separates that performance data that will not be and/or cannot be synchronized and displayed from the subset of performance data (the performance parameters) that will be synchronized and displayed. Sometimes this will require change or transformation and sometimes it will not. (Br. at 33-35.)

*Finally*, Defendants' assertion that "generate" requires transformation (although wrong) is simply irrelevant to Defendants' argument regarding "power output." That performance parameter is indisputably calculated and transformed based upon other performance data. (*See* Br. at 36-37.) Nothing in the claims negates that power output is also performance data (and it most certainly is). Power output also is a performance parameter because it is synchronized and displayed as required by the claims to simulate competition. Even if transformation is required (it is not), such requirement does not support Defendants' negative limitation.

Peloton's proposed construction should be adopted.

**4. Defendants' Sur-Reply Position**

As Defendants demonstrated in their answering brief, "performance data" and "performance parameters" cannot be the same thing because the claims require "performance parameters" to be "generate[d]" from, and on the basis of, "performance data." In arguing otherwise, Peloton attempts to eviscerate the "'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312.

Recognizing that it has no viable response to the plain claim language, Peloton buries its rebuttal in the middle of its reply, arguing that, even though "performance parameters" must be generated from "performance data," the two can be the same because "generate" means "create or produce." (Br. at 45 (citing P15, APPX095, Compact Oxford English Dictionary).) Peloton's argument confirms the absurdity of its position. Whether one uses the verb "generate," "create," or "produce" the outcome is the same: something new must come into existence.[20] *See* D-11, Oxford Concise English Dictionary (defining "generate" to mean "cause to arise or come about," "create" to mean "bring into existence," and "produce" to mean "cause to happen or exist"); D-12, Random House Webster's Unabridged Dictionary (defining "generate" to mean "bring into existence; cause to be; produce," "create" to mean "to cause to come into being, as something unique that would not naturally evolve or that is not made by ordinary processes," and "produce" to mean "to bring into existence; give rise to; cause"). The claims require "performance parameters" to be something new, created from and on the basis of, "performance data." The two things must therefore be distinct.

The remainder of Peloton's reply diverts attention from the claim language in the hopes of creating (or, better yet, generating) an infringement claim where none exists. While the Court need not reach these arguments in view of the clear and dispositive claim language, the evidence Peloton cites to does not support its position. Contrary to Peloton's contention, claim 19 of the '521 patent does not "confirm[] that performance data includes performance parameters." Claim 19 introduces a new term, "performance data content," into the claim. (JCCC Ex. B at 18:45-49)

[20] The examples Peloton provides, in which sensors "generate" performance data, further demonstrate the flaw in its position. While a person's heartrate and a bike's resistance exist independent of the sensors, the "data" reflecting the user's performance (i.e., "performance data") does not exist until "generated" by the sensors.

("The method of claim 11 . . . wherein *performance data content* received by at least one of the other users includes the first user performance parameter) (emphasis added). Claim 19 does not refer back to "performance data" or "the performance data," and therefore it does not inform the meaning of "performance data."

Nor did Defendants admit that "pedal cadence" can be both the claimed "performance data" and a "performance parameter." Defendants' answering brief simply repeated two hypotheticals offered by Peloton, and pointed out that the hypothetical requiring "performance parameters" to be something new generated from "performance data" adhered to the claim language, and that the hypothetical in which "pedal cadence" generated itself was nonsensical.

Peloton's litigation-driven explanation for how "performance data" and "performance parameters" can be the same, without rendering superfluous the requirement that performance parameters be "generate[d]" from performance data also fails. Indeed, Peloton's contention that the "generating step" merely "separates" "the subset of performance data (the performance parameters) that will be synchronized and displayed" from the rest of the "performance data" lacks any support in the claims or the specification. The word "generate" requires "performance parameters" to be something new and not just a label attached to something that already existed. Moreover, while Peloton claims that "numerous references in the specification indicat[e] that 'performance parameters' are a subset of 'performance data,'" Peloton fails to cite to even a single passage from the specification to support its fanciful explanation.

Peloton's reliance upon the claims of the related '276 patent is also misplaced. As the authority cited in Defendants' answering brief makes clear, the *presumption* that the same term should be construed similarly in related patents will be overcome when, as here, the terms are not "used consistently," *Epcon Gas*, 279 F.3d at 1030-31, or are surrounded by different claim

language that would render a uniform construction "nonsensical," *Microprocessor Enhancement*, 520 F.3d at 1376. *See also Interdigital Commc'ns, Inc. v. ZTE Corp.*, F. App'x 998, 1004 (Fed. Cir. 2017) (refusing to apply presumption where "surrounding [claim] language differs" and party arguing for same construction "has not made any showing of the irrelevance of those differences"). Peloton fails to distinguish *Microprocessor Enhancement*, and its attempt to distinguish *Epcon Gas* relies upon the false premise that the '276 patent claims do "not use 'performance parameters' or 'performance data' in a different manner." To the contrary, unlike the Asserted Patent claims, the '276 patent claims do not require that "performance parameters" be "generate[d] on the basis of" "performance data." (JCCC Ex. 2 at 15:17-17:4.)

Peloton repeatedly characterizes this dispute as being about a "negative limitation" because that is far more palatable than acknowledging its efforts to write the "generating step" out of the claims. A claim construction confirming that "performance parameters" and "performance data" must be distinct is required to give meaning to the claim language requiring "performance parameters" to be "generate[] on the basis of" "performance data." Otherwise, once the terms "performance parameter" (i.e., "numerical value relating to a user's performance in an exercise class," JCCC at Ex. 1) and "performance data" (i.e., "data reflecting performance") are replaced with their constructions, the distinction between the two terms—and the specific requirements pertaining to each (e.g., receiving over the network, synchronizing, displaying)—will effectively be read out of the claim, and Peloton will argue a singular performance metric satisfies both.

**E. "Cause[s/ing] [the] movement of [a/the] portion of the exercise device"**

| Claims | Peloton's Construction | Defendants' Construction |
|---|---|---|
| '026 Patent Claims 1, 11 | Plain and ordinary meaning in light of the intrinsic evidence, which is: "take action that | "cause movement of a portion of the exercise device by applying user force to the |

| | | |
|---|---|---|
| | results in movement of a portion of the exercise device" | portion of the exercise device to be moved" |

### 1. Plaintiff's Opening Position

The claim terms "cause movement of a portion of the exercise device" and "causes the movement of the portion of the exercise device" should be given their plain and ordinary meanings, such that the element is met when a user takes *any* action that results in movement of a portion of the exercise device. Nothing in the intrinsic record justifies further limiting the terms.

Defendants ask the Court to ignore this plain meaning and limit the commonly-used words in two ways: (1) requiring the user to "cause movement" "by applying user force"; and (2) requiring that "user force" be applied "to the portion of the exercise device to be moved." Defendants appear to be trying to limit the claims to only exercise bikes rather than "exercise devices." This is improper and should be rejected.

*First*, Defendants' proposed construction is wholly inconsistent with the plain and ordinary meaning of the claim terms. "Cause" is a commonly-used and well-understood term that means to bring about. *See, e.g.*, Ex. P1, Appx004, Merriam-Webster Dictionary 2016 (defining "cause" as "to be the cause of occasion of"); Ex. P11, Appx207, https://www.dictionary.com (defining "cause" as "to be the cause of; bring about").

Nothing in the ensuing claim language indicates a limitation on *how* the user would cause movement, and Defendants' attempt to rewrite that term to "user force" to a specific part of the system or device is improper. *See ACTV, Inc.*, 346 F.3d at 1088; *Phillips*, 415 F.3d at 1314.

*Second*, recognizing that the meaning of "cause" is readily-understandable, Defendants do not even seek to construe that term, but instead graft further limitations onto it. But Defendants do not identify lexicography, disclaimer, or any other intrinsic evidence that justifies the limitation

they propose, which requires a "clear and unmistakable" restriction on claim scope. *Thorner*, 669 F.3d at 1367.

Defendants' argument in the Joint Claim Chart that the '026 Patent allegedly "[o]nly disclose[s] one modality in [the] specification—a bike" falls far short of meeting this high burden for disclaimer. The claims themselves are not directed to an "exercise bike"; they are directed more broadly to "exercise ***devices***." The written description is similar. *See, e.g.*, JCCC Ex. A at 1:28-33 ("The invention relates generally to the field of *exercise equipment and methods*. In particular, the invention relates to a *system and method* for providing streaming and on-demand *exercise classes*."). The POSA would not understand the claimed methods to be directed only to "exercise bicycles" as Defendants intimate. To the contrary, other related Peloton patents have claims directed to "exercise bicycles," further indicating that the '026 Patent claims should not be interpreted so narrowly. *See In re Rambus Inc.*, 694 F.3d 42, 48 (Fed. Cir. 2012) (applying claim differentiation doctrine between related patents for claim construction).

Here, there is no reason to limit the scope of the readily-understandable term. Defendants' proposal should be rejected, and the Court should adopt Peloton's construction, consistent with the plain and ordinary meaning of the term.

**2. Defendants' Answering Position**

The term "cause movement of a portion of the exercise device," when viewed in light of the specification and intrinsic record, refers to a user applying force to the portion of the exercise device to be moved (e.g., a user pedaling a stationary cycle).

The specification of the '026 patent only discloses a stationary cycle and "cycling classes." Indeed, even in just the short summary of the invention, the term "cycling class[es]" appears 18 times—and that is the only type of class disclosed in the summary of the invention. (JCCC EX. A at 2:7-3:11.) Also, all figures of the '026 patent include a stationary cycle or refer to a cycling

class. Other than the one generic statement relied upon by Peloton (that the invention relates generally to the field of exercise equipment and methods), the specification only teaches and discloses a stationary cycle and cycling classes.

Further, the relevant claim language of claims 1 and 11 of the ’026 patent refers to exercise “activity” and “movement” of a user: “a sensor operable to generate first user performance data based on activity by the first user when the first user causes the movement of the portion of the exercise device.” Here, the claim language is contemplating movement and activity by the user and tracking the performance data associated with that movement. A user simply pushing a button to start a treadmill is not “activity” or “movement” that is contemplated by the plain language of this claim. This claim language clearly contemplates the user applying force to the portion of the exercise device to be moved.

When Peloton filed its first patent in the ’026 patent family, the only product offered by Peloton was a stationary cycle used in cycling classes, and the claims in its original patents only claimed “cycling classes.” (*e.g.*, (JCCC Ex. 1 at 14:48–49); (JCCC Ex. 2 at 15:18–19 and 16:17–18); (JCCC Ex. 3 at 15:25–26 and 16:6–7), and (JCCC Ex. 4 at 15:36–37).) Peloton then began selling treadmills and likely realized its patents were directed only to cycling classes, so it began drafting claims to cover treadmill classes. The problem for Peloton is it carried over the “cause movement” claim term into its new treadmill claims.

Peloton has tried to correct this issue in its newest claims in the ’521 patent. Instead of using the term “cause movement of a portion of the exercise device,” Peloton now claims “associated with movement.”

| ’026 Claims | ’521 Claims |
|---|---|
| | |

| | |
|---|---|
| an exercise device configured for a first user to cause movement of a portion of the exercise device;<br><br>a sensor operable to generate first user performance data based on activity by the first user when the first user causes the movement of the portion of the exercise device | an exercise device configured for use by the first user;<br><br>a sensor configured to generate first user performance data based on activity by the first user associated with movement of a portion of the exercise device |

There is a difference between the user *causing* the movement and the user being *associated* with the movement. But if Peloton's broad construction of "cause movement" is adopted—which is the user taking *any action* that results in movement of a portion of the exercise device—then there is no effective difference between the user causing the movement and the user being associated with the movement.

### 3. Plaintiff's Reply Position

Defendants openly admit that their proposed construction seeks to limit the '026 Patent claims to "exercise bicycles." (Br. at 52-53.) Defendants are silent on how that position can be reconciled with the language directing the claims to an "exercise *device*."

Defendants argue that the claims "refer[] to exercise 'activity' and 'movement' of a user" and that the "the claim language is contemplating movement and activity by the user and tracking the performance data associated with that movement." (*Id.* at 52.) Defendants appear to argue that the "movement" and the "activity" must be the same. The claims say no such thing. The claims specify *how* the performance data is generated: "based on activity by the first user." This claim term contemplates exercise activity by the user such as pedaling an exercise bicycle or running on a treadmill. The claims separately specify *when* this generation of performance data begins: when the first user causes the movement of the portion of the exercise device. There is no reason to link these two separate requirements to the same user action.

Defendants argue that both the "movement" and the "activity" are "of a user." (*Id.*) That does not justify linking the two claim elements. A "user" can make a "movement" and perform a separate "activity," remaining within the scope of the claims.

It may well be that a user could meet both limitations through the same action, *e.g.*, by pedaling an exercise bike that is configured to start generating performance data upon pedaling. It may alternatively be that a user could meet the limitations through two separate actions, *e.g.*, by pedaling an exercise bike and separately pressing a button on the bike that is configured to make the bike start generating performance data. In both cases, "when the first user causes the movement of the portion of the exercise device," the sensor will "generate first user performance data based on activity by the first user."

Defendants' reference to the '521 Patent is similarly unavailing. Defendants focus on the "associated with movement" language but ignore other differences in the claims. The '521 Patent claims contain neither the language requiring the user to "cause movement of a portion of the exercise device" nor the language linking the generation of data to "*when*" the user causes movement of the portion of the exercise device. Instead, the claims require the generation of data associated with movement of a portion of the exercise device. Defendants are correct that there may be a difference in scope between the claims. Defendants are incorrect that Peloton's proposed construction would eliminate this difference.

Peloton's proposed construction reflects the well-understood meaning of "cause" and should be adopted.

### 4. Defendants' Sur-Reply Position

Peloton points out that the language of the claims is directed to an "exercise device." (Br. at 53.) This has no effect on Defendants' argument that treadmills were not contemplated in the '026 patent. It is not Defendants' contention at this point that the language, "exercise device"

eliminated a treadmill for infringement purposes. Rather, the language in dispute, "cause movement of a portion of the exercise device" further narrowed the claims and eliminated treadmills as infringement targets of the '026 patent because a user does not apply user force to move the treadmill belt.

Peloton argues that "movement" and "activity" cannot be the same thing in the context of the claims. (*Id.*) However, Peloton fails to address Defendants' argument with regards to the patent as a whole. Specifically, that the '026 patent only discloses stationary cycle and "cycling classes" in the specification. (Br. at 52.) Convincingly, "even in just the short summary of the invention, the term 'cycling class[es]' appears 18 times–and that is the only type of class disclosed in the summary of the invention." (*Id.*) It is the claims, in view of the specification that leads to the conclusion that the term in dispute "clearly contemplates the user applying force to the portion of the exercise device to be moved." (*Id.*)

Peloton references the differences between the '521 and '026 patents that Defendants articulated. (Br. at 54.) Peloton then points to the same difference and makes a conclusory statement that Defendants are wrong without providing any reasoning. (*Id.*) For example, Peloton points to the lack of "cause movement of a portion of the exercise device" in the '521 patent. (*Id.*) Defendants also pointed to this difference. (Br. at 52-53.) The difference between the two parties is that Defendants provided a compelling reason (Peloton began selling treadmills and wanted to draft a patent directed to a treadmill) for why defendants' interpretation of the difference in the '521 and '026 patents is correct. (*Id.*)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Andrew M. Moshos*

Michael J. Flynn (#5333)
Anthony D. Raucci (#5948)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mflynn@morrisnichols.com
araucci@morrisnichols.com
amoshos@morrisnichols.com

*Attorneys for Plaintiff Peloton Interactive, Inc.*

OF COUNSEL:

Steven N. Feldman
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
(213) 485-1234

Lawrence J. Gotts
Gabriel K. Bell
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
(202) 637- 2200

Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876- 7700

David F. Kowalski
Patrick C. Justman
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

RICHARDS, LAYTON & FINGER LLP

*/s/ Christine D. Haynes*

Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
920 North King Street
Wilmington, DE 19801
302-651-7700
Cottrell@rlf.com
Haynes@rlf.com

*Attorneys for Defendant*
*and Counterclaimant*
*ICON HEALTH & FITNESS, INC*

OF COUNSEL:

David R. Wright
MASCHOFF BRENNAN
111 South Main Street, Suite 600
Salt Lake City, Utah 84111
(801) 297-1850

GREENBERG TRAURIG, LLP

*/s/ Benjamin J. Schladweiler*

Benjamin J. Schladweiler (#4601)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000
schlwadweilerb@gtlaw.com

*Attorneys for Defendants Echelon Fitness*

William J. Trach
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

*Multimedia LLC, Echelon Fitness, LLC, Echelon Studio, LLC, and Viatek Consumer Products Group, Inc.*

OF COUNSEL:

Douglas R. Weider
James L. Ryerson
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
(973) 360-7900

June 2, 2021

**WORD COUNT CERTIFICATION**

Counsel certifies that the foregoing brief contains 16,011 words as determined by the word-count feature of Microsoft Word, excluding the cover, table of contents, table of authorities, table of exhibits, listing of representative claims, and tables containing the disputed claim terms and proposed constructions pursuant to Paragraph 8 of the respective Scheduling Orders.

*/s/ Andrew M. Moshos*

Andrew M. Moshos (#6685)