# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
x
PELOTON INTERACTIVE, INC., :
Plaintiff, :
v. : Civil Action No.
ECHELON FITNESS MULTIMEDIA, : 19 1903(RGA)
LLC; ECHELON FITNESS, LLC; :
ECHELON STUDIO, LLC AND VIATEK :
CONSUMER PRODUCTS GROUP, INC., :
Defendants. :
x
HIGHLY CONFIDENTIAL
REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF
JACOB PROFFITT
AS AN INDIVIDUAL AND AS CORPORATE DESIGNEE FOR
ECHELON MULTIMEDIA FITNESS, LLC, ECHELON FITNESS,
LLC, AND ECHELON STUDIO, LLC
FRIDAY, JANUARY 7, 2022
8:58 A.M. CST
JOB NO.: 422958
PAGES: 1 173
REPORTED BY: KARISA EKENSEAIR, CCR RPR

[redacted]



DEPOSITION OF JACOB PROFFITT, CONDUCTED VIA ZOOM VIDEOCONFERENCE.

Pursuant to notice, before Karisa J. Ekenseair, Certified Shorthand Reporter in and for the States of Arkansas, Oklahoma, and Illinois; National Registered Professional Reporter, Notary Public in and for the State of Arkansas.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF (VIA ZOOM):

KIMBERLY Q. LI, ESQUIRE
LATHAM & WATKINS, LLP
200 CLARENDON STREET
BOSTON, MASSACHUSETTS 02116
617 880 4529

AND

JOSEPH C. AKALSKI, ESQUIRE
LATHAM & WATKINS LLP
1271 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10020
212 906 2927

AND

JOHN GREGORY JONES, ESQUIRE
LATHAM & WATKINS, LLP
555 11TH ST NW, STE 1000
WASHINGTON, DC 20004 1327
202 637 3362

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF THE DEFENDANTS (VIA ZOOM):

DOUGLAS R. WEIDER, ESQUIRE

GREENBERG TRAURIG, LLP

500 CAMPUS DRIVE, SUITE 400

FLORHAM PARK, NEW JERSEY 07932

973 360 7916

ALSO PRESENT:

SARAH LOILER, REMOTE TECHNICIAN

THEO GREEN, VIDEOGRAPHER

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins Disc Number 08:04:20
1 in the video recorded deposition of Jacob 08:58:00
Proffitt in the matter of Peloton Interactive 08:58:03
Incorporated versus Echelon Fitness Multimedia, 08:58:06
LLC, et al., in the United States District Court 08:58:12
for the District of Delaware, Case Number 19 1903. 08:58:14
Today's date is January 7, 2022. The time 08:58:18
on the video monitor is 8:58 Central time. The 08:58:22
videographer today is Theo Green representing 08:58:26
Planet Depos. This video deposition is taking 08:58:28
place remotely. 08:58:32
Will counsel please voice identify 08:58:33
themselves and state whom they represent? 08:58:35

MS. LI: Kimberly Li from Latham & Watkins 08:58:37
representing Plaintiff Peloton Interactive, Inc. 08:58:42
With me are my colleagues, Joseph Akalski and John 08:58:46
Gregory Jones. 08:58:46

MR. WEIDER: Doug Weider, Greenberg 08:58:48
Traurig on behalf of Defendant Echelon. 08:58:51

THE VIDEOGRAPHER: Thank you. The court 08:58:58
reporter today is Karisa Ekenseair representing 08:59:00
Planet Depos. 08:59:03
Would the reporter please swear in the 08:59:03
witness? 08:59:06

[redacted]


THE REPORTER: Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge that their testimony will be true under penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way and that the witness has verified that they are, in fact, Jacob Proffitt, beginning with the noticing attorney, please? 08:59:06 08:59:27

MS. LI: Yes. We agree to the stipulation. 08:59:27 08:59:32

MR. WEIDER: So does Defendant. 08:59:33

JACOB PROFFITT, 08:59:35

of lawful age, being first duly sworn, deposes and says in reply to the questions propounded as follows: 08:59:35 08:59:35 08:59:35

EXAMINATION 08:59:49

BY MS. LI: 08:59:49

Q Good morning, Mr. Proffitt. Would you please state and spell your full name for the record? 08:59:52 08:59:54 08:59:58

A Jacob Proffitt, J A C O B, P R O F F I T T. 08:59:58 09:00:03

[redacted] 09:00:03

[redacted]

[redacted] 09:29:27
[redacted] 09:29:30
[redacted] 09:29:32
[redacted] 09:29:36
[redacted] 09:29:39
[redacted] 09:29:40
[redacted] 09:29:43
[redacted] 09:29:47
[redacted] 09:29:50
[redacted] 09:29:57
[redacted] 09:29:59
[redacted] 09:30:02
[redacted] 09:30:08
[redacted] 09:30:13
[redacted] 09:30:15
[redacted] 09:30:17
[redacted] 09:30:20
[redacted] 09:30:25
[redacted] 09:30:29
[redacted] 09:30:29
[redacted] 09:31:13
[redacted] 09:31:16
[redacted] 09:31:22
[redacted] 09:31:24
[redacted] 09:31:25

[redacted]

# EXHIBIT 2

GT GreenbergTraurig

Benjamin J. Schladweiler
Tel 302.661.7352
Fax 302.661.7163
schladweilerb@gtlaw.com

April 28, 2021

**VIA E-MAIL**
Matthew S. Salerno
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834

Re: **Peloton Interactive, Inc. v. Echelon Fitness Multimedia LLC**
**C.A. No. 19-1903-RGA**

Dear Matt:

I write concerning deficiencies in Peloton's responses to Echelon's Fifth Set of Requests for Production served on April 8, 2021.

**Requests 161, 166-68, 173, 176-77, and 183**

In response to each of these Requests, Peloton states its willingness to meet and confer concerning scope. Please let us know your availability to meet and confer on these Requests next week (i.e., the week of May 3).

**Request 152**

This Request seeks Peloton's established policies and procedures concerning licensing of its intellectual property – i.e., the same information that Peloton sought from Echelon in Peloton's RFP 42. Peloton states it will only produce "licensing arrangements in connection with the patents-in-suit." This is insufficient. Peloton should produce all policies and procedures in its possession, custody or control.

**Request 154**

Peloton refuses to produce documents sufficient to show the accounting methods it uses to generate the financial statements that it has already agreed to produce in this case. These documents are essential to understanding Peloton's financial statements and should be produced.

**Request 155**

This Request seeks documents concerning how Peloton allocates its overhead costs. These documents are critical to any damages analysis and should be produced.

**Request 169**

Peloton refuses to produce the credit scores of its customers. Far from "harassing," this Request seeks documents that are highly relevant to Peloton's claim for lost profits (including a determination of what sales Peloton would have made in the hypothetical "but for" world). These documents should be produced.

**Request 175**

Peloton agrees to produce the "2019 Member Survey," but it is unclear what information that survey contains. The member responses to this survey should be produced to the extent they are not otherwise contained in the Member Survey itself.

Sincerely,

Benjamin J. Schladweiler

# EXHIBIT 3

**Matthew S. Salerno**
Direct Dial: +1.212.906.4738
matthew.salerno@lw.com

1271 Avenue of the Americas
New York, New York 10020
Tel: +1.212.906.1200 Fax: +1.212.751.4864
www.lw.com

LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES
Beijing
Boston
Brussels
Century City
Chicago
Dubai
Düsseldorf
Frankfurt
Hamburg
Hong Kong
Houston
London
Los Angeles
Madrid
Milan
Moscow
Munich
New York
Orange County
Paris
Riyadh
San Diego
San Francisco
Seoul
Shanghai
Silicon Valley
Singapore
Tokyo
Washington, D.C.

May 19, 2021

**VIA EMAIL**

Benjamin J. Schladweiler
Greenberg Traurig, LLP
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801

Re: *Peloton Interactive, Inc. v. Echelon Fitness Multimedia LLC*, C.A. No. 19-1903-RGA

Dear Ben:

I write to in response to your April 28, 2021 letter and to memorialize the parties' May 10, 2021 telephonic meet and confer, which addressed various purported discovery deficiencies, as outlined below.

## A. Peloton's Responses to Echelon's Requests for Production

### Request Nos. 142 and 144-146

With respect to Request Nos. 142 and 144-146, Peloton maintains its objections that the requests are overbroad to the extent they seek "all" documents, but agreed to produce non-privileged, responsive documents sufficient to show the requested information, to the extent such documents exist and can be located as the result of a reasonable search. Unless Echelon can articulate specifically what responsive documents will not be covered by this offer, particularly in light of Peloton's offers of production in response to other requests, the parties are at an impasse.

### Request No. 152

In response to Request No. 152, which seeks "[a]ll documents that relate to Peloton's established policies, procedures, or programs that involve the licensing (in-bound and out-bound) or use of any intellectual property asset," Peloton agreed to produce non-privileged, non-protected, non-duplicative documents sufficient to show licensing arrangements in connection with the patents-in-suit. Echelon demands that Peloton instead provide "all policies and procedures in its possession, custody, or control." April 28, 2021 Letter from B. Schladwieler to M. Salerno. Consistent with Echelon's offer in response to Peloton's Request for Production No. 42, Peloton agrees to produce documents "sufficient to show [Peloton's] policies, procedures, and practices, if any, regarding licensing patents and technology."

**Request No. 154**

Request No. 154 seeks "[d]ocuments sufficient to show the accounting methods relied upon by Peloton in generating financial statements including those related to the Peloton Bike." Echelon contends that these documents are "essential to understanding Peloton's financial statements." April 28, 2021 Letter from B. Schladwieler to M. Salerno. During the parties' telephonic meet and confer, Echelon clarified that it was looking for documents that allowed it to "understand Peloton's accounting methods." Peloton continues to assert that the information sought through this request is more appropriately suited for a 30(b)(6) deposition, as responsive documents are unlikely to exist; however, Peloton will conduct a reasonably diligent search to determine whether Peloton has any documents "sufficient to show the accounting methods relied upon by Peloton in generating financial statements."

**Request No. 155**

Request No. 155 seeks "[a]ll documents that detail, discuss, describe, or relate to overhead accounts used by Peloton to collect costs, their allocation rates, and their allocation bases," which Echelon contends are "critical to any damages analysis." April 28, 2021 Letter from B. Schladwieler to M. Salerno. As stated in Peloton's objections, this request is overbroad because it is not temporarily limited and it requests all documents detailing, discussing, describing, or related to Peloton's overhead accounts. Peloton is nonetheless willing to provide financial statements sufficient to show the information responsive to Request No. 155, to the extent they exist and can be located after a reasonably diligent search.

**Request No. 161**

Request No. 161 seeks "[a]ll documents that relate to expected returns on investment for the Peloton Bike, including target rates of return, hurdle rates, discount rates, and any standard investment policies and procedures." As explained during the parties' meet and confer, this request is incredibly broad, particularly to the extent it seeks all documents *related to* expected returns on investment. Echelon stated that it would be willing to accept a financial report detailing this information, to the extent that it exists. Peloton therefore will produce non-privileged financial statements sufficient to reflect this information, to the extent they exist and can be located after a reasonably diligent search.

**Request Nos. 166-167**

Request No. 166 seeks "[a]ll documents that relate or refer to Peloton's weighted average costs of capital." Request No. 167 requests "[a]ll documents that relate or refer to internal rates of return or hurdle rates used by Peloton for capital budgeting purposes." For the reasons stated with respect to Request No. 161, Peloton is willing to produce non-privileged financial statements sufficient to reflect this information, to the extent they exist and can be located after a reasonably diligent search.

LATHAM&WATKINS LLP

**Request No. 168**

Request No. 168 seeks "[a]ll policies and criteria used by Peloton and/or its financing partners to evaluate the extent to potential Peloton Bike customers are suitable to receive financial credit through any financing programs offered by or on behalf of Peloton." This request as written is overbroad. However, Peloton is willing to produce non-privileged documents sufficient to show the requested information, to the extent they exist and can be located after a reasonably diligent search.

**Request No. 169**

Request No. 169 seeks "[c]redit scores or ratings for all customers that purchased the Peloton Bike by taking advantage of any financing programs offered by or on behalf of Peloton during the Relevant Period." Echelon contends that these documents are "highly relevant to Peloton's claim for lost profits." April 28, 2021 Letter from B. Schladwieler to M. Salerno. This request is overly broad, particularly as it relates to "all customers." However, as represented during the parties' meet and confer, we will confer with Peloton to determine how this information is stored and, to the extent non-privileged responsive documents exist and can be located after a reasonably diligent search, will make a proposal regarding production of information responsive to this request in a fashion that is not overly burdensome, to the extent such production is possible.

**Request No. 173**

Request No. 173 seeks "[a]ll documents that relate to customer profiles, buying patterns, and/or purchase criteria for customers who have purchased the Peloton Bike or have been solicited in any way to purchase the Peloton Bike." As discussed during the parties' meet and confer, Peloton will produce consumer surveys which contain responsive information, to the extent those documents exist and can be located after a reasonably diligent search.

**Request No. 175**

In response to Request No. 175, which seeks "[a]ll documents concerning the '2019 Member Survey' referenced throughout the S-1 Registration Statements filed by Peloton in 2019," Peloton agreed to produce the 2019 Member Survey. Echelon contends that "member responses to this survey should be produced to the extent they are not otherwise contained in the Member Survey itself." As discussed during the parties' meet and confer, the 2019 Member Survey is a PowerPoint summary of all survey results, including summary graphs and statistics. The parties agreed that Peloton will produce this survey as an initial matter, with Echelon reserving rights to seek additional information to the extent it contends additional discovery is necessary. In agreeing to this proposal, Peloton makes no representation as to whether additional non-privileged and responsive documents exist.

**Request No. 176**

Request No. 176 seeks "[a]ll documents concerning the total available market (TAM) and serviceable addressable market (SAM) studies performed with assistance from Directions

Research, Inc., as referenced throughout the S-1 Registration Statements filed by Peloton in 2019." As discussed during the parties' meet and confer, Peloton will produce the TAM and SAM studies, to the extent they are in Peloton's possession, custody, or control and can be located after a reasonably diligent search.

**Request No. 177**

Request No. 177 seeks "[a]ll documents concerning the 'Ask a Member' blogposts summarized at https://blog.onepeloton.com/ask-a-member-question-4/, including all customer responses received and all analysis or summaries of those customer responses." Peloton will conduct a reasonably diligent search into whether any non-privileged consumer surveys reflected in the referenced blog post exist and can be produced without undue burden. Peloton will then make a proposal regarding production of these materials, to the extent any non-privileged documents exist.

**Request No. 183**

Request No. 183 seeks "[a]ll documents and data that show the number of Running, Cycling, Bike Bootcamp, and Tread Bootcamp classes/sessions taken by users with Peloton Digital Memberships and users with Peloton All-Access memberships, including but not limited to daily, monthly, and quarterly summaries of such classes/sessions taken during the Relevant Period." During the parties' meet and confer, Echelon stated that it was trying to ascertain the number of classes offered that did not include a leaderboard and participation in those classes. Peloton is willing to produce non-privileged documents sufficient to show this information, to the extent such documents exist and can be located after a reasonably diligent search. To the extent that production of these documents is overly burdensome, Peloton reserves the right to propose an alternative solution.

**B. Echelon's Responses to Peloton's Interrogatories**

**Interrogatory No. 11**

Echelon is not willing to consent to Peloton's reciprocal amendment of its Complaint to add claims related to the '521 patent. As such, Peloton does not consent to Echelon's proposed amendment to its Complaint to add claims related to tortious interference with Echelon's contract with Affirm.

**C. Echelon's Responses to Peloton's Requests for Production**

**Request No. 61**

Echelon confirmed it was not withholding documents on the basis of its objections in response to Request No. 60, which seeks "[a]ll documents and communications between you and Amazon referring or relating in any way to the 'EX-Prime Smart Connect Bike.'"

**Request No. 78**

Echelon stated that it would produce summary financial information "relating to sales of the Echelon Accused Instrumentalities . . ." in the manner it is stored in the ordinary course of business. To the extent that this summary financial information does not include information related to revenue, costs, gross profits, net profits, and market share, Peloton reserves the right to seek additional documents in response to this request.

**Request Nos. 79, 81 and 85**

Echelon confirmed that it would produce information relating to distribution, testing, sale, updating, and importation of each of the Echelon Accused Instrumentalities, Echelon Fit, and Leaderboard Functionality.in response to Request No. 79, to the extent that material is not privileged. Echelon also agreed to produce documents sufficient to show the information requested by Request No. 81, which seeks "[a]ll documents, communications, or things that show the location where the Echelon Accused Instrumentalities, Echelon Fit, and Leaderboard Functionality were and/or are developed, tested, manufactured, distributed, sold, updated and imported." With respect to Request No. 85, Echelon confirmed that it is producing source code, as well as documents relating to "structure, configuration, operation, functionalities, components, and performance" of Echelon Fit and Leaderboard Functionality.

**Request No. 82**

In response to Request No. 78, Echelon confirmed that it would produce documents sufficient to show the number of users of the Echelon Accused Instrumentalities and the Echelon Fit app in the United States, including changes to the number of users over time.

**Request No. 104**

Echelon offered to produce "all relevant non-privileged communications between Jay Galluzzo and Lou Lentine related to Peloton, Flywheel, and/or ICON to the extent the documents are picked up using the parties' search terms." As discussed during the parties' meet and confer, it is unclear how Echelon is using the term "relevant" in this offer, or what limitations Echelon intends to put on its production based on this caveat. Discussions related to Peloton are highly relevant to this litigation, including, *inter alia*, discussions related to Peloton's market share, business model, customers, and product offerings. Echelon stated that it would make a proposal to further outline the meaning of "relevant" in this context, including by specifically identifying what categories of documents it proposes to produce in response to these requests.

**Request No. 105**

This request seeks "[a]ll communications between YOU and NORTH CASTLE related to this LITIGATION." Echelon maintains that "communications discussing this litigation" are privileged, particularly to the extent that they were created (as Echelon contends) after North Castle "became part of Echelon," and that logging these documents would be overly burdensome. As an initial matter, North Castle is not the same entity as Echelon, regardless of its investor or

LATHAM&WATKINS LLP

shareholder status. More substantively, as stated during the parties' meet and confer, Peloton seeks non-privileged documents, including where no attorneys are part of the discussion. Echelon has no basis to withhold these documents and must produce non-privileged documents in response to this request. Although Echelon must log privileged emails responsive to this request, Peloton is willing to discuss the format of such logs in connection with the parties' mutual exchange of privilege logs. In the meantime, please confirm that Echelon will produce documents in response to Request No. 105.

**Request No. 106**

In response to Request No. 106, Peloton accepts Echelon's offer to produce "responsive, non-privileged documents to the extent they exist, that relate to the claims and defenses in this litigation, and are picked up using the parties' search terms, with the exception of communications concerning the 'design of ECHELON products' that are not the accused products in this case." Peloton reserves all rights to seek additional documents in relation to this Request at a later time after reviewing the documents produced by Echelon.

**Request No. 109**

With respect to Request No. 109, which seeks "[a]ll documents relating to AFFIRM and PELOTON from August 1, 2017 through the present," Echelon stated during the parties' meet and confer that it would produce documents relating to Affirm and Peloton from June 1, 2020 to December 31, 2020. Peloton reserves all rights to seek additional documents in relation to this Request at a later time after reviewing the documents produced by Echelon.

**Request Nos. 111, 133, 150, and 167**

These requests seeks all documents relating to Echelon's business arrangements with Affirm, Splitit, Citizens Bank, and any other third-party financial institution. With respect to Affirm, Echelon agreed to produce documents and communications related to Echelon's business relationship to Affirm, as described in Peloton's May 4, 2021 letter to Echelon. *See* May 4, 2021 Letter from M. Salerno to B. Schladwieler.

**Request Nos. 116-17, 128, 130-31, 145, 147, 162, and 164-65**

These requests seek communications between Echelon, on the one hand, and third-party financial lenders (including Affirm, Splitit, and Citizens Bank), on the other hand, including communications relating to Peloton or Affirm. In its letter, Echelon stated that "Peloton does not currently propose search terms necessary to pick up" the relevant documents. The parties have since agreed on search terms, including search terms which should hit on documents relevant to these requests. During the parties' meet and confer, Echelon agreed it will produce documents responsive to these requests. Please confirm our understanding is correct.

LATHAM&WATKINS LLP

**Request Nos. 120-22, 137-39, 154-56, 171-73, 179-180, and 182-185**

Echelon confirmed that, in response to these Requests, which seek documents relating to the loans offered by Affirm, Splitit, Citizens Bank, and any other third-party financial lender, it will produce documents sufficient to show the number of loans and the financial terms of those loans, including the number of loans that Echelon's customers later defaulted on and/or breached with the various financial entities.

**Request Nos. 190-191**

With respect to Request Nos. 190-191, Echelon agreed to produce documents through December 31, 2021. Peloton reserves all rights to seek additional documents in relation to these Requests at a later time after reviewing the documents produced by Echelon.

Sincerely,

Matthew S. Salerno
of LATHAM & WATKINS LLP

# EXHIBIT 4

Filed on behalf of: Peloton Interactive, Inc.

Entered: June 11, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

ECHELON FITNESS MULTIMEDIA, LLC,
Petitioner,

v.

PELOTON INTERACTIVE, INC.,
Patent Owner.

Case IPR2020-01541
Patent No. 10,486,026

**PATENT OWNER'S RESPONSE**

[redacted]

***PROTECTIVE ORDER MATERIAL***

[redacted]

# TABLE OF CONTENTS


I. Introduction ........ 1

II. Background ........ 2

A. The '026 Patent (Ex. 1001) ........ 2

B. Echelon's proposed Person of Ordinary Skill in the Art ("POSA") lacks any training or professional experience in the relevant art ........ 3

III. Claim Construction ........ 5

A. The claimed "archived exercise class[es]" require a human instructor ........ 6

B. "leaderboard" ........ 8

IV. Ground I: Claims 1-20 are Patentable over Watterson and Hurwitz ........ 10

A. Overview of the art and the combination ........ 11

1. Watterson (Ex. 1007) ........ 11

2. Hurwitz (Ex. 1004) ........ 14

B. Echelon's POSA would not have made the proposed combination, which also fails to teach all of the claim elements ........ 15

1. Echelon's inoperable combination fails to teach the claimed computer, and teaches away from the combination ........ 16

2. Even if operable, Echelon's POSA would not have arrived at the proposed combination ........ 21

3. The combination does not teach the dynamically updating ranked list (element [1.4.9]/[11.11]) ........ 26

4. Echelon did not remedy the defects in its Petition with its arguments for claims 2-20 ........ 27




[redacted]

C. Claims 9 and 15 (start signal) are independently patentable over Watterson and Hurwitz....28

V. Grounds II and III: Claims 1-20 are Patentable over Hurwitz, Garcia, Martens (Claim 1-19), and Loveland (Claim 20)....31

A. Overview of the art....32

1. Garcia (Ex. 1005)....32

2. Martens (Ex. 1006)....33

B. Echelon's POSA would not have arrived at the proposed combination, which also fails to teach all of the claim elements....34

1. Echelon's POSA would not have arrived at the proposed combination....35

2. The inoperability of Echelon's combination teaches away and fails to teach the claimed "operable" system....48

3. The combination does not teach the dynamically updating ranked list (element [1.4.9]/[11.11])....49

4. Echelon did not remedy the defects in its Petition with its arguments for claims 2-20....49

C. Dependent Claims....49

1. Claims 5, 7, 17, 18 (live and archived participant content)....49

2. Claims 9 and 15 (start signal)....50

VI. Objective Evidence Further Demonstrates the Patentability of the Challenged Claims....51

A. A strong nexus exists between the objective evidence and the merits of the claimed invention....52

1. The presumption of nexus applies because at least the Peloton Bike and Bike+ practice challenged claims....52

a. The Peloton Bike is coextensive with the claimed invention....52



[redacted]

b. The Peloton Bike+ is coextensive with the claimed invention. ....................................................................63
2. A nexus exists between the objective indicia of non-obviousness and the claimed invention ....................................63

B. The claimed invention achieved groundbreaking commercial success ...........................................................................................66

C. The claimed invention fulfilled a long-felt need of a convenient but competitive, on-demand workout ................................................69

D. Existing players in the industry and potential inventors demonstrated skepticism toward the claimed invention .....................70

E. The industry accepted and praised the claimed invention, which revolutionized at-home fitness .........................................................71

F. Flywheel, a competitor, admitted to copying the claimed invention ...........................................................................................73

VII. Conclusion ..................................................................................................75

Claim Listing..........................................................................................................77

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen Archery, Inc. v. Browning Mfg. Co.*,
819 F.2d 1087 (Fed. Cir. 1987) ....................71

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011) ....................8, 10

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................69, 71

*Belden Inc. v. Berk-Tek, LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................28, 48

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................52

*Dennison Mfg. Co. v. Panduit Corp.*,
475 U.S. 809 (1986)....................35

*Eli Lilly & Co. v. Actavis Elizabeth LLC*,
435 F. App'x 917 (Fed. Cir. 2011) ....................35

*Fox Factory, Inc. v. SRAM*, LLC,
944 F.3d 1366 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) ....................52

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ....................17

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....................35

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016) ....................*passim*

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
822 F.3d 1312 (Fed. Cir. 2016) ....................8, 10

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004) ....................73



[redacted]

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ........................................ 35

*Liberty Mut. Ins. Co. v. Progressive Cas. Ins. Co.*,
CBM2012-00003, Paper 8 (Oct. 25, 2012) ........................................ 18

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
941 F.3d 1133 (Fed. Cir. 2019) ........................................ 73

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ........................................ 26, 28, 46

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ........................................ 15, 17

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................ 8

*Polaris Indus., Inc. v. Artic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ........................................ 52

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000) ........................................ 3, 4

*SAS Inst, Inc. v. Iancu*,
138 S. Ct. 1348 (2018) ........................................ 3, 29

*SEB S.A. v. Montgomery Ward & Co.*,
594 F.3d 1360 (Fed. Cir. 2010) ........................................ 24

*TQ Delta v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ........................................ *passim*

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
699 F.3d 1340 (Fed. Cir. 2012) ........................................ 66

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ........................................ 51, 52, 64



[redacted]

## REGULATIONS

37 C.F.R. § 42.6 ....................................................................................................30

37 C.F.R. § 42.100 ....................................................................................................5

37 C.F.R. § 42.104 ....................................................................................................6



[redacted]

## Exhibit List

| Ex. | Description |
|---|---|
| 2001 | Schwartz, U.S. Patent Appl. Pub. No. 2007/0219059 |
| 2002 | Declaration of Henry H. Houh in Support of Patent Owner's Response ("Houh Decl.") (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2003 | Curriculum Vitae of Henry H. Houh, Ph.D. |
| 2004 | Declaration of Jim Rutberg in Support of Patent Owner's Response ("Rutberg Decl.") |
| 2005 | Curriculum Vitae of Jim Rutberg |
| 2006 | RESERVED |
| 2007 | Screenshots of Peloton leaderboards |
| 2008 | David J. Miller, *JJ's Last Ride and the Power of Peloton,* LinkedIn (June 27, 2019), https://www.linkedin.com/pulse/jjs-last-ride-power-peloton-david-j-miller |
| 2009 | Derwent Innovation Patent Export search results for U.S. patents and applications for Darren Ashby (Apr. 7, 2021) |
| 2010 | Derwent Innovation Patent Export search results for U.S. patents and applications for William Dalebout (Apr. 7, 2021) |
| 2011 | Derwent Innovation Patent Export search results for U.S. patents and applications for Scott Watterson (Apr. 7, 2021) |
| 2012 | Mike Masnick, *"Spinning" Trademarked; Gyms Being Threatened for Holding Spinning Classes Sans License,* Techdirt (Dec. 29, 2010), https://www.techdirt.com/articles/20101227/17284312425/spinning-trademarked-gyms-being-threatened-holding-spinning-classes-sans-license.shtml |
| 2013 | *Class,* Dictionary.com, https://www.dictionary.com/browse/class |



[redacted]

| Ex. | Description |
|---|---|
| 2014 | *Leaderboard,* Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/leaderboard |
| 2015 | *Leaderboard,* Collins English Dictionary, https://collinsdictionary.com/us/dictionary/english/leaderboard |
| 2016 | *Leaderboard,* Merriam-Webster, https://www.merriam-webster.com/dictionary/leaderboard |
| 2017 | Nicholas Anschultz, *Sergio Garcia on Top of Leaderboard After Round 1 of the Players Championship,* WRUF (Mar. 12, 2021), https://www.wruf.com/headlines/2021/03/12/sergio-garcia-on-top-of-leaderboard-after-round-1-of-the-players-championship/ |
| 2018 | Jim Cotton, *Giro d'Italia's Wacky Downhill Time Trial Adds Intrigue to Battle for First Pink Jersey,* VeloNews.com (Oct. 3, 2020), https://www.velonews.com/events/giro-ditalia/giro-ditalias-wacky-downhill-time-trial-adds-intrigue-to-battle-for-first-pink-jersey/ |
| 2019 | *Tour de France's First Summit Finish Goes to Primoz Roglic, as Julian Alaphilippe Keeps the Yellow Jersey*, ABC News (Sept. 1, 2020), https://www.abc.net.au/news/2020-09-02/primoz-roglic-wins-first-uphill-finish-at-2020-tour-de-france/12619602 |
| 2020 | RESERVED |
| 2021 | Declaration of Kevin Jeffay, Ph.D., IPR2020-01187 |
| 2022 | Transcript of deposition of Kevin Jeffay, Ph.D., taken May 19, 2021 (Jeffay Tr.) |
| 2023 | FYE 2016 U.S. Bike Portfolio Gross Margin Summary (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2024 | Brake 101 presentation (Aug. 1, 2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2025 | Resistance Adjustment presentation (Sept. 22, 2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |



[redacted]

| Ex. | Description |
|---|---|
| 2026 | Email chain from John Foley regarding partnerships (Dec. 18-20, 2012) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2027 | PCB Assy (May 23, 2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2028 | Signed Statement of Work (May 3, 2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2029 | V1 Brake Redesign (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2030 | API Instructor Cues (2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2031 | Multi-Leaderboard Server Recovery (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2032 | Android Packet Caching for Performance Graphs (2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2033 | Video Streaming – Security (2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2034 | Peloton's Stream Delivery Platform Overview 2020 presentation (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2035 | Leaderboard Spec (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2036 | Leaderboard presentation (2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2037 | When Database Can't Keep Up presentation (July 17, 2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2038 | Sensor Specification (Nov. 2, 2015) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |



[redacted]

| Ex. | Description |
|---|---|
| 2039 | PL01 Technical Specification (2015) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2040 | Software presentation (Jan. 24, 2017) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2041 | Email from John Foley regarding Peloton investor update (June 27, 2012) (CONFIDENTIAL & REDACTED VERSIONS) |
| 2042 | Gabe Ulla, *John Foley: The CEO of Fitness Company Peloton, Which Is Now Valued at $4 Billion is Committed to Expanding the Company Around the Globe,* WSJ Magazine (Nov. 2018) |
| 2043 | *Peloton's Q4 Revenue Tops £1 Billion, but Shipping Delays Continue*, CEO Today (Feb. 5, 2021), https://www.ceotodaymagazine.com/2021/02/pelotons-q4-revenue-tops-1-billion-but-shipping-delays-continue/ |
| 2044 | Lauren Thomas, *Peloton Quarterly Sales Top $1 Billion, but Shares Fall as Cycle Maker Steps Up Further Supply Chain Investments*, CNBC (Feb. 4, 2021), https://www.cnbc.com/2021/02/04/peloton-pton-reports-q2-2021-earnings.html |
| 2045 | Elyse Dupre, *5 Ways Peloton Is Pedaling Towards a Better Customer Experience*, DMNews (June 2017) |
| 2046 | Maureen Farrell, *Peloton's Financing Round Values Stationary-Bike Maker at $4.15 Billion,* Wall Street Journal (Aug. 2, 2018), https://www.wsj.com/articles/pelotons-financing-round-values-stationary-bike-maker-at-4-15-billion-1533255443?mod=searchresults&page=1&pos=7 |
| 2047 | Tom Huddleston, *How Peloton Exercise Bikes Became a $4 Billion Fitness Start-Up with a Cult Following*, CNBC (Feb. 12, 2019), https://www.cnbc.com/2019/02/12/how-peloton-exercise-bikes-and-streaming-gained-a-cult-following.html |



[redacted]

| Ex. | Description |
|---|---|
| 2048 | Hannah Sutker, *Meet Peloton, the Next Big Indoor Bike*, BTR Today (Jan. 25, 2016), https://www.btrtoday.com/read/themeweek/fitness/lt-fitness-2/ |
| 2049 | *Peloton is One of Time's 50 Genius Companies 2018*, Time.com http://time.com/collection/genius-companies-2018/5412650/peloton/ |
| 2050 | Romualdo Faura et al., *The Best People, Programs, and Ideas in Fitness Today; The Men's Health 2015 Fitness Awards* (June 2, 2015), https://www.menshealth.com/fitness/a19542875/2015-fitness-awards/ |
| 2051 | Leah Zerbe, *Peloton Bike: The Most Addictive Piece of Exercise Equipment on the Planet*, Dr. Axe (Aug. 26, 2016), https://draxe.com/fitness/peloton-bike/ |
| 2052 | *Peloton Bike – The Most Fulfilling Indoor Cycling Experience Ever*, Qorix, https://www.qorix.com/peloton-bike-the-most-fulfilling-indoor-cycling-experience-ever/ |
| 2053 | Jono Bacon, *The Five Ways Peloton Weave Community and Content Beautifully*, Forbes (Dec. 6, 2018), https://www.forbes.com/sites/jonobacon/2018/12/06/the-five-ways-peloton-weave-community-and-content-beautifully/?sh=6e8df23b6b59 |
| 2054 | Transcript of *How I Built This: Peloton* podcast (Apr. 29, 2019) |
| 2055 | *The World's 50 Most Innovative Companies 2016, Fitness Honorees*, Fast Company, https://www.fastcompany.com/most-innovative-companies/2016/sectors/fitness |
| 2056 | *The World's 50 Most Innovative Companies 2017, Fitness Honorees,* Fast Company, https://www.fastcompany.com/most-innovative-companies/2017/sectors/fitness |
| 2057 | *The World's 50 Most Innovative Companies 2018, Wellness Honorees,* Fast Company, https://www.fastcompany.com/most-innovative-companies/2018/sectors/wellness |



[redacted]

| Ex. | Description |
|---|---|
| 2058 | Jonathan C. Miller, *Fitness Insider FitTech of the Year 2014, The Peloton Bike,* Fitness Insider (Dec. 24, 2014) |
| 2059 | Leah Ingram, *It Seems Everyone—Even the President—Has a Peloton. Is it Time for You to Get One?,* NextTribe (Jan. 23, 2021), https://nexttribe.com/is-peloton-worth-it/ |
| 2060 | Press Release, *Spinning Partners with Spivi to Offer Spinning Leaderboard for Gyms and Cycling Studios* (Oct. 8, 2019) |
| 2061 | Millicia West, *Meet the British Celebrity Peloton Trainer Who Wants You (and the Rest of the UK) to Join the Cult of Spin*, GQ Britain (June 9, 2019), https://www.gq-magazine.co.uk/article/peloton-homecoming-new-york |
| 2062 | Lauren Goode, *My Two-Month Ride with Peloton, the Cultish, Internet-Connected Fitness Bike*, The Verge (Apr. 25, 2017), https://www.theverge.com/2017/4/25/15408338/bike-peloton-review-indoor-cycle-live-streaming-cycling |
| 2063 | RESERVED |
| 2064 | Susan Miller, *Peloton Bike Review*, Bike Hacks (Nov. 30, 2020), https://www.bikehacks.com/peloton-bike-review/ |
| 2065 | John D. Stoll, *Peloton Bike+ Review: Rationalizing a $2,495 Exercise Bike*, Wall Street Journal (Oct. 18, 2020), https://www.wsj.com/ articles/peloton-bike-review-rationalizing-a-2-495-exercise-bike-11603026000 |
| 2066 | Ingrid Skjong, *Peloton Review: What to Know Before You Buy 2021*, Wirecutter (Feb. 19, 2021), https://www.nytimes.com/wirecutter/ reviews/peloton-review-what-to-know-before-you-buy/ |
| 2067 | Eva Waite-Taylor, *Peloton vs Wattbike Atom: Which Exercise Bike is the Best*, The Independent (Aug. 10, 2020), https://www.independent.co.uk/...uipment-accessories/peloton-vs-wattbike-atom-best-exercise-bike-review-cycle-app-spin-uk-a9663126.html |



[redacted]

| Ex. | Description |
|---|---|
| 2068 | *Peloton vs. SoulCycle* (Oct. 16, 2020), FitFormula Wellness Blog, https://fitformulawellness.com/blogs/blog/peloton-vs-soulcycle-bike#:~:text=If you love the energy,finding an instructor I liked. |
| 2069 | *Peloton Indoor Exercise Bike with Online Streaming Classes,* https://www.onepeloton.com/bike (last visited Apr. 25, 2021) |
| 2070 | Peloton Q1 2021 Shareholder Letter, https://investor.onepeloton.com/static-files/75d1e429-dc1f-4264-b53e-6442e1b8c7bd |
| 2071 | Zac Hall, *Review: Peloton Digital for iPhone and iPad + Using Tread and Bike with Apple Watch*, 9to5Mac (Sept. 30, 2019), https://9to5mac.com/2019/09/30/peloton-digital-tread-bike-iphone-ipad-apple-watch-review |
| 2072 | Ian D'Silva, *Peloton Interactive: An Ecosystem Strategy to Top the Leaderboard*, Sandbox Thoughts (Oct. 24, 2020), https://sandboxthoughts.substack.com/p/peloton-interactive-an-ecosystem |
| 2073 | Peloton Screenshot of Largest Ride |
| 2074 | Matt Bean, *Peloton's Interactive Stationary Bike Lets You Take on the World*, Sports Illustrated (Nov. 14, 2014), https://www.si.com/edge/2014/11/14/pelotons-interactive-bike-lets-you-take-on-the-world |
| 2075 | Josh Constine, *How Peloton Made Sweat Addictive Enough to IPO*, TechCrunch (Sept. 22, 2019), https://techcrunch.com/2019/09/22/why-buy-peloton/ |
| 2076 | Andrew Griffin, *Peloton Bike Review: The Best Way to Work Out at Home and Perhaps the Future of Fitness*, The Independent (Apr. 8, 2019), https://www.independent.co.uk/life-style/gadgets-and-tech/features/peloton-bike-review-home-work-out-best-spin-class-gym-app-tablet-a8860916.html |

| Ex. | Description |
|---|---|
| 2077 | Natt Garun, *Flywheel Admits Its Streaming Bikes Copied Peloton's Technology,* The Verge (Feb. 5, 2020), https://www.theverge.com/2020/2/5/21125153/peloton-flywheel-bike-tech-ip-infringment-settlement-cycling |
| 2078 | *The World's 50 Most Innovative Companies 2019, Wellness Honorees*, Fast Company, https://www.fastcompany.com/most-innovative-companies/2019/sectors/wellness |
| 2079 | Katie Way, *"Project Magnum": Flywheel's Alleged Plot to Steal Peloton's Technology,* Vice (Feb. 20, 2020), https://www.vice.com/en/article/qjdz7v/project-magnum-flywheel-peloton-patent-lawsuit |
| 2080 | Bethany Biron, *Competition Has Flywheel and SoulCycle Spiraling Into an Identity Crisis*, Vox (Jan. 11, 2019), https://www.vox.com/the-goods/2019/1/11/18176929/flywheel-soulcycle-peloton-spinning-bubble-cycling-class |
| 2081 | Cheryl Wischhover, *Peloton's $2,000 Stationary Bike Has Totally Disrupted Working Out at Home*, Vox (Nov. 14, 2018), https://www.vox.com/the-goods/2018/11/14/18088390/peloton-hugh-jackman-spin-bikes-hydrow-tonal |
| 2082 | Kelsey Schagemann, *What I've Learned From 100 Peloton Rides*, aSweatLife (Feb. 25, 2019), https://asweatlife.com/2019/02/what-ive-learned-from-100-peloton-rides/ |
| 2083 | Issie Lapowsky, A Smart Bike That Lets You Stream Indoor Cycling Classes at Home, Wired (Nov. 3, 2014), https://wired.com/2014/11/peloton/ |
| 2084 | Robert Leedham, *You Need a Peloton: David Beckham's Exercise Bike*, GQ Britain (Oct. 2, 2018), https://www.gq-magazine.co.uk/article/you-need-a-peloton-david-beckhams-exercise-bike |
| 2085 | Peloton Brochure (2017) |
| 2086 | Peloton Bike+ User Manual (2020) |

| Ex. | Description |
|---|---|
| 2087 | Peloton Bike Manual (2018) |
| 2088 | Peloton Speed Test screenshot |
| 2089 | Peloton Leaderboard Here Now screenshot |
| 2090 | Peloton Speed Test screenshot |
| 2091 | Peloton On-Demand Library screenshot |
| 2092 | Peloton Class Selection screenshot |
| 2093 | Peloton Wireless Network screenshot |
| 2094 | Peloton Leaderboard All screenshot |
| 2095 | Peloton On-Demand Library screenshot |
| 2096 | Transcript of Masters of Scale episode, available at https://mastersofscale.com/john-foley/ |
| 2097 | Wedbush Deep Dive, *Peloton Interactive, Inc.* (Mar. 17, 2020) |
| 2098 | Market Map Discussion presentation (2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |



[redacted]

## I. Introduction

All of the '026 patent's claims are patentable over the three proposed grounds.

Echelon's arguments for Ground I fail because (i) Echelon's proposed combination is inoperable—Echelon did not (and cannot credibly) explain where the Watterson (Ex. 1007) combination would obtain the data needed to generate the proposed display, (ii) the combination does not teach the dynamic ranked list claim element, and (iii) Echelon's proposed person of ordinary skill in the art ("POSA") lacks any skill in the exercise field and therefore had no basis to conclude that any particular modifications would inspire users to exercise. And because Echelon's expert also lacks any expertise in the exercise field, his conclusory testimony on such exercise topics is due no weight.

For Grounds II and III, Echelon impermissibly used the '026 patent's claims as a template to fashion an intricate patchwork of modifications to Hurwitz. Echelon failed to establish why its POSA—with no skill in the exercise field—would have made the specific combination of modifications proposed with any reasonable expectation of motivating users to exercise. And as in Ground I, the combination does not teach the dynamic ranked list claim element, and Echelon's conclusory testimony on exercise topics is due no weight, especially because it was given by an expert with no expertise in the exercise field.



[redacted]

Accordingly, the Board should find that Echelon failed to carry its burden for any of the challenged claims.

## II. Background

### A. The '026 Patent (Ex. 1001)

The '026 patent's "invention relates to … providing streaming and on-demand exercise classes." '026 patent 1:31-33. "[S]tationary exercise bicycles … are equipped with an associated local system that allows the user to fully participate in live instructor-led or recorded cycling classes from any location that can access a suitable communications network." *Id.* at 4:11-15.

Figure 8 of the patent illustrates an exemplary display:



are insufficient to establish obviousness. *TQ Delta*, 942 F.3d at 1361; *Harmonic*, 815 F.3d at 1363.

Further, when explaining above that Echelon impermissibly used the claims as a template to arrive at its patchwork of modifications, Peloton demonstrated Martens has no need of a start button or signal to properly synchronize and display data so that it can be compared in a coherent manner. *See* Section V.B.1 above.

Accordingly, Echelon failed to demonstrate that claims 9 and 15 would have been obvious.

## VI. Objective Evidence Further Demonstrates the Patentability of the Challenged Claims

Objective evidence of non-obviousness "play[s] an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328-30 (Fed. Cir. 2016). Indeed, it "may often be the most probative and cogent evidence in the record," and "must be considered in *every* case." *Id.* at 1328 (quotation omitted, original emphasis). Here, evidence of commercial success, long-felt but unsolved need, skepticism, industry acceptance and praise, and copying are linked to the invention as a whole and demonstrate the non-obviousness of the challenged claims.

## A. A strong nexus exists between the objective evidence and the merits of the claimed invention

### 1. The presumption of nexus applies because at least the Peloton Bike and Bike+ practice challenged claims

"[T]here is a presumption of nexus … when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F.3d at 1329-30; *Polaris Indus., Inc. v. Artic Cat, Inc.*, 882 F.3d 1056, 1072-73 (Fed. Cir. 2018). While perfect unity of product and patent claim is not necessary, the patentee is required to "demonstrate that the product is essentially the claimed invention." *Fox Factory, Inc. v. SRAM*, LLC, 944 F.3d 1366, 1374 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020).

Here, a nexus is presumed because the Peloton Bike and Bike+ practice the challenged claims of the '026 patent, and the claimed invention is not a subcomponent of (as opposed to the entirety of) the products sold. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) (presumption does not apply if the claimed invention is merely a subcomponent).

#### a. The Peloton Bike is coextensive with the claimed invention.

As demonstrated below for independent claims 1 and 11, the Peloton Bike is coextensive with these claims of the '026 patent.



[redacted]

**<u>[1.1]/[11.1] An exercise system …, comprising:</u>**[12]

The Peloton Bike is an exercise system for use at home, and it is computer-augmented because it includes a computer. Ex. 2069; Ex. 2087 at 6-7; Ex. 2028 at 5-7; Houh Decl. ¶¶ 127-135.

The Peloton Bike allows a first user to participate in an archived exercise class accessible over a computer network. *See* Houh Decl. ¶¶ 136-137; Ex. 2087 at 7, 13, 14; Ex. 2093.




Ex. 2095 (annotated). Peloton live classes become available as on-demand classes. Ex. 2034 at 2.

---

[12] See attached claim listing for claim language.

**[1.2]/[11.6] user causes movement**

A user rides the Peloton Bike by "clipping in" to the pedals of the Peloton Bike and pedaling to cause the Peloton Bike's flywheel to rotate. Houh Decl. ¶¶ 138-140; Ex. 2087 at 11.

**[1.3]/[11.6] sensor generates first user's performance data;**

The Peloton Bike includes various sensors to generate user performance data, including those for cadence, resistance, power output, and heart rate. Houh Decl. ¶¶ 141-147; Ex. 2039; Ex. 2038 at 4, 8; Ex. 2087 at 5, 15; Ex. 2024 at 4-5, 10; Ex. 2025 at 2-4.

**[1.4] a computer configured to:**

The Peloton Bike's console includes a computer. Houh Decl. ¶ 148; Ex. 2087 at 6-7; Ex. 2028 at 5-7.

**[1.4.1]/[11.2] present available archived exercise classes;**

The Peloton Bike's console has a display screen.




Ex. 2087 at 15; Houh Decl. ¶¶ 149-151. The user may select an on-demand (*i.e.*, archived) class from the selection of available classes displayed on the screen. Houh Decl. ¶ 152.



[redacted]




Ex. 2095 (annotated).




Ex. 2091 (annotated).

<u>**[1.4.2]/[11.3] accept selected archived exercise class**</u>

The user may select an on-demand class using the console's touchscreen. Houh Decl. ¶¶ 153-156. The computer accepts the users selection when the user touches the "Start" button.




Ex. 2092 (annotated).

**[1.4.3]/[11.4] receive archived exercise class content**

When "start" (which is not the "start signal" in the dependent claims) is touched by the user for an on-demand (i.e., archived) class, a leaderboard, including other riders who have also joined the on-demand class at the same time as the user ***as well as*** any rider who has taken the same class in the past, is loaded alongside archived performance parameters for those riders. Houh Decl. ¶¶ 157-161, 165-166; Ex. 2035 at 1.1, 1.2, 3.1, 4.1, 4.2, 4.4.

[redacted] Houh Decl. ¶¶ 162-164; Ex. 2040 at 3, 5; Ex. 2034 at 3-6.

**[1.4.4]/[11.5] display archived exercise class content**

While the user is pedaling, the Bike's display screen shows the video content of the selected archived class, the user's cadence and other performance parameters, and the leaderboard. The leaderboard displays other riders' performance parameters, including archived performance parameters of the archived riders who previously participated in that specific class. Houh Decl. ¶¶ 167-170; Ex. 2035 at 4.4.




Ex. 5240; Ex. 2094.

**[1.4.5]/[11.7] receive first user performance data**

[redacted] Houh Decl. ¶¶ 171-174; Ex. 2030 at 2. [redacted] Houh Decl. ¶ 173; Ex. 2029 at 4; Ex. 2027.

**[1.4.6]/[11.8] generate first user's performance parameter**

The performance data is used to generate a performance parameter, such as cadence, resistance, power output, or heartrate, which is displayed as shown below. Houh Decl. ¶¶ 175-178.




Ex. 2089 (annotated); Ex. 2094.

**[1.4.7]/[11.9] receive archived performance data**

The Bike's console receives archived performance data representing archived user performance parameters (such as power output) for other archived



[redacted]

participants, as displayed on the leaderboard. Houh Decl. ¶¶ 179-182; *see also* element [1.4.3]/[11.4] above; *see also* Ex. 2040 at 11.




Ex. 2089 (annotated); Ex. 2094.

**<u>[1.4.8]/[11.10] synchronize archived performance data</u>**

[redacted].



[redacted]

[redacted]

Ex. 2036 at 10 ([redacted]); Ex. 2037 at 9; Houh Decl. ¶¶ 183-186.

**[1.4.9]/[11.11] display a dynamically updating ranked list**

When the user is participating in an archived class, the leaderboard is a dynamically updating ranked list and displayed on the display screen. Houh Decl. ¶ 187-191; Ex. 2040 at 7, 9; Ex. 2036 at 38-63. For example, power output dynamically updates, as does the riders' ranking based on the total output (work). Ex. 2035 at 2.3-2.4; Ex. 2036 at 3-12; *see also* element [1.4.8]/[11.10] above.



[redacted]




Ex. 2089 (annotated).






[redacted]

Ex. 2094 (cropped).

**b. The Peloton Bike+ is coextensive with the claimed invention.**

The Bike+ is coextensive with the claims for the same reasons discussed above, as the Bike+ has all of those features. The primary differences between the Bike+ and the Bike are that the Bike+ has (1) a rotatable touchscreen, and (2) the additional "auto-follow" feature in Peloton Bike+, which are not linked to the objective evidence herein Houh Decl. ¶¶ 192-196; Ex. 2086 at 23, 32-33; *see generally* Ex. 2035.

**2. A nexus exists between the objective indicia of non-obviousness and the claimed invention**

Even without a presumption of nexus, a nexus exists between the objective indicia of non-obviousness and the claimed invention. The claimed invention, embodied by the Peloton Bike and Bike+, offers the convenience of being able to take a class at any time, on-demand, with all of the synchronized, archived performance data from those who have previously taken the class to simulate the competition of an in-studio class. Ex. 2084 at 2 ("Peloton is much more than just a bike: it's Netflix for spinning … [w]ith an archive of 10,000 rides …."). It is also not just the on-demand availability of the exercise class, but the on-demand availability of the synchronized, archived performance data that fuels the "connected fitness" experience. *See* Ex. 2066 at 35 ("Peloton is often credited with kick-starting the trend of connected fitness: streamed, on-demand home workouts



[redacted]

that aim to replicate a traditional studio experience, including live group workouts, the ability to follow a favorite instructor, and a built-in community, but without the stress of scheduling and commuting."); Ex. 2058 at 12 ("A truly disruptive product …. It is the first in-home exercise cycle to offer live streaming and on-demand classes in the comfort of riders' home."); Ex. 2040 at 4, 7.

The claimed invention allows riders to compete, on-demand, with a host of other riders based on a comparison of the rider's own performance parameters against the synchronized, archived users' performance parameters. *WBIP*, 829 F.3d at 1330-31 ("[I]t is the claimed combination as a whole that serves as the nexus for the objective evidence … the fact that an isolated feature may be present in the prior art may not render irrelevant objective evidence of non-obviousness of that feature in the claimed combination.").

Displaying synchronized, archived performance data—elements of the claimed invention—on a dynamically updated ranked list, *i.e.*, the Peloton leaderboard—begets the kind of social interaction, competition, and community that has made Peloton so widely successful, and garnered such buy-in from riders. Ex. 2053 at 4 ("The leaderboard … provides a shared social board of information that weaves together riders from all over the world."); Ex. 2082 at 2; Ex. 2081 at 2 ("It's managed to harness the energy, connection, and competitiveness of a live group fitness class."). Archived competition, as claimed here, results in an ever-

increasing database that generates more competition. For example, some workouts have archived performance data of over 300,000 previous rides.




Ex. 2073. As of 2018, over 10,000 archived rides were available through Peloton. Ex. 2084 at 2. As another example, one popular instructor's last ride garnered over 4,000 live participants and its archived version was taken over 22,500 times over the course of a mere 5 days. Ex. 2008 at 1.

The claimed invention revolutionized fitness by making accessible the competition riders crave, but were otherwise unable to obtain without the synchronization of archived class content (including performance data) with the rider's own performance data. By displaying synchronized, archived performance data, Peloton allows the user to compete against real people, but at any time and



[redacted]

from home. Ex. 2072 at 4-5 ("[T]he Bike and Tread provide priceless data."); Ex. 2053 at 2 ("It is the integration between the *bike*, *content*, and importantly, unlocking *personal* and social competition that is where their secret sauce is brewed.") (original emphasis); Ex. 2074 at 1 ("The innovative system pulls in your telemetry … which means there's a lot more than just sweat to help gauge your workout and to help glue you to others in the class.").

Peloton's claimed invention creates an ever-growing and scalable base of rider data that contributes to the rider community—or, "peloton." Ex. 2065 at 6 ("The Peloton formula—hardware, classes, and social interaction—leads to the thrill and adrenaline of a sport rather than the drudgery and isolation of working out at home."); Ex. 2075 at 6; Ex. 2071 at 13. Indeed, the vision of John Foley, CEO of Peloton, was to create a "network of home riders, thousands per class, pedaling away at the same time, to the same … instructor, in a gamified leaderboard system." Ex. 2096 at 8.

**B. The claimed invention achieved groundbreaking commercial success**

The commercial success of the Peloton Bike, including gross revenue, year-over-year revenue growth, consumer demand, and market share, demonstrates that the claimed invention is non-obvious. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1350 (Fed. Cir. 2012). Peloton



[redacted]

created the market, and until copycat products (such those produced by Flywheel and Petitioner), entered the market, Peloton had the market to itself.

For example, in the first quarter of 2021, Peloton reported a total revenue of $757.9 million, reflecting 232% year-over-year growth "driven by strong demand for [its] Bike and Bike+," despite the company reducing the price of the Peloton Bike. Ex. 2070 at 4. In the last quarter of 2020, Peloton reported its first billion-dollar quarter. Ex. 2043 at 1. Consistent with these reported quarterly revenues, Peloton's revenue outlook for the 2021 fiscal year is nearly $4 billion. Ex. 2070 at 11.

Peloton's commercial success is not limited to the past year. [redacted] Ex. 2023 at 6. [redacted] Ex. 2023 at 4-6.



[redacted]

Peloton also boasts over 1.67 million connected fitness subscribers,[13] and over 4.4 million overall users. Ex. 2043; Ex. 2044. Market data shows that, around early 2020, the vast majority of Peloton users would not consider an alternative, with even the best-ranked alternative garnering a mere 16%. Ex. 2097 at 8. This was true even though most Peloton alternatives were all priced below the Peloton Bike. *Id.* [redacted] Ex. 2098 at 40-41, 45. In fact, Peloton was the creator of "connected fitness." Ex. 2054 at 38:8-20 ("the frustrating thing is [that there was] no market data because we created a category"); Ex. 2066 at 35.

The commercial success of Peloton's bike portfolio is further reflected by the funding Peloton raised from investors and the company's ever-increasing valuation. Ex. 2083 at 2 (raising over $14 million in funding in 2014); Ex. 2065 at 1 (valuing the company at $4 billion in 2020); Ex. 2045 at 1 (labeling Peloton a "$1.25 billion unicorn" in 2017).

---

[13] Connected fitness subscribers reflect monthly subscriptions to sync the company's workout classes to the user's Peloton equipment. Ex. 2070 at 13.


[redacted]

### C. The claimed invention fulfilled a long-felt need of a convenient but competitive, on-demand workout

Peloton was the first to present an on-demand, at-home workout that recreated an in-studio experience. Ex. 2068 at 2. As explained in the previous sections, the prior art did not teach or suggest how to capture the competition or community associated with the studio experience in a way that offered both convenience and flexibility. This long-felt but unmet need demonstrates non-obviousness because "the need would not have persisted had the solution been obvious." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1054-56 (Fed. Cir. 2016).

The Peloton Bike delivers motivates users to exercise by offering competition at any time and from any location, even from home. Users no longer need to choose between an inflexible, scheduled studio class and an isolated, boring ride in the basement. Users instead log in and compete against archived performances from a vast network of other riders whenever (and from wherever) they want. Ex. 2064 at 6-7 ("[I]t is the workouts that put the Peloton miles ahead of other bikes on the market …. With live classes, the leaderboard shows everyone who has logged into the live stream."); Ex. 2082 at 2; Ex. 2059 at 6 ("The leaderboard … is also designed to inspire riders' competitive nature."); Ex. 2062 at 4-5 ("The bigger draw with Peloton was the built-in competitive element of it: seeing that leaderboard somehow did make me pedal harder. And despite being



[redacted]

alone in my living room, it effectively simulated a 'real' cycling class, for lack of a better description."); Ex. 2072 at 4 ("Alone, the hardware is not much more than just another bike, and 'just another bike' doesn't generate much profit. The media experiences are a differentiator.").

### D. Existing players in the industry and potential inventors demonstrated skepticism toward the claimed invention

At its start, Peloton struggled to secure investors because the industry was skeptical of how the claimed invention would effectively recreate the in-studio experience. Investors failed to see how Peloton's on-demand, at-home workout could replace gyms and studios; there simply was no measure of how a "connected fitness" product would deliver on its promise. *See* Ex. 2054 at 38:8-20; Ex. 2042 at 3. None of the investors was able to grasp the connection between fitness and technology. Ex. 2041 at 1. Over 400 investors chose to pass on Peloton, including a score of institutional investors during Peloton's first three years of fundraising. Ex. 2054 at 35:16-38:7, 65:9-66:4; Ex. 2042 at 3-4. Nobody believed Peloton could recreate the community and competition of an in-studio experience. Ex. 2054 at 67:3-14.

Even though Peloton reached out to existing studio-based competitors such as Flywheel, Equinox, and SoulCycle to offer a collaboration—Peloton delivering exclusive, on-demand class content featuring competitors' instructors to monetize



[redacted]

content beyond the studio—none of those outreaches gained traction. Ex. 2054 at 30:21-32:13; Ex. 2026 at 1-2.

### E. The industry accepted and praised the claimed invention, which revolutionized at-home fitness

Peloton received extensive praise within the industry for being the first to offer an at-home, on-demand connected fitness experience that rivaled in-studio classes. Evidence of industry praise shows non-obviousness because "[i]ndustry participants, especially competitors, are not likely to praise an obvious advance over the known art." *Apple*, 839 F.3d at 1053. The industry's widespread acceptance of the claimed invention shows the claimed invention is not obvious. *Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1092 (Fed. Cir. 1987).

Peloton has been identified as a leader in its industry for delivering an on-demand, at-home experience with the same perks of studio classes. Ex. 2080 at 8 ("Peloton is swiftly solidifying itself as the frontrunner in the spinning market."); Ex. 2072 at 7 ("Peloton is a category leader"); Ex. 2058. Peloton has been consistently recognized as among the world's most innovative companies. Ex. 2055 ("bring spin class home"); Ex. 2056 ("for spinning a fitness revolution in your living room"); Ex. 2057 ("for bringing the boutique fitness experience home"); Ex. 2078 ("[f]or revolutionizing the at-home fitness experience"); Ex. 2085 at 9-10.



[redacted]

Other praise similarly highlights the Peloton Bike as introducing a new, on-demand and at-home experience that is engaging and competitive. Ex. 2048 at 2 ("Hailed by Men's Health as 'the best cardio machine on the planet,' the Peloton bike sets a new standard for excellence in both the home fitness and studio cycling arenas."); Ex. 2050 (same); Ex. 2051 ("most addictive piece of exercise equipment" and praising on-demand accessibility); Ex. 2052 ("most fulfilling indoor cycling experience ever"); Ex. 2067 ("the best way to work out from home"); Ex. 2049.

Peloton has been likened to technology giants such as Netflix, Amazon, and Apple. Ex. 2084 at 2 ("Peloton is much more than just a bike: it's Netflix for spinning."); Ex. 2046 at 2 ("[W]hile many companies claim to be the Netflix of their category, Peloton is a rare example of one that is."); Ex. 2047 at 4 ("[Peloton has] been dubbed the 'Apple of fitness,' but it could also be compared to Amazon …."); Ex. 2071 at 13 ("Like with Apple products, there's more to Peloton than just an app or machine.").

Peloton has been recognized outside of the fitness industry, which speaks to how the claimed invention was revolutionary even by technology and media standards. Ex. 2076 at 1 ("hailed as the future not just of fitness but of media and tech too"); Ex. 2061 at 1 ("Awarded every accolade in the tech and fitness sphere,



[redacted]

Peloton connects riders to world-class workouts in a socially connected space."); Ex. 2047 at 4.

Imitation is the sincerest form of flattery. On the coattails of Peloton's success, other companies mimicked how Peloton's Bike creates a "connected fitness" experience. Ex. 2081 at 6 ("[N]ew startups are now calling themselves the 'Peloton of [insert exercise type here].' It's become the go-to model …."); Ex. 2066 at 35. Both studios and stationary bike manufacturers began offering at-home exercise bikes with on-demand, archived content. Ex. 2080 at 8 ("To contend with this, SoulCycle and Flywheel are scrambling to find ways to keep up, namely by expanding their offerings."); Ex. 2060.

### F. Flywheel, a competitor, admitted to copying the claimed invention

To compete with Peloton, Flywheel copied the Peloton Bike, specifically targeting its tablet technology, and admitted to copying, which demonstrates that the claimed invention embodied by the Peloton Bike was non-obvious. Copying as evidence of non-obviousness requires replication of a specific product, and Flywheel admitted outright to duplicating the claimed features and the steps it took to copy the Peloton Bike. *See Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1138 (Fed. Cir. 2019) ("[W]here there is evidence of actual copying efforts, that evidence is always relevant."); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed.



[redacted]

Cir. 2004) (finding support through internal documents, direct evidence, or access to or substantial similarity to the patented product).

Flywheel's actions led to a legal dispute resulting in the discontinuation of Flywheel's copycat product, "FLY Anywhere." Ex. 2079; Ex. 2077. Flywheel's FLY Anywhere was capable of "displaying live and archived cycling class content to remote riders, tracking a remote rider's performance, and comparing that remote rider's performance against the performance of other remote riders." Ex. 2079 at 4-5. Flywheel deliberately obtained confidential information regarding Peloton's praised technology through its covert investigations and a design firm that previously collaborated with Peloton. Ex. 2079 at 4-5.

* * *

Accordingly, the objective evidence demonstrates the claims' nonobviousness.



[redacted]

## VII. Conclusion

For the above reasons, the Board should confirm the patentability of all challenged claims.

Respectfully submitted,

Dated: June 11, 2021 By: / Jonathan M. Strang /

Jonathan M. Strang (Reg. No. 61,724)
jonathan.strang@lw.com
Lawrence J. Gotts (Reg. No. 31,163)
lawrence.gotts@lw.com
Ethan L. Plail (*pro hac vice* forthcoming)
ethan.plail@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW, Ste. 1000
Washington, D.C. 20004-1304
Telephone: 202.637.2200
Fax: 202.637.2201

Marc N. Zubick (*pro hac vice* forthcoming)
marc.zubick@lw.com
Dale Chang (Reg. No. 61,476)
dale.chang@lw.com
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Fax: 312.993.9767

David F. Kowalski (*pro hac vice* forthcoming)
david.kowalski@lw.com
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130



[redacted]

Telephone: 858.523.5400
Fax: 858.523.5450

Joseph C. Akalski (Reg. No. 76,783)
joe.akalski@lw.com
Stephen D. O'Donohue (*pro hac vice* forthcoming)
stephen.odonohue@lw.com
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200
Fax: 212.751.4864

Kimberly Q. Li (Reg. No. 74,713)
kimberly.li@lw.com
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Telephone: 617.948.6000
Fax: 617.948.6001

*Counsel for Patent Owner*
*Peloton Interactive, Inc.*



[redacted]

# EXHIBIT 5

Filed on behalf of: Peloton Interactive, Inc.

Entered: June 11, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ECHELON FITNESS MULTIMEDIA, LLC,
Petitioner,

v.

PELOTON INTERACTIVE, INC.,
Patent Owner.

---

Case IPR2020-01541
Patent No. 10,486,026

---

**PATENT OWNER'S RESPONSE**

***PUBLIC VERSION-REDACTED***

# TABLE OF CONTENTS

I. Introduction ........................................................................................ 1

II. Background ........................................................................................ 2

A. The '026 Patent (Ex. 1001) ........................................................................ 2

B. Echelon's proposed Person of Ordinary Skill in the Art ("POSA") lacks any training or professional experience in the relevant art ........................................................................ 3

III. Claim Construction ........................................................................ 5

A. The claimed "archived exercise class[es]" require a human instructor ........................................................................ 6

B. "leaderboard" ........................................................................ 8

IV. Ground I: Claims 1-20 are Patentable over Watterson and Hurwitz ............ 10

A. Overview of the art and the combination ........................................ 11

1. Watterson (Ex. 1007) ........................................................ 11

2. Hurwitz (Ex. 1004) ........................................................ 14

B. Echelon's POSA would not have made the proposed combination, which also fails to teach all of the claim elements ........ 15

1. Echelon's inoperable combination fails to teach the claimed computer, and teaches away from the combination ........................................................ 16

2. Even if operable, Echelon's POSA would not have arrived at the proposed combination ........................................ 21

3. The combination does not teach the dynamically updating ranked list (element [1.4.9]/[11.11]) ......................... 26

4. Echelon did not remedy the defects in its Petition with its arguments for claims 2-20 ................................................ 27

C. Claims 9 and 15 (start signal) are independently patentable over Watterson and Hurwitz ..... 28

V. Grounds II and III: Claims 1-20 are Patentable over Hurwitz, Garcia, Martens (Claim 1-19), and Loveland (Claim 20) ..... 31

A. Overview of the art ..... 32

1. Garcia (Ex. 1005) ..... 32

2. Martens (Ex. 1006) ..... 33

B. Echelon's POSA would not have arrived at the proposed combination, which also fails to teach all of the claim elements ..... 34

1. Echelon's POSA would not have arrived at the proposed combination ..... 35

2. The inoperability of Echelon's combination teaches away and fails to teach the claimed "operable" system ..... 48

3. The combination does not teach the dynamically updating ranked list (element [1.4.9]/[11.11]) ..... 49

4. Echelon did not remedy the defects in its Petition with its arguments for claims 2-20 ..... 49

C. Dependent Claims ..... 49

1. Claims 5, 7, 17, 18 (live and archived participant content) ..... 49

2. Claims 9 and 15 (start signal) ..... 50

VI. Objective Evidence Further Demonstrates the Patentability of the Challenged Claims ..... 51

A. A strong nexus exists between the objective evidence and the merits of the claimed invention ..... 52

1. The presumption of nexus applies because at least the Peloton Bike and Bike+ practice challenged claims ..... 52

a. The Peloton Bike is coextensive with the claimed invention. ..... 52

b. The Peloton Bike+ is coextensive with the claimed invention. ....63
2. A nexus exists between the objective indicia of non-obviousness and the claimed invention ....63
B. The claimed invention achieved groundbreaking commercial success ....66
C. The claimed invention fulfilled a long-felt need of a convenient but competitive, on-demand workout ....69
D. Existing players in the industry and potential inventors demonstrated skepticism toward the claimed invention ....70
E. The industry accepted and praised the claimed invention, which revolutionized at-home fitness ....71
F. Flywheel, a competitor, admitted to copying the claimed invention ....73
VII. Conclusion ....75
Claim Listing....77

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen Archery, Inc. v. Browning Mfg. Co.*,
819 F.2d 1087 (Fed. Cir. 1987) ....................71

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011) ....................8, 10

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................69, 71

*Belden Inc. v. Berk-Tek, LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................28, 48

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................52

*Dennison Mfg. Co. v. Panduit Corp.*,
475 U.S. 809 (1986)....................35

*Eli Lilly & Co. v. Actavis Elizabeth LLC*,
435 F. App'x 917 (Fed. Cir. 2011) ....................35

*Fox Factory, Inc. v. SRAM*, LLC,
944 F.3d 1366 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) ....................52

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ....................17

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....................35

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016) ....................*passim*

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
822 F.3d 1312 (Fed. Cir. 2016) ....................8, 10

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004) ....................73

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ............ 35

*Liberty Mut. Ins. Co. v. Progressive Cas. Ins. Co.*,
CBM2012-00003, Paper 8 (Oct. 25, 2012) ............ 18

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
941 F.3d 1133 (Fed. Cir. 2019) ............ 73

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ............ 26, 28, 46

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ............ 15, 17

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ............ 8

*Polaris Indus., Inc. v. Artic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ............ 52

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000) ............ 3, 4

*SAS Inst, Inc. v. Iancu*,
138 S. Ct. 1348 (2018) ............ 3, 29

*SEB S.A. v. Montgomery Ward & Co.*,
594 F.3d 1360 (Fed. Cir. 2010) ............ 24

*TQ Delta v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ............ *passim*

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
699 F.3d 1340 (Fed. Cir. 2012) ............ 66

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ............ 51, 52, 64

## REGULATIONS

37 C.F.R. § 42.6 ........................................................................................30

37 C.F.R. § 42.100 ........................................................................................5

37 C.F.R. § 42.104 ........................................................................................6

**Exhibit List**

| Ex. | Description |
|---|---|
| 2001 | Schwartz, U.S. Patent Appl. Pub. No. 2007/0219059 |
| 2002 | Declaration of Henry H. Houh in Support of Patent Owner's Response ("Houh Decl.") (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2003 | Curriculum Vitae of Henry H. Houh, Ph.D. |
| 2004 | Declaration of Jim Rutberg in Support of Patent Owner's Response ("Rutberg Decl.") |
| 2005 | Curriculum Vitae of Jim Rutberg |
| 2006 | RESERVED |
| 2007 | Screenshots of Peloton leaderboards |
| 2008 | David J. Miller, *JJ's Last Ride and the Power of Peloton,* LinkedIn (June 27, 2019), https://www.linkedin.com/pulse/jjs-last-ride-power-peloton-david-j-miller |
| 2009 | Derwent Innovation Patent Export search results for U.S. patents and applications for Darren Ashby (Apr. 7, 2021) |
| 2010 | Derwent Innovation Patent Export search results for U.S. patents and applications for William Dalebout (Apr. 7, 2021) |
| 2011 | Derwent Innovation Patent Export search results for U.S. patents and applications for Scott Watterson (Apr. 7, 2021) |
| 2012 | Mike Masnick, *"Spinning" Trademarked; Gyms Being Threatened for Holding Spinning Classes Sans License,* Techdirt (Dec. 29, 2010), https://www.techdirt.com/articles/20101227/17284312425/spinning-trademarked-gyms-being-threatened-holding-spinning-classes-sans-license.shtml |
| 2013 | *Class,* Dictionary.com, https://www.dictionary.com/browse/class |

| Ex. | Description |
|---|---|
| 2014 | *Leaderboard,* Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/leaderboard |
| 2015 | *Leaderboard,* Collins English Dictionary, https://collinsdictionary.com/us/dictionary/english/leaderboard |
| 2016 | *Leaderboard,* Merriam-Webster, https://www.merriam-webster.com/dictionary/leaderboard |
| 2017 | Nicholas Anschultz, *Sergio Garcia on Top of Leaderboard After Round 1 of the Players Championship,* WRUF (Mar. 12, 2021), https://www.wruf.com/headlines/2021/03/12/sergio-garcia-on-top-of-leaderboard-after-round-1-of-the-players-championship/ |
| 2018 | Jim Cotton, *Giro d'Italia's Wacky Downhill Time Trial Adds Intrigue to Battle for First Pink Jersey,* VeloNews.com (Oct. 3, 2020), https://www.velonews.com/events/giro-ditalia/giro-ditalias-wacky-downhill-time-trial-adds-intrigue-to-battle-for-first-pink-jersey/ |
| 2019 | *Tour de France's First Summit Finish Goes to Primoz Roglic, as Julian Alaphilippe Keeps the Yellow Jersey*, ABC News (Sept. 1, 2020), https://www.abc.net.au/news/2020-09-02/primoz-roglic-wins-first-uphill-finish-at-2020-tour-de-france/12619602 |
| 2020 | RESERVED |
| 2021 | Declaration of Kevin Jeffay, Ph.D., IPR2020-01187 |
| 2022 | Transcript of deposition of Kevin Jeffay, Ph.D., taken May 19, 2021 (Jeffay Tr.) |
| 2023 | FYE 2016 U.S. Bike Portfolio Gross Margin Summary (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2024 | Brake 101 presentation (Aug. 1, 2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2025 | Resistance Adjustment presentation (Sept. 22, 2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |

| Ex. | Description |
|---|---|
| 2026 | Email chain from John Foley regarding partnerships (Dec. 18-20, 2012) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2027 | PCB Assy (May 23, 2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2028 | Signed Statement of Work (May 3, 2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2029 | V1 Brake Redesign (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2030 | API Instructor Cues (2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2031 | Multi-Leaderboard Server Recovery (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2032 | Android Packet Caching for Performance Graphs (2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2033 | Video Streaming – Security (2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2034 | Peloton's Stream Delivery Platform Overview 2020 presentation (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2035 | Leaderboard Spec (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2036 | Leaderboard presentation (2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2037 | When Database Can't Keep Up presentation (July 17, 2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2038 | Sensor Specification (Nov. 2, 2015) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |

| Ex. | Description |
|---|---|
| 2039 | PL01 Technical Specification (2015) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2040 | Software presentation (Jan. 24, 2017) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2041 | Email from John Foley regarding Peloton investor update (June 27, 2012) (CONFIDENTIAL & REDACTED VERSIONS) |
| 2042 | Gabe Ulla, *John Foley: The CEO of Fitness Company Peloton, Which Is Now Valued at $4 Billion is Committed to Expanding the Company Around the Globe,* WSJ Magazine (Nov. 2018) |
| 2043 | *Peloton's Q4 Revenue Tops £1 Billion, but Shipping Delays Continue*, CEO Today (Feb. 5, 2021), https://www.ceotodaymagazine.com/2021/02/pelotons-q4-revenue-tops-1-billion-but-shipping-delays-continue/ |
| 2044 | Lauren Thomas, *Peloton Quarterly Sales Top $1 Billion, but Shares Fall as Cycle Maker Steps Up Further Supply Chain Investments*, CNBC (Feb. 4, 2021), https://www.cnbc.com/2021/02/04/peloton-pton-reports-q2-2021-earnings.html |
| 2045 | Elyse Dupre, *5 Ways Peloton Is Pedaling Towards a Better Customer Experience*, DMNews (June 2017) |
| 2046 | Maureen Farrell, *Peloton's Financing Round Values Stationary-Bike Maker at $4.15 Billion,* Wall Street Journal (Aug. 2, 2018), https://www.wsj.com/articles/pelotons-financing-round-values-stationary-bike-maker-at-4-15-billion-1533255443?mod=searchresults&page=1&pos=7 |
| 2047 | Tom Huddleston, *How Peloton Exercise Bikes Became a $4 Billion Fitness Start-Up with a Cult Following*, CNBC (Feb. 12, 2019), https://www.cnbc.com/2019/02/12/how-peloton-exercise-bikes-and-streaming-gained-a-cult-following.html |

| Ex. | Description |
|---|---|
| 2048 | Hannah Sutker, *Meet Peloton, the Next Big Indoor Bike*, BTR Today (Jan. 25, 2016), https://www.btrtoday.com/read/themeweek/fitness/lt-fitness-2/ |
| 2049 | *Peloton is One of Time's 50 Genius Companies 2018*, Time.com http://time.com/collection/genius-companies-2018/5412650/peloton/ |
| 2050 | Romualdo Faura et al., *The Best People, Programs, and Ideas in Fitness Today; The Men's Health 2015 Fitness Awards* (June 2, 2015), https://www.menshealth.com/fitness/a19542875/2015-fitness-awards/ |
| 2051 | Leah Zerbe, *Peloton Bike: The Most Addictive Piece of Exercise Equipment on the Planet*, Dr. Axe (Aug. 26, 2016), https://draxe.com/fitness/peloton-bike/ |
| 2052 | *Peloton Bike – The Most Fulfilling Indoor Cycling Experience Ever*, Qorix, https://www.qorix.com/peloton-bike-the-most-fulfilling-indoor-cycling-experience-ever/ |
| 2053 | Jono Bacon, *The Five Ways Peloton Weave Community and Content Beautifully*, Forbes (Dec. 6, 2018), https://www.forbes.com/sites/jonobacon/2018/12/06/the-five-ways-peloton-weave-community-and-content-beautifully/?sh=6e8df23b6b59 |
| 2054 | Transcript of *How I Built This: Peloton* podcast (Apr. 29, 2019) |
| 2055 | *The World's 50 Most Innovative Companies 2016, Fitness Honorees*, Fast Company, https://www.fastcompany.com/most-innovative-companies/2016/sectors/fitness |
| 2056 | *The World's 50 Most Innovative Companies 2017, Fitness Honorees,* Fast Company, https://www.fastcompany.com/most-innovative-companies/2017/sectors/fitness |
| 2057 | *The World's 50 Most Innovative Companies 2018, Wellness Honorees,* Fast Company, https://www.fastcompany.com/most-innovative-companies/2018/sectors/wellness |

| **Ex.** | **Description** |
|---|---|
| 2058 | Jonathan C. Miller, *Fitness Insider FitTech of the Year 2014, The Peloton Bike,* Fitness Insider (Dec. 24, 2014) |
| 2059 | Leah Ingram, *It Seems Everyone—Even the President—Has a Peloton. Is it Time for You to Get One?,* NextTribe (Jan. 23, 2021), https://nexttribe.com/is-peloton-worth-it/ |
| 2060 | Press Release, *Spinning Partners with Spivi to Offer Spinning Leaderboard for Gyms and Cycling Studios* (Oct. 8, 2019) |
| 2061 | Millicia West, *Meet the British Celebrity Peloton Trainer Who Wants You (and the Rest of the UK) to Join the Cult of Spin*, GQ Britain (June 9, 2019), https://www.gq-magazine.co.uk/article/peloton-homecoming-new-york |
| 2062 | Lauren Goode, *My Two-Month Ride with Peloton, the Cultish, Internet-Connected Fitness Bike*, The Verge (Apr. 25, 2017), https://www.theverge.com/2017/4/25/15408338/bike-peloton-review-indoor-cycle-live-streaming-cycling |
| 2063 | RESERVED |
| 2064 | Susan Miller, *Peloton Bike Review*, Bike Hacks (Nov. 30, 2020), https://www.bikehacks.com/peloton-bike-review/ |
| 2065 | John D. Stoll, *Peloton Bike+ Review: Rationalizing a $2,495 Exercise Bike*, Wall Street Journal (Oct. 18, 2020), https://www.wsj.com/articles/peloton-bike-review-rationalizing-a-2-495-exercise-bike-11603026000 |
| 2066 | Ingrid Skjong, *Peloton Review: What to Know Before You Buy 2021*, Wirecutter (Feb. 19, 2021), https://www.nytimes.com/wirecutter/reviews/peloton-review-what-to-know-before-you-buy/ |
| 2067 | Eva Waite-Taylor, *Peloton vs Wattbike Atom: Which Exercise Bike is the Best*, The Independent (Aug. 10, 2020), https://www.independent.co.uk/...uipment-accessories/peloton-vs-wattbike-atom-best-exercise-bike-review-cycle-app-spin-uk-a9663126.html |

| Ex. | Description |
|---|---|
| 2068 | *Peloton vs. SoulCycle* (Oct. 16, 2020), FitFormula Wellness Blog, https://fitformulawellness.com/blogs/blog/peloton-vs-soulcycle-bike#:~:text=If you love the energy,finding an instructor I liked. |
| 2069 | *Peloton Indoor Exercise Bike with Online Streaming Classes,* https://www.onepeloton.com/bike (last visited Apr. 25, 2021) |
| 2070 | Peloton Q1 2021 Shareholder Letter, https://investor.onepeloton.com/static-files/75d1e429-dc1f-4264-b53e-6442e1b8c7bd |
| 2071 | Zac Hall, *Review: Peloton Digital for iPhone and iPad + Using Tread and Bike with Apple Watch*, 9to5Mac (Sept. 30, 2019), https://9to5mac.com/2019/09/30/peloton-digital-tread-bike-iphone-ipad-apple-watch-review |
| 2072 | Ian D'Silva, *Peloton Interactive: An Ecosystem Strategy to Top the Leaderboard*, Sandbox Thoughts (Oct. 24, 2020), https://sandboxthoughts.substack.com/p/peloton-interactive-an-ecosystem |
| 2073 | Peloton Screenshot of Largest Ride |
| 2074 | Matt Bean, *Peloton's Interactive Stationary Bike Lets You Take on the World*, Sports Illustrated (Nov. 14, 2014), https://www.si.com/edge/2014/11/14/pelotons-interactive-bike-lets-you-take-on-the-world |
| 2075 | Josh Constine, *How Peloton Made Sweat Addictive Enough to IPO*, TechCrunch (Sept. 22, 2019), https://techcrunch.com/2019/09/22/why-buy-peloton/ |
| 2076 | Andrew Griffin, *Peloton Bike Review: The Best Way to Work Out at Home and Perhaps the Future of Fitness*, The Independent (Apr. 8, 2019), https://www.independent.co.uk/life-style/gadgets-and-tech/features/peloton-bike-review-home-work-out-best-spin-class-gym-app-tablet-a8860916.html |

| Ex. | Description |
|---|---|
| 2077 | Natt Garun, *Flywheel Admits Its Streaming Bikes Copied Peloton's Technology,* The Verge (Feb. 5, 2020), https://www.theverge.com/2020/2/5/21125153/peloton-flywheel-bike-tech-ip-infringment-settlement-cycling |
| 2078 | *The World's 50 Most Innovative Companies 2019, Wellness Honorees*, Fast Company, https://www.fastcompany.com/most-innovative-companies/2019/sectors/wellness |
| 2079 | Katie Way, *"Project Magnum": Flywheel's Alleged Plot to Steal Peloton's Technology,* Vice (Feb. 20, 2020), https://www.vice.com/en/article/qjdz7v/project-magnum-flywheel-peloton-patent-lawsuit |
| 2080 | Bethany Biron, *Competition Has Flywheel and SoulCycle Spiraling Into an Identity Crisis*, Vox (Jan. 11, 2019), https://www.vox.com/the-goods/2019/1/11/18176929/flywheel-soulcycle-peloton-spinning-bubble-cycling-class |
| 2081 | Cheryl Wischhover, *Peloton's $2,000 Stationary Bike Has Totally Disrupted Working Out at Home*, Vox (Nov. 14, 2018), https://www.vox.com/the-goods/2018/11/14/18088390/peloton-hugh-jackman-spin-bikes-hydrow-tonal |
| 2082 | Kelsey Schagemann, *What I've Learned From 100 Peloton Rides*, aSweatLife (Feb. 25, 2019), https://asweatlife.com/2019/02/what-ive-learned-from-100-peloton-rides/ |
| 2083 | Issie Lapowsky, A Smart Bike That Lets You Stream Indoor Cycling Classes at Home, Wired (Nov. 3, 2014), https://wired.com/2014/11/peloton/ |
| 2084 | Robert Leedham, *You Need a Peloton: David Beckham's Exercise Bike*, GQ Britain (Oct. 2, 2018), https://www.gq-magazine.co.uk/article/you-need-a-peloton-david-beckhams-exercise-bike |
| 2085 | Peloton Brochure (2017) |
| 2086 | Peloton Bike+ User Manual (2020) |

| Ex. | Description |
|---|---|
| 2087 | Peloton Bike Manual (2018) |
| 2088 | Peloton Speed Test screenshot |
| 2089 | Peloton Leaderboard Here Now screenshot |
| 2090 | Peloton Speed Test screenshot |
| 2091 | Peloton On-Demand Library screenshot |
| 2092 | Peloton Class Selection screenshot |
| 2093 | Peloton Wireless Network screenshot |
| 2094 | Peloton Leaderboard All screenshot |
| 2095 | Peloton On-Demand Library screenshot |
| 2096 | Transcript of Masters of Scale episode, available at https://mastersofscale.com/john-foley/ |
| 2097 | Wedbush Deep Dive, *Peloton Interactive, Inc.* (Mar. 17, 2020) |
| 2098 | Market Map Discussion presentation (2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |

## I. Introduction

All of the '026 patent's claims are patentable over the three proposed grounds.

Echelon's arguments for Ground I fail because (i) Echelon's proposed combination is inoperable—Echelon did not (and cannot credibly) explain where the Watterson (Ex. 1007) combination would obtain the data needed to generate the proposed display, (ii) the combination does not teach the dynamic ranked list claim element, and (iii) Echelon's proposed person of ordinary skill in the art ("POSA") lacks any skill in the exercise field and therefore had no basis to conclude that any particular modifications would inspire users to exercise. And because Echelon's expert also lacks any expertise in the exercise field, his conclusory testimony on such exercise topics is due no weight.

For Grounds II and III, Echelon impermissibly used the '026 patent's claims as a template to fashion an intricate patchwork of modifications to Hurwitz. Echelon failed to establish why its POSA—with no skill in the exercise field—would have made the specific combination of modifications proposed with any reasonable expectation of motivating users to exercise. And as in Ground I, the combination does not teach the dynamic ranked list claim element, and Echelon's conclusory testimony on exercise topics is due no weight, especially because it was given by an expert with no expertise in the exercise field.

Accordingly, the Board should find that Echelon failed to carry its burden for any of the challenged claims.

## II. Background

### A. The '026 Patent (Ex. 1001)

The '026 patent's "invention relates to … providing streaming and on-demand exercise classes." '026 patent 1:31-33. "[S]tationary exercise bicycles … are equipped with an associated local system that allows the user to fully participate in live instructor-led or recorded cycling classes from any location that can access a suitable communications network." *Id.* at 4:11-15.

Figure 8 of the patent illustrates an exemplary display:



are insufficient to establish obviousness. *TQ Delta*, 942 F.3d at 1361; *Harmonic*, 815 F.3d at 1363.

Further, when explaining above that Echelon impermissibly used the claims as a template to arrive at its patchwork of modifications, Peloton demonstrated Martens has no need of a start button or signal to properly synchronize and display data so that it can be compared in a coherent manner. *See* Section V.B.1 above.

Accordingly, Echelon failed to demonstrate that claims 9 and 15 would have been obvious.

## VI. Objective Evidence Further Demonstrates the Patentability of the Challenged Claims

Objective evidence of non-obviousness "play[s] an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328-30 (Fed. Cir. 2016). Indeed, it "may often be the most probative and cogent evidence in the record," and "must be considered in *every* case." *Id.* at 1328 (quotation omitted, original emphasis). Here, evidence of commercial success, long-felt but unsolved need, skepticism, industry acceptance and praise, and copying are linked to the invention as a whole and demonstrate the non-obviousness of the challenged claims.

### A. A strong nexus exists between the objective evidence and the merits of the claimed invention

#### 1. The presumption of nexus applies because at least the Peloton Bike and Bike+ practice challenged claims

"[T]here is a presumption of nexus … when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F.3d at 1329-30; *Polaris Indus., Inc. v. Artic Cat, Inc.*, 882 F.3d 1056, 1072-73 (Fed. Cir. 2018). While perfect unity of product and patent claim is not necessary, the patentee is required to "demonstrate that the product is essentially the claimed invention." *Fox Factory, Inc. v. SRAM*, LLC, 944 F.3d 1366, 1374 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020).

Here, a nexus is presumed because the Peloton Bike and Bike+ practice the challenged claims of the '026 patent, and the claimed invention is not a subcomponent of (as opposed to the entirety of) the products sold. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) (presumption does not apply if the claimed invention is merely a subcomponent).

##### a. The Peloton Bike is coextensive with the claimed invention.

As demonstrated below for independent claims 1 and 11, the Peloton Bike is coextensive with these claims of the '026 patent.

**[1.1]/[11.1] An exercise system …, comprising:**[12]

The Peloton Bike is an exercise system for use at home, and it is computer-augmented because it includes a computer. Ex. 2069; Ex. 2087 at 6-7; Ex. 2028 at 5-7; Houh Decl. ¶¶ 127-135.

The Peloton Bike allows a first user to participate in an archived exercise class accessible over a computer network. *See* Houh Decl. ¶¶ 136-137; Ex. 2087 at 7, 13, 14; Ex. 2093.




Ex. 2095 (annotated). Peloton live classes become available as on-demand classes. Ex. 2034 at 2.

---

[12] See attached claim listing for claim language.

**[1.2]/[11.6] user causes movement**

A user rides the Peloton Bike by "clipping in" to the pedals of the Peloton Bike and pedaling to cause the Peloton Bike's flywheel to rotate. Houh Decl. ¶¶ 138-140; Ex. 2087 at 11.

**[1.3]/[11.6] sensor generates first user's performance data;**

The Peloton Bike includes various sensors to generate user performance data, including those for cadence, resistance, power output, and heart rate. Houh Decl. ¶¶ 141-147; Ex. 2039; Ex. 2038 at 4, 8; Ex. 2087 at 5, 15; Ex. 2024 at 4-5, 10; Ex. 2025 at 2-4.

**[1.4] a computer configured to:**

The Peloton Bike's console includes a computer. Houh Decl. ¶ 148; Ex. 2087 at 6-7; Ex. 2028 at 5-7.

**[1.4.1]/[11.2] present available archived exercise classes;**

The Peloton Bike's console has a display screen.




Ex. 2087 at 15; Houh Decl. ¶¶ 149-151. The user may select an on-demand (*i.e.*, archived) class from the selection of available classes displayed on the screen. Houh Decl. ¶ 152.




Ex. 2095 (annotated).




Ex. 2091 (annotated).

**[1.4.2]/[11.3] accept selected archived exercise class**

The user may select an on-demand class using the console's touchscreen. Houh Decl. ¶¶ 153-156. The computer accepts the users selection when the user touches the "Start" button.




Ex. 2092 (annotated).

**[1.4.3]/[11.4] receive archived exercise class content**

When "start" (which is not the "start signal" in the dependent claims) is touched by the user for an on-demand (i.e., archived) class, a leaderboard, including other riders who have also joined the on-demand class at the same time as the user ***as well as*** any rider who has taken the same class in the past, is loaded alongside archived performance parameters for those riders. Houh Decl. ¶¶ 157-161, 165-166; Ex. 2035 at 1.1, 1.2, 3.1, 4.1, 4.2, 4.4.

[redacted] Houh Decl. ¶¶ 162-164; Ex. 2040 at 3, 5; Ex. 2034 at 3-6.

**[1.4.4]/[11.5] display archived exercise class content**

While the user is pedaling, the Bike's display screen shows the video content of the selected archived class, the user's cadence and other performance parameters, and the leaderboard. The leaderboard displays other riders' performance parameters, including archived performance parameters of the archived riders who previously participated in that specific class. Houh Decl. ¶¶ 167-170; Ex. 2035 at 4.4.




Ex. 5240; Ex. 2094.

**[1.4.5]/[11.7] receive first user performance data**

[redacted] Houh Decl. ¶¶ 171-174; Ex. 2030 at 2. [redacted] Houh Decl. ¶ 173; Ex. 2029 at 4; Ex. 2027.

**[1.4.6]/[11.8] generate first user's performance parameter**

The performance data is used to generate a performance parameter, such as cadence, resistance, power output, or heartrate, which is displayed as shown below. Houh Decl. ¶¶ 175-178.




Ex. 2089 (annotated); Ex. 2094.

**[1.4.7]/[11.9] receive archived performance data**

The Bike's console receives archived performance data representing archived user performance parameters (such as power output) for other archived

participants, as displayed on the leaderboard. Houh Decl. ¶¶ 179-182; *see also* element [1.4.3]/[11.4] above; *see also* Ex. 2040 at 11.




Ex. 2089 (annotated); Ex. 2094.

**<u>[1.4.8]/[11.10] synchronize archived performance data</u>**

[redacted]

[redacted]

Ex. 2036 at 10 ([redacted]); Ex. 2037 at 9; Houh Decl. ¶¶ 183-186.

**<u>[1.4.9]/[11.11] display a dynamically updating ranked list</u>**

When the user is participating in an archived class, the leaderboard is a dynamically updating ranked list and displayed on the display screen. Houh Decl. ¶ 187-191; Ex. 2040 at 7, 9; Ex. 2036 at 38-63. For example, power output dynamically updates, as does the riders' ranking based on the total output (work). Ex. 2035 at 2.3-2.4; Ex. 2036 at 3-12; *see also* element [1.4.8]/[11.10] above.




Ex. 2089 (annotated).



Ex. 2094 (cropped).

#### b. The Peloton Bike+ is coextensive with the claimed invention.

The Bike+ is coextensive with the claims for the same reasons discussed above, as the Bike+ has all of those features. The primary differences between the Bike+ and the Bike are that the Bike+ has (1) a rotatable touchscreen, and (2) the additional "auto-follow" feature in Peloton Bike+, which are not linked to the objective evidence herein Houh Decl. ¶¶ 192-196; Ex. 2086 at 23, 32-33; *see generally* Ex. 2035.

### 2. A nexus exists between the objective indicia of non-obviousness and the claimed invention

Even without a presumption of nexus, a nexus exists between the objective indicia of non-obviousness and the claimed invention. The claimed invention, embodied by the Peloton Bike and Bike+, offers the convenience of being able to take a class at any time, on-demand, with all of the synchronized, archived performance data from those who have previously taken the class to simulate the competition of an in-studio class. Ex. 2084 at 2 ("Peloton is much more than just a bike: it's Netflix for spinning … [w]ith an archive of 10,000 rides …."). It is also not just the on-demand availability of the exercise class, but the on-demand availability of the synchronized, archived performance data that fuels the "connected fitness" experience. *See* Ex. 2066 at 35 ("Peloton is often credited with kick-starting the trend of connected fitness: streamed, on-demand home workouts

that aim to replicate a traditional studio experience, including live group workouts, the ability to follow a favorite instructor, and a built-in community, but without the stress of scheduling and commuting."); Ex. 2058 at 12 ("A truly disruptive product …. It is the first in-home exercise cycle to offer live streaming and on-demand classes in the comfort of riders' home."); Ex. 2040 at 4, 7.

The claimed invention allows riders to compete, on-demand, with a host of other riders based on a comparison of the rider's own performance parameters against the synchronized, archived users' performance parameters. *WBIP*, 829 F.3d at 1330-31 ("[I]t is the claimed combination as a whole that serves as the nexus for the objective evidence … the fact that an isolated feature may be present in the prior art may not render irrelevant objective evidence of non-obviousness of that feature in the claimed combination.").

Displaying synchronized, archived performance data—elements of the claimed invention—on a dynamically updated ranked list, *i.e.*, the Peloton leaderboard—begets the kind of social interaction, competition, and community that has made Peloton so widely successful, and garnered such buy-in from riders. Ex. 2053 at 4 ("The leaderboard … provides a shared social board of information that weaves together riders from all over the world."); Ex. 2082 at 2; Ex. 2081 at 2 ("It's managed to harness the energy, connection, and competitiveness of a live group fitness class."). Archived competition, as claimed here, results in an ever-

increasing database that generates more competition. For example, some workouts have archived performance data of over 300,000 previous rides.




Ex. 2073. As of 2018, over 10,000 archived rides were available through Peloton. Ex. 2084 at 2. As another example, one popular instructor's last ride garnered over 4,000 live participants and its archived version was taken over 22,500 times over the course of a mere 5 days. Ex. 2008 at 1.

The claimed invention revolutionized fitness by making accessible the competition riders crave, but were otherwise unable to obtain without the synchronization of archived class content (including performance data) with the rider's own performance data. By displaying synchronized, archived performance data, Peloton allows the user to compete against real people, but at any time and

from home. Ex. 2072 at 4-5 ("[T]he Bike and Tread provide priceless data."); Ex. 2053 at 2 ("It is the integration between the *bike*, *content*, and importantly, unlocking *personal* and social competition that is where their secret sauce is brewed.") (original emphasis); Ex. 2074 at 1 ("The innovative system pulls in your telemetry … which means there's a lot more than just sweat to help gauge your workout and to help glue you to others in the class.").

Peloton's claimed invention creates an ever-growing and scalable base of rider data that contributes to the rider community—or, "peloton." Ex. 2065 at 6 ("The Peloton formula—hardware, classes, and social interaction—leads to the thrill and adrenaline of a sport rather than the drudgery and isolation of working out at home."); Ex. 2075 at 6; Ex. 2071 at 13. Indeed, the vision of John Foley, CEO of Peloton, was to create a "network of home riders, thousands per class, pedaling away at the same time, to the same … instructor, in a gamified leaderboard system." Ex. 2096 at 8.

### B. The claimed invention achieved groundbreaking commercial success

The commercial success of the Peloton Bike, including gross revenue, year-over-year revenue growth, consumer demand, and market share, demonstrates that the claimed invention is non-obvious. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1350 (Fed. Cir. 2012). Peloton

created the market, and until copycat products (such those produced by Flywheel and Petitioner), entered the market, Peloton had the market to itself.

For example, in the first quarter of 2021, Peloton reported a total revenue of $757.9 million, reflecting 232% year-over-year growth "driven by strong demand for [its] Bike and Bike+," despite the company reducing the price of the Peloton Bike. Ex. 2070 at 4. In the last quarter of 2020, Peloton reported its first billion-dollar quarter. Ex. 2043 at 1. Consistent with these reported quarterly revenues, Peloton's revenue outlook for the 2021 fiscal year is nearly $4 billion. Ex. 2070 at 11.

Peloton's commercial success is not limited to the past year. [redacted] Ex. 2023 at 6. [redacted] Ex. 2023 at 4-6.

Peloton also boasts over 1.67 million connected fitness subscribers,[13] and over 4.4 million overall users. Ex. 2043; Ex. 2044. Market data shows that, around early 2020, the vast majority of Peloton users would not consider an alternative, with even the best-ranked alternative garnering a mere 16%. Ex. 2097 at 8. This was true even though most Peloton alternatives were all priced below the Peloton Bike. *Id.* [redacted] Ex. 2098 at 40-41, 45. In fact, Peloton was the creator of "connected fitness." Ex. 2054 at 38:8-20 ("the frustrating thing is [that there was] no market data because we created a category"); Ex. 2066 at 35.

The commercial success of Peloton's bike portfolio is further reflected by the funding Peloton raised from investors and the company's ever-increasing valuation. Ex. 2083 at 2 (raising over $14 million in funding in 2014); Ex. 2065 at 1 (valuing the company at $4 billion in 2020); Ex. 2045 at 1 (labeling Peloton a "$1.25 billion unicorn" in 2017).

---

[13] Connected fitness subscribers reflect monthly subscriptions to sync the company's workout classes to the user's Peloton equipment. Ex. 2070 at 13.

### C. The claimed invention fulfilled a long-felt need of a convenient but competitive, on-demand workout

Peloton was the first to present an on-demand, at-home workout that recreated an in-studio experience. Ex. 2068 at 2. As explained in the previous sections, the prior art did not teach or suggest how to capture the competition or community associated with the studio experience in a way that offered both convenience and flexibility. This long-felt but unmet need demonstrates non-obviousness because "the need would not have persisted had the solution been obvious." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1054-56 (Fed. Cir. 2016).

The Peloton Bike delivers motivates users to exercise by offering competition at any time and from any location, even from home. Users no longer need to choose between an inflexible, scheduled studio class and an isolated, boring ride in the basement. Users instead log in and compete against archived performances from a vast network of other riders whenever (and from wherever) they want. Ex. 2064 at 6-7 ("[I]t is the workouts that put the Peloton miles ahead of other bikes on the market …. With live classes, the leaderboard shows everyone who has logged into the live stream."); Ex. 2082 at 2; Ex. 2059 at 6 ("The leaderboard … is also designed to inspire riders' competitive nature."); Ex. 2062 at 4-5 ("The bigger draw with Peloton was the built-in competitive element of it: seeing that leaderboard somehow did make me pedal harder. And despite being

alone in my living room, it effectively simulated a 'real' cycling class, for lack of a better description."); Ex. 2072 at 4 ("Alone, the hardware is not much more than just another bike, and 'just another bike' doesn't generate much profit. The media experiences are a differentiator.").

### D. Existing players in the industry and potential inventors demonstrated skepticism toward the claimed invention

At its start, Peloton struggled to secure investors because the industry was skeptical of how the claimed invention would effectively recreate the in-studio experience. Investors failed to see how Peloton's on-demand, at-home workout could replace gyms and studios; there simply was no measure of how a "connected fitness" product would deliver on its promise. *See* Ex. 2054 at 38:8-20; Ex. 2042 at 3. None of the investors was able to grasp the connection between fitness and technology. Ex. 2041 at 1. Over 400 investors chose to pass on Peloton, including a score of institutional investors during Peloton's first three years of fundraising. Ex. 2054 at 35:16-38:7, 65:9-66:4; Ex. 2042 at 3-4. Nobody believed Peloton could recreate the community and competition of an in-studio experience. Ex. 2054 at 67:3-14.

Even though Peloton reached out to existing studio-based competitors such as Flywheel, Equinox, and SoulCycle to offer a collaboration—Peloton delivering exclusive, on-demand class content featuring competitors' instructors to monetize

content beyond the studio—none of those outreaches gained traction. Ex. 2054 at 30:21-32:13; Ex. 2026 at 1-2.

**E. The industry accepted and praised the claimed invention, which revolutionized at-home fitness**

Peloton received extensive praise within the industry for being the first to offer an at-home, on-demand connected fitness experience that rivaled in-studio classes. Evidence of industry praise shows non-obviousness because "[i]ndustry participants, especially competitors, are not likely to praise an obvious advance over the known art." *Apple*, 839 F.3d at 1053. The industry's widespread acceptance of the claimed invention shows the claimed invention is not obvious. *Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1092 (Fed. Cir. 1987).

Peloton has been identified as a leader in its industry for delivering an on-demand, at-home experience with the same perks of studio classes. Ex. 2080 at 8 ("Peloton is swiftly solidifying itself as the frontrunner in the spinning market."); Ex. 2072 at 7 ("Peloton is a category leader"); Ex. 2058. Peloton has been consistently recognized as among the world's most innovative companies. Ex. 2055 ("bring spin class home"); Ex. 2056 ("for spinning a fitness revolution in your living room"); Ex. 2057 ("for bringing the boutique fitness experience home"); Ex. 2078 ("[f]or revolutionizing the at-home fitness experience"); Ex. 2085 at 9-10.

Other praise similarly highlights the Peloton Bike as introducing a new, on-demand and at-home experience that is engaging and competitive. Ex. 2048 at 2 ("Hailed by Men's Health as 'the best cardio machine on the planet,' the Peloton bike sets a new standard for excellence in both the home fitness and studio cycling arenas."); Ex. 2050 (same); Ex. 2051 ("most addictive piece of exercise equipment" and praising on-demand accessibility); Ex. 2052 ("most fulfilling indoor cycling experience ever"); Ex. 2067 ("the best way to work out from home"); Ex. 2049.

Peloton has been likened to technology giants such as Netflix, Amazon, and Apple. Ex. 2084 at 2 ("Peloton is much more than just a bike: it's Netflix for spinning."); Ex. 2046 at 2 ("[W]hile many companies claim to be the Netflix of their category, Peloton is a rare example of one that is."); Ex. 2047 at 4 ("[Peloton has] been dubbed the 'Apple of fitness,' but it could also be compared to Amazon …."); Ex. 2071 at 13 ("Like with Apple products, there's more to Peloton than just an app or machine.").

Peloton has been recognized outside of the fitness industry, which speaks to how the claimed invention was revolutionary even by technology and media standards. Ex. 2076 at 1 ("hailed as the future not just of fitness but of media and tech too"); Ex. 2061 at 1 ("Awarded every accolade in the tech and fitness sphere,

Peloton connects riders to world-class workouts in a socially connected space."); Ex. 2047 at 4.

Imitation is the sincerest form of flattery. On the coattails of Peloton's success, other companies mimicked how Peloton's Bike creates a "connected fitness" experience. Ex. 2081 at 6 ("[N]ew startups are now calling themselves the 'Peloton of [insert exercise type here].' It's become the go-to model …."); Ex. 2066 at 35. Both studios and stationary bike manufacturers began offering at-home exercise bikes with on-demand, archived content. Ex. 2080 at 8 ("To contend with this, SoulCycle and Flywheel are scrambling to find ways to keep up, namely by expanding their offerings."); Ex. 2060.

**F. Flywheel, a competitor, admitted to copying the claimed invention**

To compete with Peloton, Flywheel copied the Peloton Bike, specifically targeting its tablet technology, and admitted to copying, which demonstrates that the claimed invention embodied by the Peloton Bike was non-obvious. Copying as evidence of non-obviousness requires replication of a specific product, and Flywheel admitted outright to duplicating the claimed features and the steps it took to copy the Peloton Bike. *See Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1138 (Fed. Cir. 2019) ("[W]here there is evidence of actual copying efforts, that evidence is always relevant."); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed.

Cir. 2004) (finding support through internal documents, direct evidence, or access to or substantial similarity to the patented product).

Flywheel's actions led to a legal dispute resulting in the discontinuation of Flywheel's copycat product, "FLY Anywhere." Ex. 2079; Ex. 2077. Flywheel's FLY Anywhere was capable of "displaying live and archived cycling class content to remote riders, tracking a remote rider's performance, and comparing that remote rider's performance against the performance of other remote riders." Ex. 2079 at 4-5. Flywheel deliberately obtained confidential information regarding Peloton's praised technology through its covert investigations and a design firm that previously collaborated with Peloton. Ex. 2079 at 4-5.

* * *

Accordingly, the objective evidence demonstrates the claims' nonobviousness.

## VII. Conclusion

For the above reasons, the Board should confirm the patentability of all challenged claims.

Respectfully submitted,

Dated: June 11, 2021 By: / Jonathan M. Strang /

Jonathan M. Strang (Reg. No. 61,724)
jonathan.strang@lw.com
Lawrence J. Gotts (Reg. No. 31,163)
lawrence.gotts@lw.com
Ethan L. Plail (*pro hac vice* forthcoming)
ethan.plail@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW, Ste. 1000
Washington, D.C. 20004-1304
Telephone: 202.637.2200
Fax: 202.637.2201

Marc N. Zubick (*pro hac vice* forthcoming)
marc.zubick@lw.com
Dale Chang (Reg. No. 61,476)
dale.chang@lw.com
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Fax: 312.993.9767

David F. Kowalski (*pro hac vice* forthcoming)
david.kowalski@lw.com
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130

Telephone: 858.523.5400
Fax: 858.523.5450

Joseph C. Akalski (Reg. No. 76,783)
joe.akalski@lw.com
Stephen D. O'Donohue (*pro hac vice* forthcoming)
stephen.odonohue@lw.com
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200
Fax: 212.751.4864

Kimberly Q. Li (Reg. No. 74,713)
kimberly.li@lw.com
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Telephone: 617.948.6000
Fax: 617.948.6001

*Counsel for Patent Owner*
*Peloton Interactive, Inc.*

# EXHIBIT 6

Filed on behalf of: Peloton Interactive, Inc.

Entered: October 22, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ECHELON FITNESS MULTIMEDIA, LLC,
Petitioner,

v.

PELOTON INTERACTIVE, INC.,
Patent Owner.

---

Case IPR2020-01541
Patent No. 10,486,026

---

# PATENT OWNER'S SURREPLY

# TABLE OF CONTENTS

**Page**

I. Introduction ........ 1

II. Preliminary Matters ........ 2

A. Echelon's proposed POSA lacks the skills necessary to support a conclusion of obviousness ........ 2

B. Echelon's expert is unqualified to opine on exercise-related topics ........ 3

C. Claim Construction ........ 4

III. Grounds I-III: The Art Fails To Teach The Claimed "Dynamically Updating Ranked List" (element [1.4.9]/[11.11]) And "Leaderboard" (claims 8, 13, and 14) ........ 5

IV. Ground II: Echelon's New Arguments Do Not Salvage Its Hindsight-Driven Proposal to Modify Watterson ........ 11

A. Echelon failed to demonstrate that its POSA *would have* modified Watterson as proposed ........ 11

B. Echelon's Watterson combination is inoperable ........ 14

C. Claims 9/15: Echelon's belated "start signal" theory fails ........ 18

V. Grounds II and III: Echelon's New Arguments Do Not Salvage Its Defective Hurwitz Combination ........ 18

A. Echelon's POSA would not have arrived at Echelon's convoluted, hindsight-driven combination ........ 18

B. Claims 5, 7, 17, and 18 – Echelon's belated theory for two live participants ........ 23

VI. Echelon Fails to Rebut Patentee's Objective Evidence of Nonobviousness ........ 24

VII. Conclusion ........ 28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexsam, Inc. v. IDT Corp.*,
715 F.3d 1336 (Fed. Cir. 2013) ....................3

*Amazon.com v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed Cir. 2001) ....................14

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................17

*Caterpillar Inc. v. Wirtgen Am., Inc.*,
IPR2018-00155, Paper 13 (May 22, 2019)....................17

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F.3d 1294 (Fed. Cir. 2010) ....................2

*In re Cyclobenzaprine Hydrochloride*,
676 F.3d 1063 (Fed. Cir. 2012) ....................3

*Env't. Designs, Ltd. v. Union Oil Co. of Cal.*,
713 F.2d 693 (Fed. Cir. 1983) ....................3

*Facebook, Inc. v. Windy City Innovations*,
973 F.3d 1321 (Fed. Cir. 2020) ....................17

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) ....................23

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................8

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ....................11

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................10

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) ....................16

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
600 F. App'x 755 (Fed. Cir. 2015) ....................16, 22

*Polaris Indus, Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................8, 13

*TQ Delta, LLC v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................8, 17

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ....................7, 16

# EXHIBIT LIST

| Ex. | Description |
|---|---|
| 2001 | Schwartz, U.S. Patent Appl. Pub. No. 2007/0219059 |
| 2002 | Declaration of Henry H. Houh in Support of Patent Owner's Response ("Houh Decl.") (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2003 | Curriculum Vitae of Henry H. Houh, Ph.D. |
| 2004 | Declaration of Jim Rutberg in Support of Patent Owner's Response ("Rutberg Decl.") |
| 2005 | Curriculum Vitae of Jim Rutberg |
| 2006 | RESERVED |
| 2007 | Screenshots of Peloton leaderboards |
| 2008 | David J. Miller, *JJ's Last Ride and the Power of Peloton,* LinkedIn (June 27, 2019), https://www.linkedin.com/pulse/jjs-last-ride-power-peloton-david-j-miller |
| 2009 | Derwent Innovation Patent Export search results for U.S. patents and applications for Darren Ashby (Apr. 7, 2021) |
| 2010 | Derwent Innovation Patent Export search results for U.S. patents and applications for William Dalebout (Apr. 7, 2021) |
| 2011 | Derwent Innovation Patent Export search results for U.S. patents and applications for Scott Watterson (Apr. 7, 2021) |
| 2012 | Mike Masnick, *"Spinning" Trademarked; Gyms Being Threatened for Holding Spinning Classes Sans License,* Techdirt (Dec. 29, 2010), https://www.techdirt.com/articles/20101227/17284312425/spinning-trademarked-gyms-being-threatened-holding-spinning-classes-sans-license.shtml |
| 2013 | *Class,* Dictionary.com, https://www.dictionary.com/browse/class |

| Ex. | Description |
|---|---|
| 2014 | *Leaderboard,* Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/leaderboard |
| 2015 | *Leaderboard,* Collins English Dictionary, https://collinsdictionary.com/us/dictionary/english/leaderboard |
| 2016 | *Leaderboard,* Merriam-Webster, https://www.merriam-webster.com/dictionary/leaderboard |
| 2017 | Nicholas Anschultz, *Sergio Garcia on Top of Leaderboard After Round 1 of the Players Championship,* WRUF (Mar. 12, 2021), https://www.wruf.com/headlines/2021/03/12/sergio-garcia-on-top-of-leaderboard-after-round-1-of-the-players-championship/ |
| 2018 | Jim Cotton, *Giro d'Italia's Wacky Downhill Time Trial Adds Intrigue to Battle for First Pink Jersey,* VeloNews.com (Oct. 3, 2020), https://www.velonews.com/events/giro-ditalia/giro-ditalias-wacky-downhill-time-trial-adds-intrigue-to-battle-for-first-pink-jersey/ |
| 2019 | *Tour de France's First Summit Finish Goes to Primoz Roglic, as Julian Alaphilippe Keeps the Yellow Jersey*, ABC News (Sept. 1, 2020), https://www.abc.net.au/news/2020-09-02/primoz-roglic-wins-first-uphill-finish-at-2020-tour-de-france/12619602 |
| 2020 | RESERVED |
| 2021 | Declaration of Kevin Jeffay, Ph.D., IPR2020-01187 |
| 2022 | Transcript of deposition of Kevin Jeffay, Ph.D., taken May 19, 2021 (Jeffay Tr.) |
| 2023 | FYE 2016 U.S. Bike Portfolio Gross Margin Summary (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2024 | Brake 101 presentation (Aug. 1, 2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2025 | Resistance Adjustment presentation (Sept. 22, 2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |

| Ex. | Description |
|---|---|
| 2026 | Email chain from John Foley regarding partnerships (Dec. 18-20, 2012) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2027 | PCB Assy (May 23, 2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2028 | Signed Statement of Work (May 3, 2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2029 | V1 Brake Redesign (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2030 | API Instructor Cues (2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2031 | Multi-Leaderboard Server Recovery (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2032 | Android Packet Caching for Performance Graphs (2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2033 | Video Streaming – Security (2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2034 | Peloton's Stream Delivery Platform Overview 2020 presentation (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2035 | Leaderboard Spec (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2036 | Leaderboard presentation (2018) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2037 | When Database Can't Keep Up presentation (July 17, 2016) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2038 | Sensor Specification (Nov. 2, 2015) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |

| Ex. | Description |
|---|---|
| 2039 | PL01 Technical Specification (2015) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2040 | Software presentation (Jan. 24, 2017) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2041 | Email from John Foley regarding Peloton investor update (June 27, 2012) (CONFIDENTIAL & REDACTED VERSIONS) |
| 2042 | Gabe Ulla, *John Foley: The CEO of Fitness Company Peloton, Which Is Now Valued at $4 Billion is Committed to Expanding the Company Around the Globe,* WSJ Magazine (Nov. 2018) |
| 2043 | *Peloton's Q4 Revenue Tops £1 Billion, but Shipping Delays Continue*, CEO Today (Feb. 5, 2021), https://www.ceotodaymagazine.com/2021/02/pelotons-q4-revenue-tops-1-billion-but-shipping-delays-continue/ |
| 2044 | Lauren Thomas, *Peloton Quarterly Sales Top $1 Billion, but Shares Fall as Cycle Maker Steps Up Further Supply Chain Investments*, CNBC (Feb. 4, 2021), https://www.cnbc.com/2021/02/04/peloton-pton-reports-q2-2021-earnings.html |
| 2045 | Elyse Dupre, *5 Ways Peloton Is Pedaling Towards a Better Customer Experience*, DMNews (June 2017) |
| 2046 | Maureen Farrell, *Peloton's Financing Round Values Stationary-Bike Maker at $4.15 Billion,* Wall Street Journal (Aug. 2, 2018), https://www.wsj.com/articles/pelotons-financing-round-values-stationary-bike-maker-at-4-15-billion-1533255443?mod=searchresults&page=1&pos=7 |
| 2047 | Tom Huddleston, *How Peloton Exercise Bikes Became a $4 Billion Fitness Start-Up with a Cult Following*, CNBC (Feb. 12, 2019), https://www.cnbc.com/2019/02/12/how-peloton-exercise-bikes-and-streaming-gained-a-cult-following.html |

| Ex. | Description |
|---|---|
| 2048 | Hannah Sutker, *Meet Peloton, the Next Big Indoor Bike*, BTR Today (Jan. 25, 2016), https://www.btrtoday.com/read/themeweek/fitness/lt-fitness-2/ |
| 2049 | *Peloton is One of Time's 50 Genius Companies 2018*, Time.com http://time.com/collection/genius-companies-2018/5412650/peloton/ |
| 2050 | Romualdo Faura et al., *The Best People, Programs, and Ideas in Fitness Today; The Men's Health 2015 Fitness Awards* (June 2, 2015), https://www.menshealth.com/fitness/a19542875/2015-fitness-awards/ |
| 2051 | Leah Zerbe, *Peloton Bike: The Most Addictive Piece of Exercise Equipment on the Planet*, Dr. Axe (Aug. 26, 2016), https://draxe.com/fitness/peloton-bike/ |
| 2052 | *Peloton Bike – The Most Fulfilling Indoor Cycling Experience Ever*, Qorix, https://www.qorix.com/peloton-bike-the-most-fulfilling-indoor-cycling-experience-ever/ |
| 2053 | Jono Bacon, *The Five Ways Peloton Weave Community and Content Beautifully*, Forbes (Dec. 6, 2018), https://www.forbes.com/sites/ jonobacon/2018/12/06/the-five-ways-peloton-weave-community-and-content-beautifully/?sh=6e8df23b6b59 |
| 2054 | Transcript of *How I Built This: Peloton* podcast (Apr. 29, 2019) |
| 2055 | *The World's 50 Most Innovative Companies 2016, Fitness Honorees*, Fast Company, https://www.fastcompany.com/most-innovative-companies/2016/sectors/fitness |
| 2056 | *The World's 50 Most Innovative Companies 2017, Fitness Honorees,* Fast Company, https://www.fastcompany.com/most-innovative-companies/2017/sectors/fitness |
| 2057 | *The World's 50 Most Innovative Companies 2018, Wellness Honorees,* Fast Company, https://www.fastcompany.com/most-innovative-companies/2018/sectors/wellness |

| Ex. | Description |
|---|---|
| 2058 | Jonathan C. Miller, *Fitness Insider FitTech of the Year 2014, The Peloton Bike,* Fitness Insider (Dec. 24, 2014) |
| 2059 | Leah Ingram, *It Seems Everyone—Even the President—Has a Peloton. Is it Time for You to Get One?,* NextTribe (Jan. 23, 2021), https://nexttribe.com/is-peloton-worth-it/ |
| 2060 | Press Release, *Spinning Partners with Spivi to Offer Spinning Leaderboard for Gyms and Cycling Studios* (Oct. 8, 2019) |
| 2061 | Millicia West, *Meet the British Celebrity Peloton Trainer Who Wants You (and the Rest of the UK) to Join the Cult of Spin*, GQ Britain (June 9, 2019), https://www.gq-magazine.co.uk/article/peloton-homecoming-new-york |
| 2062 | Lauren Goode, *My Two-Month Ride with Peloton, the Cultish, Internet-Connected Fitness Bike*, The Verge (Apr. 25, 2017), https://www.theverge.com/2017/4/25/15408338/bike-peloton-review-indoor-cycle-live-streaming-cycling |
| 2063 | RESERVED |
| 2064 | Susan Miller, *Peloton Bike Review*, Bike Hacks (Nov. 30, 2020), https://www.bikehacks.com/peloton-bike-review/ |
| 2065 | John D. Stoll, *Peloton Bike+ Review: Rationalizing a $2,495 Exercise Bike*, Wall Street Journal (Oct. 18, 2020), https://www.wsj.com/ articles/peloton-bike-review-rationalizing-a-2-495-exercise-bike-11603026000 |
| 2066 | Ingrid Skjong, *Peloton Review: What to Know Before You Buy 2021*, Wirecutter (Feb. 19, 2021), https://www.nytimes.com/wirecutter/ reviews/peloton-review-what-to-know-before-you-buy/ |
| 2067 | Eva Waite-Taylor, *Peloton vs Wattbike Atom: Which Exercise Bike is the Best*, The Independent (Aug. 10, 2020), https://www.independent.co.uk/...uipment-accessories/peloton-vs-wattbike-atom-best-exercise-bike-review-cycle-app-spin-uk-a9663126.html |

| Ex. | Description |
|---|---|
| 2068 | *Peloton vs. SoulCycle* (Oct. 16, 2020), FitFormula Wellness Blog, https://fitformulawellness.com/blogs/blog/peloton-vs-soulcycle-bike#:~:text=If you love the energy,finding an instructor I liked. |
| 2069 | *Peloton Indoor Exercise Bike with Online Streaming Classes,* https://www.onepeloton.com/bike (last visited Apr. 25, 2021) |
| 2070 | Peloton Q1 2021 Shareholder Letter, https://investor.onepeloton.com/static-files/75d1e429-dc1f-4264-b53e-6442e1b8c7bd |
| 2071 | Zac Hall, *Review: Peloton Digital for iPhone and iPad + Using Tread and Bike with Apple Watch*, 9to5Mac (Sept. 30, 2019), https://9to5mac.com/2019/09/30/peloton-digital-tread-bike-iphone-ipad-apple-watch-review |
| 2072 | Ian D'Silva, *Peloton Interactive: An Ecosystem Strategy to Top the Leaderboard*, Sandbox Thoughts (Oct. 24, 2020), https://sandboxthoughts.substack.com/p/peloton-interactive-an-ecosystem |
| 2073 | Peloton Screenshot of Largest Ride |
| 2074 | Matt Bean, *Peloton's Interactive Stationary Bike Lets You Take on the World*, Sports Illustrated (Nov. 14, 2014), https://www.si.com/edge/2014/11/14/pelotons-interactive-bike-lets-you-take-on-the-world |
| 2075 | Josh Constine, *How Peloton Made Sweat Addictive Enough to IPO*, TechCrunch (Sept. 22, 2019), https://techcrunch.com/2019/09/22/why-buy-peloton/ |
| 2076 | Andrew Griffin, *Peloton Bike Review: The Best Way to Work Out at Home and Perhaps the Future of Fitness*, The Independent (Apr. 8, 2019), https://www.independent.co.uk/life-style/gadgets-and-tech/features/peloton-bike-review-home-work-out-best-spin-class-gym-app-tablet-a8860916.html |

| Ex. | Description |
|---|---|
| 2077 | Natt Garun, *Flywheel Admits Its Streaming Bikes Copied Peloton's Technology,* The Verge (Feb. 5, 2020), https://www.theverge.com/2020/2/5/21125153/peloton-flywheel-bike-tech-ip-infringment-settlement-cycling |
| 2078 | *The World's 50 Most Innovative Companies 2019, Wellness Honorees*, Fast Company, https://www.fastcompany.com/most-innovative-companies/2019/sectors/wellness |
| 2079 | Katie Way, *"Project Magnum": Flywheel's Alleged Plot to Steal Peloton's Technology,* Vice (Feb. 20, 2020), https://www.vice.com/en/article/qjdz7v/project-magnum-flywheel-peloton-patent-lawsuit |
| 2080 | Bethany Biron, *Competition Has Flywheel and SoulCycle Spiraling Into an Identity Crisis*, Vox (Jan. 11, 2019), https://www.vox.com/the-goods/2019/1/11/18176929/flywheel-soulcycle-peloton-spinning-bubble-cycling-class |
| 2081 | Cheryl Wischhover, *Peloton's $2,000 Stationary Bike Has Totally Disrupted Working Out at Home*, Vox (Nov. 14, 2018), https://www.vox.com/the-goods/2018/11/14/18088390/peloton-hugh-jackman-spin-bikes-hydrow-tonal |
| 2082 | Kelsey Schagemann, *What I've Learned From 100 Peloton Rides*, aSweatLife (Feb. 25, 2019), https://asweatlife.com/2019/02/what-ive-learned-from-100-peloton-rides/ |
| 2083 | Issie Lapowsky, A Smart Bike That Lets You Stream Indoor Cycling Classes at Home, Wired (Nov. 3, 2014), https://wired.com/2014/11/peloton/ |
| 2084 | Robert Leedham, *You Need a Peloton: David Beckham's Exercise Bike*, GQ Britain (Oct. 2, 2018), https://www.gq-magazine.co.uk/article/you-need-a-peloton-david-beckhams-exercise-bike |
| 2085 | Peloton Brochure (2017) |
| 2086 | Peloton Bike+ User Manual (2020) |

| Ex. | Description |
|---|---|
| 2087 | Peloton Bike Manual (2018) |
| 2088 | Peloton Speed Test screenshot |
| 2089 | Peloton Leaderboard Here Now screenshot |
| 2090 | Peloton Speed Test screenshot |
| 2091 | Peloton On-Demand Library screenshot |
| 2092 | Peloton Class Selection screenshot |
| 2093 | Peloton Wireless Network screenshot |
| 2094 | Peloton Leaderboard All screenshot |
| 2095 | Peloton On-Demand Library screenshot |
| 2096 | Transcript of Masters of Scale episode, available at https://mastersofscale.com/john-foley/ |
| 2097 | Wedbush Deep Dive, *Peloton Interactive, Inc.* (Mar. 17, 2020) |
| 2098 | Market Map Discussion presentation (2019) (HIGHLY CONFIDENTIAL—AEO & REDACTED VERSIONS) |
| 2099 | Declaration of Kenneth Jiang [*served, not filed*] |
| 2100 | Declaration of Scott Burch [*served, not filed*] |
| 2101 | Declaration of Yony Feng [*served, not filed*] |
| 2102 | Declaration of Tom Cortese [*served, not filed*] |
| 2103 | Declaration of Maryann Gong [*served, not filed*] |
| 2104 | Declaration of David Packles [*served, not filed*] |

| Ex. | Description |
|---|---|
| 2105 | Markman Order, *Peloton Interactive, Inc. v. Echelon Fitness Multimedia LLC,* No. 1:19-cv-01903-RGA, and *Peloton Interactive, Inc. v. Icon Health & Fitness, Inc.,* No. 1:20-cv-00662-RGA (D. Del. June 23, 2021) |
| 2106 | Excerpt from Transcript of Markman Hearing, *Peloton Interactive, Inc. v. Echelon Fitness Multimedia LLC,* No. 1:19-cv-01903-RGA, and *Peloton Interactive, Inc. v. Icon Health & Fitness, Inc.,* No. 1:20-cv-00662-RGA (D. Del. June 24, 2021) |
| 2107 | Memorandum Opinion, *Peloton Interactive, Inc. v. Echelon Fitness Multimedia LLC,* No. 1:19-cv-01903-RGA, and *Peloton Interactive, Inc. v. Icon Health & Fitness, Inc.,* No. 1:20-cv-00662-RGA (D. Del. Aug. 3, 2021) |
| 2108 | Transcript of deposition of Kevin Jeffay, Ph.D., (with deposition exhibits 2101 and 2104), taken Sept. 28, 2021 |

# I. Introduction

The '026 patent's claims focus tightly on what is missing from all of the prior art: on-demand, at-home exercise classes with racing (parameter comparison) between the user and those who have previously competed.

For its part, Watterson teaches live and on-demand remote exercise programs and touts their advantages. POR 11-12, 22-23. Watterson also provides a separate competition module with live and time-delayed racing against others (the "personalized race" at issue here), a "race around the world," and "race the computer." POR 11-14. But Watterson recognized that racing provides different advantages and is incompatible with its prescribed workouts, and therefore never combined them—and Echelon's POSA would have had no reason to make that combination. POR 21-25. Echelon's Reply, with its flawed and belated arguments, does not change that result.

Echelon's convoluted Hurwitz/Garcia/Martens combination also fails. Hurwitz teaches only live racing, and contrary to Echelon's arguments, its POSA would not be motivated by Garcia to provide archived racing classes. Garcia touts its live exercise classes without racing as a purported improvement over streaming recorded exercise videos, and like Watterson, Garcia provides trainers to ensure users receive the prescribed workout. POR 32-33; Garcia (Ex. 1005) [0007]. Garcia thus provides no basis for Echelon's POSA to conjure up on-demand, at-

home exercise classes with racing between the user and previous users. And as with the Watterson grounds, Echelon replied to the POR with belated arguments that fail on the merits.

And spanning both grounds, all of the art fails to teach the claimed dynamically updating ranked list—despite Echelon's attempts to insert new arguments into this IPR.

Accordingly, the Board should confirm the patentability of all claims.

## II. Preliminary Matters

### A. Echelon's proposed POSA lacks the skills necessary to support a conclusion of obviousness

Echelon contends that its POSA was motivated to enhance the benefits of group exercise and better motivate people to exercise. *E.g.*, Pet. 16 ("To **enhance** the benefits of group exercise activities...."), 20 (modifying Watterson "because doing so **further** 'promote[s] a healthy sense of competition among group members'").

But these topics are beyond the ken of Echelon's POSA, who is skilled only in various computer-related arts and lacks the requisite skills in the exercise/fitness arts. Pet. 8; Reply 1-2; POR 3-7. Echelon's POSA was therefore unable to correctly evaluate the exercise-related content of the prior art, determine whether or how to modify group exercise activities, or form a reasonable expectation of success in doing so. *Cf. Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310

(Fed. Cir. 2010) ("[L]aymen ... are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries.")[1].

As a result, Echelon cannot meet its burden because its obviousness analysis is fatally flawed from the bottom up. *Env't. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 697 (Fed. Cir. 1983) (The analysis is whether the claims would have been obvious to a POSA, "not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art").

### B. Echelon's expert is unqualified to opine on exercise-related topics

Echelon's expert testimony on exercise topics—including what was well-known in the exercise arts—is due no weight, as such matters are beyond his expertise. *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1347-48 (Fed. Cir. 2013); *In re Cyclobenzaprine Hydrochloride*, 676 F.3d 1063, 1072 n.2 (Fed. Cir. 2012).

Echelon contends that it is sufficient that Dr. Jeffay has taken spin classes (Reply 4 n.2), but that does not qualify him as an expert in the exercise/fitness field by any stretch of the imagination. In fact, he could not recall any significant details of his classes because he "tend[s] not to pay a lot of attention to the particular system that [he's] used" when exercising. Ex. 2108 at 9-16.

[1] All emphasis is added, and citations omitted, unless otherwise noted.

Dr. Jeffay's lack of expertise matters here because he repeatedly misinterprets exercise-related teachings. For example, he pointed to Watterson's explanation of the benefits of exercise classes **without** racing (parameter comparison), and incorrectly concluded that the passage was evidence of the benefits of racing. *See* Ex. 1003 ¶ 77 (discussing Watterson 1:57-66); Rutberg Decl. (Ex. 2004) ¶ 74. He also contends that Echelon's POSA would rank racers by their power output, but that would produce an unusable display. *See* Section III below (dynamically updating/leaderboard).

Echelon also contends that its POSA and its expert need **no** skill in the exercise field because what motivated exercisers was well known. Reply 4. Echelon, however, presumes its conclusion. Determining what was well known in a field requires evidence from the perspective of a POSA in that field at that time. Echelon proffered no such evidence.

### C. Claim Construction

The Board should apply Peloton's proposed constructions of "leaderboard" and "archived exercise classes." POR 6-11. Echelon cannot object. It expressly "takes no position" on claim construction, despite having the burden to do so as a petitioner. Pet. 9; Reply 5.

Peloton also agrees with the district court's construction of leaderboard ("a scoreboard containing **a list in ranked order** of some or all of the users"). Exs.

2105-2107. It is consistent in the relevant respects with Peloton's ("numerically **ordered list ranking users** by their performance"), and also takes into account the specification's description of "scroll[ing] up and down through the rider rankings."




'026 patent Fig. 8 (excerpted, annotated), 8:53-58.

## III. Grounds I-III: The Art Fails To Teach The Claimed "Dynamically Updating Ranked List" (element [1.4.9]/[11.11]) And "Leaderboard" (claims 8, 13, and 14)

Echelon's Petition failed to demonstrate that the art taught these claim elements. POR 26-27, 49.

Specifically, Echelon contends that Hurwitz's "ranked list ordered by user (1-5)" teaches them, but it does not. User numbers 1-5 are not performance parameters, as required by the claims. Pet. 28-29; POR 26-27. Echelon also made the bare allegation that "[i]t was also obvious to display Hurwitz's ordered list ranked with respect to a given performance parameter." Pet. 29. That conclusory assertion is insufficient, as a matter of law, to prove obviousness. POR 26. This is especially so here, where **all** of the art with such displays used Hurwitz's horse-race arrangement. *See* Hurwitz Fig. 15; Watterson 41:15-18; Martens Figs. 5, 6.

Likewise, Dr. Jeffay's argument (which cannot be incorporated into the Petition) fails because he contended without explanation that a POSA would have ranked racers by "power output in watts." Ex. 1003 ¶ 122. Dr. Jeffay's unreasoned and hindsight-driven conclusion merely demonstrated his lack of expertise and understanding of Hurwitz. A racer's relative position is determined by the total distance covered (which is proportional to total output), not the racer's speed/power at a given instant. For example, Hurwitz's user #2 is outputting less power at a lower cadence than user #4, but is still leading the race:




FIG. 15 Illust[user number]niting example display.

Hurwitz Fig. 15 (annotated by Echelon, Reply 10); POR 27; Rutberg Decl. ¶ 102.

After being educated on these points by Peloton, Echelon impermissibly presents three new arguments in Reply: (i) Hurwitz's horse-race display meets the claims because it shows the racers' relative positions, (ii) a POSA would have provided racers with a display "sorted" by "instantaneous or cumulative parameters," i.e., power/cadence or total output/distance, and (iii) a POSA would have provided racers with the ability to sort the display by such parameters. Reply 9-13.

The Board should ignore Echelon's belated arguments. "Shifting arguments in this fashion is foreclosed by statute, [Federal Circuit] precedent, and Board guidelines." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1286

(Fed. Cir. 2017); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016).

Further, Echelon's three belated arguments fail on their merits. ***First***, Hurwitz's horse-race display does not meet the claims because it is not a "dynamically updating **ranked list** of the" user's performance parameters. That the racers' icons move from left to right does not transform the unranked list into the claimed ranked list or a leaderboard.

***Second***, even after being told by Peloton that rankings should be by cumulative parameters instead of instantaneous ones like power, Echelon still failed to explain why its POSA **would have** ranked Hurwitz's list by any parameters at all. *Polaris Indus, Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068-1069 (Fed. Cir. 2018).

Echelon merely asserted without further explanation that ranking by instantaneous (power and cadence) and cumulative (total output and distance) would have provided a "more useful" display, without even bothering to distinguish between the two. Reply 11-12. Echelon's conclusory assertion is insufficient, and indicates that Echelon "use[d] the challenged patent," and Peloton's Response, "as a roadmap to reconstruct the claimed invention .... i.e., the impermissible *ex post* reasoning and hindsight bias that *KSR* warned against." *TQ*

*Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019) (reversing the Board's obviousness determination).

Echelon also cites Dr. Jeffay's reply declaration, but Echelon cannot incorporate Dr. Jeffay's arguments by reference—and this is especially so now because Echelon's Reply is at its word limit. *See* Consolidated Trial Practice Guide 35, 39 (Nov. 2019).

Dr. Jeffay's belated arguments also fail on the merits. Dr. Jeffay does not even attempt to justify modifying Hurwitz's list so that it is ranked by a cumulative variable, and wisely so. Hurwitz already shows the user's relative position from right to left.



Ex. 1056 ¶ 12. Dr. Jeffay did not (and cannot) explain why a POSA would **also** rank them by distance in the list,[2] duplicating what is already shown.

Dr. Jeffay also contends for the first time that ranking by instantaneous parameters such as power "mak[es] it easier to see which riders a user is gaining on" or "losing ground to." Ex. 1056 ¶ 13. Dr. Jeffay's lack of expertise is showing again. One with expertise in the exercise arts would have appreciated that ranking by an instantaneous variable would have caused each competitors' ranking to constantly jump around even though their position in the race is not, making it difficult or impossible to determine anything.[3]

***Third***, Echelon's new argument that a POSA would have provided users with sortable lists is entirely unsupported—Echelon merely asserts that it "was an obvious variant" without citing any evidence. Reply 13. Echelon's conclusory allegation is insufficient, as a matter of law, to establish obviousness. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

---

[2] Total work is proportional to total distance. Ex. 2004 ¶ 102.

[3] Had Echelon timely presented this argument, Mr. Rutberg would have opined as he did in a related matter. *See* IPR2021-00848, Ex. 2004 (Mr. Rutberg explaining that racers' instantaneous parameters "change constantly.").

Accordingly, Echelon failed to demonstrate the obviousness of this claim element and dependent "leaderboard" claims 8, 13, and 14.

## IV. Ground II: Echelon's New Arguments Do Not Salvage Its Hindsight-Driven Proposal to Modify Watterson

### A. Echelon failed to demonstrate that its POSA *would have* modified Watterson as proposed

Watterson's system has two separate components most relevant to this proceeding: (i) live/stored exercise programs and (ii) competition module. As their names suggest, the competition module offers racing (parameter comparison), while the exercise programs offer non-competitive exercise.

Echelon's POSA would have had no reason to modify Watterson's exercise programs in view of Watterson's competition module based on alleged motivations found in Watterson, or Hurwitz for that matter. Watterson's competition module already provides Hurwitz's live-on-live racing (parameter comparison), and more. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) (no reason to combine because "both of these references independently accomplish similar functions"). Echelon provided no reason to also add racing to Watterson's exercise programs, which have their own advantages that are not compatible with racing. POR 22-23; Rutberg Decl. ¶¶ 73-74; Rutberg Tr. 72-74.

Further, Echelon and its expert misunderstood Watterson, which extolled the virtues of group exercise classes, **not** racing (i.e., performance-parameter

comparison) as they contended, and Echelon's POSA similarly lacked the requisite skill to determine whether or how to motivate exercisers, or form a reasonable expectation of success in doing so. *See* Section II above; POR 22-23.

Echelon's reply changes nothing. Echelon argues for the first time that it was well-known, even to laypersons, that competition motivates people to exercise. E.g., Reply 4. The Board should ignore Echelon's untimely argument, which also fails on the merits. ***First***, Echelon cannot bootstrap obviousness based on attorney argument and testimony from expert who is unqualified to discern what was well-known in the exercise field. *See* Section II.B above.

***Second***, Echelon and its expert have again demonstrated their lack of expertise by contending that it was desirable to merely encourage users to exercise more and harder via racing. Not so. Mr. Rutberg explained in unrebutted testimony that "the goal is not to merely exercise more (quantity)" as Echelon contends, "but to exercise more effectively and correctly (quality)." Rutberg Decl. ¶ 34 (Ex. 2004). Mr. Rutberg also explained that one aspect of exercising effectively and correctly is to incur specific dosages of exertion—certain "kind[s] of stress" and

"level[s] of stress"—prescribed workouts (e.g., exercise classes) that increase fitness efficiently. Ex. 1057 12-13, 72-75.[4]

Indeed Watterson recognizes the benefits of exercise programs that do not compare parameters, but instead have an "instructor leading the group through a **prescribed program** or routine." Watterson 1:57-2:8; 3:58-65 (trainer modifying "operating parameters of the user's treadmill such that the user achieves an exercise program **designed by the trainer**"), 4:5-14, 7:40-55; Rutberg Decl. ¶¶ 73-74. The obviousness analysis must consider Watterson for "all it taught," not just the parts that help Echelon. *Polaris Indus.*, 882 F.3d at 1069.

Racers, however, seek only to win, i.e., have a higher cumulative performance parameter than every other competitor, and vary their exertions in response to, e.g., their opponents' speed and position in the race. Because they do not follow any prescribed program or routine, racing does not provide the fitness benefits of Watterson's exercise programs. Rutberg Tr. 72-74.

---

[4] If the Board considers Echelon's new arguments and evidence, the Board should also consider Peloton's expert testimony on this topic submitted in a related, parallel IPR. *See* IPR2021-00848, Ex. 2004 ¶¶ 59-64 (cited at Paper 6 (POPR) at 25).

***Third***, Echelon's proposed motivation is disconnected from its proposed modification. Racing (parameter comparison) may be desirable, but Watterson already has the same live-on-live competition as Hurwitz, and further includes time-delayed races, "race around the world," and "race the computer." POR 12-14. Echelon never demonstrated that its POSA would have modified Watterson to provide even **more** racing by turning Watterson's exercise programs into races.

Echelon also tries to confuse the issues by arguing that "the design choices of [Watterson's] three inventors ... are irrelevant." Reply 8. Echelon misses the point. As the *Amazon* Court explained, "[t]he relevant inquiry" focuses on the evidence of what would have motivated a POSA. *Amazon.com v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1363-64 (Fed Cir. 2001). Echelon bears the burden here, and failed to demonstrate that its POSA, with no experience in the exercise field, would have modified Watterson's exercise programs to incorporate the racing already provided by Watterson's competition module, and done so with a reasonable expectation of success. Without exercise skills, Echelon's POSA had no reason to conclude that Watterson's users would benefit from even more racing.

### B. Echelon's Watterson combination is inoperable

Echelon contended in its Petition that its POSA would simply add "the comparative display functionality" of Watterson's competition module to Watterson's exercise programs **without further modification**. Pet. 20-21 (the

combination "**only requires** making features that are already available in Watterson's racing events available with respect to classes."), Ex. 1003 ¶ 80 (Dr. Jeffay repeating verbatim).

Peloton demonstrated in response that Echelon's proposed combination is inoperable. Watterson's exercise programs may be selected on demand as required by the claims, but they do not archive the data needed for the claimed display. Conversely, Watterson's competition module might obtain the needed data, but in doing so, it precludes users from selecting a race on-demand. Watterson's competition module does not, and **cannot**, gather the data needed to deliver "comparative display functionality" for archived exercise programs. POR 16-21. Watterson's competition module requires all competitors to register before the race so that the system may allocate the necessary resources before the race begins. **Once the race starts, no more people may participate**. POR 19-20. In addition, Watterson does not disclose keeping the user's data after the race is over. *Id*. Dr. Houh's testimony on these points remains unrebutted.

In Reply, Echelon effectively admits its Petition was deficient. No longer does Echelon's proposal "only require[] making features that are already available in Watterson's racing events available with respect to classes." Pet. 21. Echelon now proposes further modifying Watterson's competition module to save the exercisers' data. Reply 6-7.

The Board should ignore Echelon's untimely new argument which "amount[s] to an entirely new theory of *prima facie* obviousness absent from the petition." *Wasica*, 853 F.3d at 1286.

Further, Echelon's belated argument fails on the merits. Echelon ignores the critical and undisputed fact that Watterson's competition module does not **and cannot** gather the data needed to allow users to select and participate in a race after it has occurred. Echelon never explained, not even in Reply, how a POSA could have or would have altered the competition module's fundamental principle of operation, changing it from a system that requires all participants to sign up before the race begins so that it may pre-allocate resources (and frees up those resources after the race), to a system that somehow allocates resources and archives data to allow users to select a race after the race begins. *Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 758-59 (Fed. Cir. 2015) (rejecting a proposed modification that "would fundamentally alter [the reference's] principle of operation").

Echelon's bodily-incorporation arguments are misplaced. Reply 10. In *Mouttet*, the Federal Circuit affirmed the Board's finding that the teachings of two references were combinable because **the teachings** were independent of electrical or optical implementation. *In re Mouttet*, 686 F.3d 1322, 1332-33 (Fed. Cir. 2012). Similarly, the *Facebook* court recognized that Roseman taught the use of "keys"

and Rissanen taught storing keys in a database, and therefore it would have been obvious to store the keys in a database. *See Facebook, Inc. v. Windy City Innovations*, 973 F.3d 1321, 1343 (Fed. Cir. 2020). In contrast to those cases, it is undisputed that Watterson fails to teach the requisite functionality.

Echelon's cited *Caterpillar* case is likewise inapposite. Reply 7 (quoting *Caterpillar Inc. v. Wirtgen Am., Inc.*, IPR2018-00155, Paper 13 (May 22, 2019)). Caterpillar explained with the requisite particularity that a POSA could have and would have combined various transmission components in the claimed manner. *Caterpillar,* at 30-31. Caterpillar's expert testimony was "unrebutted" on these points. *Id*. In contrast, Echelon contended in its Petition that Watterson's competition module needed **no modifications**. Peloton demonstrated that Echelon was incorrect, and that Watterson lacked the requisite teachings.

Echelon's bare allegation of "creativity" is also insufficient. *Cf. Arendi S.A.R.L. v. Apple Inc*., 832 F.3d 1355, 1362 (Fed. Cir. 2016) (("[R]eferences to 'common sense' ... cannot be used as a wholesale substitute for reasoned analysis and evidentiary support.")). Indeed, Echelon's belated and "conclusory and unsupported expert testimony" indicates that Echelon and its expert "use[d] the challenged patent as a roadmap to reconstruct the claimed invention using disparate elements from the prior art—i.e., the impermissible *ex post* reasoning and hindsight bias that *KSR* warned against." *TQ Delta*, 942 F.3d at 1361.

### C. Claims 9/15: Echelon's belated "start signal" theory fails

The conclusory assertion in Echelon's petition, like the also-conclusory (but different) assertion in Dr. Jeffay's original declaration, was insufficient to establish obviousness. POR 28-31.

Echelon tries again in its Reply, providing a brand-new theory that it would have been obvious to add a start signal to Watterson's live and archived classes "to allow for a warm-up/ramp-up before the competition starts." Reply 13.

The Board should disregard Echelon's new theory, as it exceeds the permissible scope of a reply. Further, Watterson's classes and races start at the scheduled time, without any such warmup period. POR 28-31. Echelon failed to demonstrate **why** its POSA (or even one with the requisite exercise skill) **would have** further modified Watterson as proposed, and Dr. Jeffay is wholly unqualified to opine on such topics.

## V. Grounds II and III: Echelon's New Arguments Do Not Salvage Its Defective Hurwitz Combination

### A. Echelon's POSA would not have arrived at Echelon's convoluted, hindsight-driven combination.

Echelon's Reply did not rebut the POR, but instead reinforced the conclusion that Echelon's convoluted proposal was driven solely by hindsight. Echelon never demonstrated that its POSA, without any exercise skills, **would have** followed Echelon's circuitous route through three different references, picking and choosing exactly what the claims needed and discarding the rest.

To start, Echelon argues in Reply that Garcia would have motivated Echelon's POSA to archive Hurwitz's races. Reply 15-16. But like Watterson, Garcia recognizes the benefits of live exercise classes—without competition—that allow a trainer to "critique and correct exercise technique" and ensure the user receives the designed workout. Garcia [0007], [0035]; Watterson 1:57-2:8, 3:58-4:14; Rutberg Decl. ¶ 34 (quality, not just quantity, of exercise is important), ¶¶ 73-74. Indeed, Garcia touts the advantages of its live classes as an improvement over recorded video—live trainers provide feedback and instruction to ensure users receive the correct dosages of exertion. Garcia [0007]-[0010], [0013]. Garcia provides no reason for Echelon's POSA to record Hurwitz's computer-generated display.

Echelon also correctly notes that it did not jettison Hurwitz's live exercise programs/competitions, and replace them with Garcia's live exercise classes. Reply 15. Echelon's proposal is in fact more complicated than Peloton stated in the POR. Echelon first proposes using Garcia's exercise class videos. Pet. 48 (using Garcia's interface for selecting "from available live and archived classes" to "select an available class to begin exercising"); Inst. Dec. 38 ("Petitioner also asserts ... obvious to use Hurwitz's exercise system with Garcia's archived exercise video classes"). Echelon then shifts to recording computer-generated video from Hurwitz's live classes and using Garcia's interface to select them. Pet. 49-50.

Echelon next removes Garcia's live-streamed videos from Garcia's interface and replaces them with Hurwitz's live computer-generated video. Pet. 50-51. Echelon then modifies Hurwitz's live and (now) recorded computer-generated display so that it also displays live and recorded video of the instructor. Pet. 46-47; Inst. Dec. 37. This is but one part of Echelon's proposal, and it can only be explained by hindsight.

Regarding the instructor, Echelon's Petition unequivocally proposed modifying Hurwitz to display video of the instructor in place of the computer-generated road ahead. Pet. 50-51; Ex. 1003 ¶ 247; Inst. Dec. 39. In response, Peloton demonstrated that Echelon had no credible evidence supporting its proposal to replace the display of the road ahead with a view of the instructor—and its expert and POSA both lacked the necessary skills to conclude such a change was desirable. POR 50-53. In desperation, Echelon argues for the first time in reply that the claims do not require displaying the instructor. Reply 19. This argument is too late, and should be disregarded. Further, Echelon failed to provide any claim construction argument or rebuttal to Peloton's construction. POR 6-8.[5]

---

[5] The Board found that an instructor is required, and a court found that one is not. Ex. 1018 at 35-36; Ex. 2105. Echelon never mentioned the court's construction, which issued after the POR and before the Reply.

Echelon also argues for the first time in its Reply that its POSA would have modified Hurwitz to simultaneously display the instructor **and** the road ahead. Reply 20. To be sure, Echelon argued in its Petition that its "POSITA would use Garcia's known technique to modify Hurwitz to ... provid[e] live or archived videos **showing an instructor** and class participants" to meet the claims. Pet. 50-51, 53, 61; Ex. 1003 ¶ 217; Inst. Dec. 37. Echelon proposed providing the ability to switch between views (one purportedly practicing the claims and the other not), but never demonstrated why its POSA would provide a view of the instructor.

The Board should ignore Echelon's belated arguments, which also fail on the merits for the same reasons as its original arguments. Echelon's POSA had no basis to conclude what motivates exercisers to exercise more and properly, and its expert lacks the expertise to opine on such matters. *See* Sections II and IV.A above (also explaining that racing does not provide the fitness benefits of exercise classes). Further, Echelon's new argument that Hurwitz's Figure 15 is a "non-limiting" disclosure and there could be "many forms of display" (Reply 20) approaches the absurd. Hurwitz discloses what it discloses, and such boilerplate adds nothing.

Turning to the claimed archived exercise classes, Echelon's Petition argued that "Hurwitz was already storing archived results" for display, and that adding the comparison would be "nothing more" than adding known display features. Pet. 63.

Peloton demonstrated that Echelon was wrong: Hurwitz did not archive data suitable for display or the metadata necessary to ensure a fair competition. POR 42-44.

Certainly, Hurwitz discloses that it stores some data. POR 42 (citing Hurwitz 4:25-34, 8:38-42). But Echelon incorrectly pushes aside what Hurwitz discloses just a few lines later: Hurwitz stores an individual's data for generating summaries. POR 43 (citing Hurwitz 9:1-5). That summary data is inadequate for real-time comparisons (POR 43), as Echelon essentially concedes by arguing in reply that Hurwitz "suggests" archiving the necessary data for data comparisons. Reply 17.

Further, Echelon again demonstrates its lack of skill by failing to realize—even after being told—that Hurwitz collects data for each **individual**, not each **race**. POR 42-44; Reply 17-18. Nothing in Hurwitz indicates that Hurwitz stores the racecourse profile for each race when it stores an individual's summary data—any given performance for each individual could have come from any race. And even if Hurwitz did store that metadata, Echelon never explained how or why its POSA would have modified Hurwitz's individual-centric data store to a racecourse-centric one. *Plas-Pak*, 600 F. App'x at 758-59 (not obvious to alter fundamental aspect of reference). Echelon insists that it is easier to compare archived race data, but never explains why it would be easier to do so using Hurwitz's user-centric data. Further, Echelon's *GE* case is inapposite. Reply 17.

GE, unlike Echelon, established that a POSA with the requisite skill in the relevant art would have been motivated to make the combination. *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1350-51 (Fed. Cir. 2020).

Regarding the temporal aspects of such synchronization, Echelon also failed to account for the fact that Martens has no start signal because it starts the data comparison at the start of the exercise, and is therefore not compatible with Hurwitz's alleged start signal. POR 45-48. Echelon attempts to downplay this defect in its Petition by arguing that it applies only to claims 9 and 15. Reply 18. Not true, as Echelon relied on Martens' synchronization for **all** claims. Pet. 49-50. Echelon also argues that its POSA "would have known how to modify" the prior-art teachings, but that argument is just as conclusory as the ones in the Petition. POR 52-54 (all claims), 72-73 (claim 9 in particular).

* * *

Accordingly, Echelon failed to meet its burden as to all claims, including claims 9 and 15.

### B. Claims 5, 7, 17, and 18 – Echelon's belated theory for two live participants

Echelon failed to establish that its combination could support two live participants: Martens' machines store the user's current workout data locally, and only periodically upload chunks of data to a remote server. POR 49-50.

In reply, Echelon points to a different disclosure to support its argument that Martens supports "real-time competitions." Reply 21-22 (citing Martens 4:21-23).

The Board should ignore Echelon untimely new theory, which also fails because it (inadvertently) mixes-and-matches embodiments without any obviousness analysis. Echelon's newly cited disclosure addresses Martens' "single local server" embodiment. Martens 4:13-24. This "single local server" embodiment is not compatible with Echelon's arguments regarding remote users. Further, the Petition expressly relied on Martens' Figure 8 embodiment, which uses a separate local computer for each client. Pet. 63-65. The local computer downloads historical data and only sporadically uploads newly generated data, ruling out live-on-live competition. POR 49-50.

## VI. Echelon Fails to Rebut Patentee's Objective Evidence of Nonobviousness

It is undisputed the Peloton was the first to present on-demand, at-home workouts with competition (parameter comparison) between the user and previous performances by others. Indeed, Echelon could not even attempt to cover all of the claim elements without assembling a convoluted combination of prior art. The claims in the '026 patent focus tightly on this aspect of Peloton's invention, forming a strong nexus with what was not available in the past.

And even if the Bike/Bike+ is not coextensive with the claims, Peloton demonstrated a strong nexus between the claims and the objective evidence,

especially commercial success. Echelon attempts to confuse issues by pointing to other products, like subscriptions that include yoga classes, for example, arguing that they make up 42% of Peloton workouts. Reply 28-29. But Peloton's commercial success evidence points to **Bike/Bike+ sales**, not revenue from those other products/services. To be sure, **Bike** sales (and profit margins on the Bikes) rapidly and steadily increased from FY2016 to FY2020 (which ended in June 2020), and into FY2021. POR 67; Ex. 2023. Notably, Peloton had no **Bike+** revenue until September 2020. Ex. 2023. Bike+ sales quickly grew to rival Bike sales, and total Bike/Bike+ revenue continued to skyrocket. Ex. 2023 at 5-6.[6]

To be sure, users buy the Bike/Bike+ primarily for the archived classes—the vast majority of on-bike workouts are in archived classes. Ex. 2040 at 4, 7; POR 65. And contrary to Echelon's misleading, out-of-context quote from a previous brief (Ex. 1048), Peloton has always recognized this. POR 26, Ex. 1048 at 53 ("The reviews consistently highlight two features—archived classes offered anytime and the leaderboard."), 59 ("...especially with ghost riders in an archived

[6] Bike and Bike+ are the same in the relevant respects: the Bike+ includes a swivel touchscreen and has an auto-follow feature, but the users take the same archived classes and "the" leaderboard is the leaderboard for all bikes. Houh Decl. ¶¶ 192-196; Ex. 2035 (leaderboard spec); Ex. 2108 at 52-53; Ex. 2065 at 1-4.

class"). This makes sense, as this is what was long missing from the prior art despite previously untapped consumer demand. And while Peloton also has live classes, those live classes become archived classes and users take them over and over again.

Certainly, some of the praise directed to Peloton does not directly address Peloton's on-demand competition with its dynamically ranked leaderboard, even though users revealed their true preferences for archived classes by taking them far more often. But some undisputedly does. Ex. 2080 at 7-8 (discussing the "rise of the on-demand, at-home bicycle movement – or more specifically, Peloton"); Ex. 2076 at 1-2 (Peloton provides "all the convenience of working out at home and on your time but the same social spirit of going to the gym."); Ex. 2066 at 35 ("Peloton is often credited with kick-starting the trend of connected fitness: streamed, on-demand home workouts that aim to replicate a traditional studio experience.").

And contrary to Echelon's arguments, Peloton's bikes practice the claims. Echelon contends that the documentary exhibits "are not reliable and do not purport to show how the Bike functioned." Reply 24 (citing Ex. 1056 ¶¶ 35-42). Nonsense. Echelon and Dr. Jeffay applied an imaginary test, alleging that "a POSITA would not be able to ascertain," based solely on the information on the face of the document, whether it was describing the Bike. Ex. 1056 ¶¶ 36-42.

The documents are what Peloton said they are: they demonstrate the functionality of the Bike/Bike+, and the ordinary artisan has nothing to do with analysis. Peloton (via counsel) provided Dr. Houh with documents showing the functionality of the leaderboard (and other features), and he demonstrated that the bikes meet every single claim limitation. When Echelon objected to the documents' authenticity (Paper 32), Peloton responded by serving declarations from the relevant custodians. Exs. 2099-2104.[7] Echelon declined to cross-examine any of these custodians, and their testimony is unrebutted. There is no evidence of record that the documents do not accurately portray the functionality the Bike/Bike+.

Echelon also contends that the Bike/Bike+ does not receive the archived data per element [1.4.7/11.9], but it is undisputed that Peloton stores the archived user data on the cloud. Houh Decl. (Ex. 2002) ¶¶ 162-163. From there, the data is transmitted to the Bike/Bike+ over the internet, as required by the claims. *Id.*; Ex. 2031; Ex. 2040 at 3-5. Likewise, the Bike/Bike+ synchronizes the data as required by element [1.4.8/11.10] and evidenced by Peloton's internal documentation and

[7] Because Dr. Jeffay specifically references Exs. 2101 and 2104 in his declaration, the parties agreed to attach those to the end of his cross-examination transcript. Ex. 2108 at 24-28, 42-58.

Dr. Houh's analysis. Houh Decl. ¶¶ 162-163, 185-186; Ex. 2040 at 3-5; Ex. 2108 46-47.

Accordingly, the objective evidence of nonobviousness—especially Peloton's commercial success—demonstrates the patentability of these focused claims.

## VII. Conclusion

For the above reasons, the Board should confirm the patentability of all claims.

Respectfully submitted,

Dated: October 22, 2021

By: / Jonathan M. Strang /

Jonathan M. Strang (Reg. No. 61,724)
jonathan.strang@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW, Ste. 1000
Washington, D.C. 20004-1304
Telephone: 202.637.2200
Fax: 202.637.2201

*Counsel for Patent Owner*
*Peloton Interactive, Inc.*

**CERTIFICATE OF COMPLIANCE WITH 37 C.F.R. § 42.24**

I hereby certify that this Patent Owner's Sur-Reply complies with the word count limitation of 37 C.F.R. § 42.24(c)(4) because the Patent Owner's Sur-Reply contains 5,526 words using Microsoft Word's word counting feature, excluding the cover page, signature block, and the parts of the Patent Owner's Sur-Reply exempted by 37 C.F.R. § 42.24(c)(4).

By: / Jonathan M. Strang /

Jonathan M. Strang (Reg. No. 61,724)
jonathan.strang@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW, Ste. 1000
Washington, DC 20004-1304
Telephone: 202.637.2200
Fax: 202.637.2201

*Counsel for Patent Owner*
*Peloton Interactive, Inc.*

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e), I certify that on this 22nd day of October, 2021, a true and correct copy of the foregoing **Patent Owner's Sur-Reply and Exhibit 2108** were served by electronic mail on Petitioner's lead and backup counsel at the following email addresses:

Barry J. Schindler (Reg. No. 32,938)
James L. Ryerson (Reg. No. 64,617)
Douglas R. Weider (*pro hac vice*)
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Telephone: 973.360.7900
Fax: 973.301.8410
SchindlerB@gtlaw.com
RyersonJ@gtlaw.com
WeiderD@gtlaw.com
echelon-iprs@gtlaw.com

Heath J. Briggs (Reg. No. 54,919)
Stephen M. Ullmer (*pro hac vice*)
Greenberg Traurig, LLP
1144 15th St. Suite 3300
Denver, CO 80202
Telephone: 303.685.7418
Fax: 720.904.6118
BriggsH@gtlaw.com
UllmerS@gtlaw.com

By: / Jonathan M. Strang /

Jonathan M. Strang (Reg. No. 61,724)
jonathan.strang@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW, Ste. 1000
Washington, DC 20004-1304
Telephone: 202.637.2200

Fax: 202.637.2201

*Counsel for Patent Owner*
*Peloton Interactive, Inc.*

# EXHIBIT 7

Trials@uspto.gov
571-272-7822

Paper # 55
Entered: March 3, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ECHELON FITNESS MULTIMEDIA, LLC
Petitioner,

v.

PELOTON INTERACTIVE, INC.,
Patent Owner.

---

IPR 2020-01541
Patent 10,486,026 B2

---

Record of Oral Hearing
Held: December 2, 2021

---

Before SCOTT A. DANIELS, RICHARD H. MARSCHALL, and ALYSSA A. FINAMORE, *Administrative Patent Judges.*

APPEARANCES:

ON BEHALF OF THE PETITIONER:

DOUGLAS R. WEIDER, ESQUIRE
Greenberg Traurig, LLP
500 Campus Drive
Suite 400
Florham Park, NJ 07932

ON BEHALF OF PATENT OWNER:

JONATHAN M. STRANG, ESQUIRE
Latham & Watkins, LLP
555 11th Street, N.W.
# 1000
Washington, D.C. 20004

The above-entitled matter came on for hearing on Thursday, December 2, 2021, commencing at 1:00 p.m., EDT, at the U.S. Patent and Trademark Office, by video/by telephone, before Julie Souza, Notary Public.

P R O C E E D I N G S

\- - - - -

JUDGE MARSCHALL: This is a hearing in IPR2020-01541 between Petitioner Echelon Fitness Multimedia, LLC and Patent Owner Peloton Interactive, Inc., and we're reviewing patent no. 10,486,026. I'm Judge Marschall. With me by video are Judges Daniels and Finamore. Let's start with the parties' appearances please and let's start first with Petitioner.

MR. WEIDER: This is Doug Weider for Petitioner Echelon and with me is lead counsel, Barry Schindler.

JUDGE MARSCHALL: Thank you. Could you please spell your last name for the record?

MR. WEIDER: My last name is W-E-I-D-E-R.

JUDGE MARSCHALL: Thank you very much, and for Patent Owner.

MR. STRANG: Thank you, Your Honor. Lead counsel Jonathan Strang S-T-R-A-N-G and with me and back-up counsel Kimberley Li L-I, both from Latham & Watkins.

JUDGE MARSCHALL: Thank you and welcome. As you know from the Hearing Order, each party will have 60 minutes of total time to present arguments and a portion of that time may be reserved for rebuttal. This hearing is taking place via video conference. During your presentation please refer to exhibit or slide numbers to aid us in following along and to make the transcript clear. Please do not interrupt the other party's presentation. You may object only during your argument time or following the rebuttal. Please be aware that we have provided public access through a

public access line to this video presentation and they may be listening in by audio or watching us by video. Also, we do not have a pre-planned break during this hearing. It should take roughly two hours. If you need a break just let me know and we'll stop at an appropriate time. Petitioner will start. Would you like to reserve any time for rebuttal and how much would you like to reserve?

MR. WEIDER: Yes, Your Honor. I'd like to reserve 30 minutes for rebuttal.

JUDGE MARSCHALL: Okay. You may begin when ready.

MR. WEIDER: Thank you, Your Honor. Good afternoon, Your Honors. My name is Doug Weider and I represent Petitioner Echelon and as I indicated with me is lead counsel, Barry Schindler. Given the Board's familiarity with this family of patents and the similarity with the issues with the '315 and the '590 patents and the recent argument on those patents, my argument is going to focus on three distinct issues. First, the ranked list limitation for both grounds. Patent Owner's new argument raised for the first time in its sur-reply that parameter display comparisons are incompatible with Watterson's classes and secondary considerations that are not raised in the earlier two patents.

As to the remaining issues, unless the Board has questions, while I'll be happy to address, I'm going to defer the remaining issues to rebuttal to the extent the issues are raised in Patent Owner's argument.

Starting with the ranked list limitation and turning to slide 3, like the dependent leaderboard claims of the prior two patents, the ranked list limitation requires ranking the performance. However, where it differs from

steps. But the alleged steps of the API aren't supported by any document, the source code or anything else.

Turning briefly to slide 66, he then points to Exhibit 2036 and says it demonstrates sorting various riders on the leaderboard. But as Dr. Jeffay explains, it's unclear what the page attempted to show as neither the cited page nor the surrounding pages provided any context. But even if he's right and it discloses sorting, sorting is not establishing the claim scope. Ultimately, the problem here is that Peloton's commercial -- this is Peloton's commercial embodiment that had access to all the source code, that had access to the designers who wrote the system. It was Patent Owner's burden to show that their commercial embodiment practiced the claim and they failed to do so. None of the evidence they actually cite shows that they actually practice the embodiment. Turning now to slide 69.

JUDGE MARSCHALL: Can I cut in just for a second here?

MR. WEIDER: yes.

JUDGE MARSCHALL: This is Judge Marschall again. Are you contending that you know how the Peloton products work and that they clearly do not embody one limitation in these claims or that Patent Owner has just failed to meet its burden of showing how it works and establishing that the claims cover the products?

MR. WEIDER: The latter, Your Honor.

JUDGE MARSCHALL: Okay. Thank you. You have five minutes left.

MR. WEIDER: Okay. Turning now to nexus and slide 69. To presume a nexus a product has to be essentially the claimed invention when,

for example, the unclaimed features amount to nothing more than additional insignificant features. When no presumption applies, Patent Owner has to show that the secondary considerations are a direct result of the unique characteristic the claimed invention. Given the presence of significant unclaimed features, Peloton cannot show a presumption of nexus or prove a nexus even if it can show its product embodied the claims.

Turning to slide 70. Patent Owner admits that the '026 patent is different from all the other patents in the family because its claims cover exercise classes only -- cover archived exercise classes only and Patent Owner admits that the ability to offer both live and archived classes are notable contributors to its commercial success and the evidence Peloton offers for secondary considerations, a few of which are highlighted on slide 70, highlight the significance of live classes.

Turning to slide 71. Every physical component of the Peloton bike except the sensors and the computer are unclaimed. Its own brochure touts top of the line materials, HD touchscreen, sleek carbon frame, silent belt drive, and many other features, and the secondary consideration evidence that Patent Owner submitted is full of references such as the example on slide 71 touting distinguishing features of its bike over a competitor's bike.

Moving to slide 73, is the music platform. As discussed in the background of the '026 patent it was known in the prior art the key to the engagement and motivation of in-studio classes included music. Though it's not claimed, Peloton has capitalized on the importance by developing its own proprietary music platform. As their own annual report admits, members consistently rank music as one of their favorite aspects of the

Peloton experience. Peloton also admits that it's a competitive advantage over other fitness platforms. Consistent with its importance of music, its brochure, Exhibit 2085, only mentions leaderboard once and touts several music-related features. The bike's web page, Exhibit 2069, did not mention the leaderboard but highlights, music, instructors and class content.

Turning to slide 75, which deals with class content and instructors, Peloton also attributes its success to its diverse content library with thousands of classes. Its own exhibits offered to show secondary considerations emphasized that the class content is a driver of their success and one of the important factors that differentiates Peloton from its competitors and part of the class content differential also includes instructors and the Patent Owner's annual report admits its instructors play a critical role in bringing the Peloton experience to life.

If you turn to slide 76 and the content delivery platform, the '026 patent does not claim a specific network architecture or scale regarding number of classes offered for the number of users. But its considerations borne from the scale and capabilities of its architecture are unclaimed and Peloton admits it invests substantial resources to improve that speed of scalability on its platform and admits its platform is critical to its success. Much of the secondary considerations point to things like the Netflix of spinning or the ability to do thousands of people in a class; those flow from the scale of its system and not from any claimed invention.

Finally, if we turn to slide 78. Petitioner doesn't dispute that the Patent Owner has had commercial success. However, it cannot and has not shown that its commercial success directly results from the claimed

invention given all the unclaimed features of the system. One of the things that's notable here, Your Honors, is what they've tried to prove secondary considerations is a lot of newspaper articles, other things people are saying. There's no survey evidence, there's nothing else of their own, you know, documentation to show which of these features are considered important and in addition to all the other things with respect to commercial success --

JUDGE FINAMORE: Mr. Weider?

MR. WEIDER: Yes.

JUDGE FINAMORE: That is the end of your 30-minute time. Would you like to go into your rebuttal time?

MR. WEIDER: Yes, yes, I would, Your Honor. I'm close to wrapping up but yes, Your Honor. However, it also cannot show a nexus between its claimed invention and success as it ignores its sales were initially slow and only with intensive and creative marketing features did sales pick up. That intensive marketing has ranged from $324 to $730 million per year over the last few years as cited in the 2021 annual report. This massive marketing and advertising campaign further obscures any nexus between the claimed invention and commercial success, and I'm going to reserve the rest of my time for rebuttal.

JUDGE MARSCHALL: Okay. Thank you. Looks like you went a whole one minute over so you only have 29 minutes left. Patent Owner, would you like to reserve some rebuttal time?

MR. STRANG: Thank you, Your Honor. I would like to reserve 15 minutes, please.

JUDGE MARSCHALL: Okay. Great. You may begin when ready.

MR. STRANG: Thank you, Your Honor. Your Honor, this is Jon Strang representing Patent Owner Peloton Interactive. If we turn to the agenda on slide 2, please. Now I have a big agenda slide here but as I understand I'm up here now to respond to the arguments we have so we're going to cut this back quite a bit. I would like to give a very brief overview of the '026 patent and as far as the level of ordinary skill, a person of ordinary skill in the art and Dr. Jeffay, both of who lack any expertise or education or relevant professional experience in the exercise arts, I'll just talk about that in the context of the issues we're going to discuss, which are limited to the dynamically updating ranked list and the leaderboard.

But just to preview that a little bit. It's going to matter here and it's going to matter because Echelon's person of ordinary skill in the art is just simply not equipped to appreciate what the users need to see and Dr. Jeffay likewise is not, and that was evidenced by him giving the example of, for example, the power in watts.

JUDGE MARSCHALL: If I could just jump in on the POSITA issue. This is Judge Marschall.

MR. STRANG: Yes. Yes, Your Honor.

JUDGE MARSCHALL: I just had a question. Is there any evidence in the record that the inventors of the '026 patent or of Watterson or the developers of any of the prior art had a certification in exercise training?

MR. STRANG: No, Your Honor. To my knowledge Petitioner never raised that issue. It's one of the five factors of course or at least in some of the different formulations that you see in the Federal Circuit case law. It hasn't been raised and it's not in the record. So the analysis that, for

MR. STRANG: Okay. If we go to slide 48 the answer is the same for all of the art because all of the art describes the same thing. Now, I think we see it best in the words and this will answer your question, the words, although Petitioner Echelon never made this connection. Watterson explains that there's a racing track that shows a relative position of each competitor and you can see Hurwitz shows the relative position of each competitor versus another and as Mr. Rutberg explained in his Declaration that is a cumulative variable and in particular and importantly it's a cumulative variable for total work output. So the variable is there. But as Echelon just stood up here and told you, that's very useful. That's useful, this display is useful. So that raises the question why would you turn this into the claimed leaderboard? So the question isn't could the person of ordinary skill in the art in the computer field, you know, the Petitioner's person of ordinary skill in the art, the question isn't could they do it? Sure, if you told them to do it but who would tell them? There's nobody in the record on Petitioner's side that would tell them to do that and that's the issue.

JUDGE DANIELS: Got it.

MR. STRANG: Not just -- to sum it up, Your Honor, that’s just not the obviousness analysis and just could a POSA have done it, it's would a POSA have done it and we don't have the would have. They never established the would have.

Now jumping to secondary considerations. I want to really focus on just a couple of things here. The first is the commercial success of the Bike and Bike+ itself is undisputed. The supporting evidence or the breakdown in the evidence shows the actual revenue per quarter going back to I believe

it was 2016 -- my co-counsel will correct me if I have that year wrong -- going back to 2016 up through I believe early 2021, that data was accompanying or actually followed up with after evidentiary objection with a Declaration from a finance official at Peloton who said this is our Bike sales, this is our Bike+ sales. So that is -- that takes away all of the other arguments we need to worry about "is the letter to the shareholders hearsay or not?," which is in the Motion to Exclude. We just focus on the evidence that isn't objected to and there's no dispute and then the other issue is the nexus, and where is the strongest nexus here? Even if we assume there's no presumption of nexus, even if we presume that the strongest nexus here is to these features that are not in the prior art and that is this combination of features of a leaderboard with competition between a live person and archived people and that combination isn't anywhere in the art, and if we go to, for example, the Houh Declaration, page 88.

So calling out Exhibit 2002 and going to page 88 and this is a part of the nexus and what I'm looking at is the unredacted version so I'm not going to get into any details so we can keep this in front of the public. But if you look at page 88 of the Houh Declaration, it has an excerpt from Exhibit 2040 and if Your Honors want to pull Exhibit 2040 that might be helpful, and you notice a couple of things. One is in the background and this is an official Peloton document, they identify what is the core aspect and that is live and historical users, and then they explain -- and this goes to some other points, they go back to the merits. This wasn't a simple thing. This isn't like, you know, using Hurwitz's summary data and just rearranging it a little bit and using it. No, they say, look, relational database solutions will not work.

But what was the core issue here was that core live and historical users and if you go to Exhibit 2040, page 4, there's a graph that shows archived versus live users and you can see there's far more, especially as the (indiscernible), there's far more archived users and Exhibit 2040, page 7, and these are all cited in the POSR and the POR. Exhibit 2040, page 7 shows the percentage of exercisers taken on the Bike or the Bike+ that are of archived classes. So what we have here is the revealed preferences for the users are and what they're really buying the Bike and Bike+ for are for these archived classes and for the leaderboard, okay, and the reviews consistently highlight the archived classes and the leaderboard and there's no prior art teaching of that. So we have -- that's our strongest nexus, this is our best case which we can attach the best nexus. Now I still think we should have a presumption of nexus but our stronger nexus, even without that, are the commercial sales because of how often the users participated in archived classes, and as far as any sort of market share argument goes, I think it's undisputed Peloton created the market. There was no market that existed before Peloton. Peloton came and dominated and then the low-cost people came in after that. Subject to your questions, Your Honor, I'd like to reserve the rest of my time for rebuttal.

JUDGE MARSCHALL: Thank you.

MR. STRANG: Thank you, Your Honor.

JUDGE MARSCHALL: Looks like you used 32 minutes so you'll have 28 minutes left for rebuttal. Petitioner, you have 29 minutes left and you can begin whenever you're ready.

MR. WEIDER: Thank you, Your Honor. So I'm going to start with

you stand and all those same benefits would apply to, let's say, you have a display that uses that number, instead it uses a graphical representation. It's simply not patentable over the prior art because the ordering is only graphical. Hurwitz has a parameter display and for all the reasons you would do an ordering on the graphical display to show who's in the lead and to show relative performance all those same benefits would apply in the context of doing it with numbers instead of using a graph to show the numbers.

A few comments here on the secondary considerations. They've not rebutted any of the fact that you have all these unclaimed features, that things like music, their platform as to the live classes versus archived classes, the fact that some users may take more archived classes versus live classes would sort of make sense. You may want to take a class at a particular time and that's all that's available, that doesn't actually assess, you know, whether or not someone would actually purchase this or not. You know, what they don't have is any survey evidence and interesting the only survey evidence they point to, they made the comment how about reviews insist that they highlight archived classes and leaderboard, but they cite to the Patent Owner's Sur-reply which cites to a document that was put in another IPR proceeding that actually included the reviews. The reviews aren't in the record. We don't know whether anybody offered a review in which they said what I'd really like is I get a leaderboard and an archived class which is arguably the only thing that would relate to the claimed invention, that's nowhere in the record. They haven't established anything about this. There's no evidence of people taking archived classes and doing

so because of the leaderboard. I mean, that's not in the record at all.

JUDGE FINAMORE: Mr. Weider, this is Judge Finamore.

MR. WEIDER: Yes.

JUDGE FINAMORE: I wanted to follow up on that statement you made, and please correct me if I'm misquoting you. But I think you said something in regard to Patent Owner's evidence, I think it's Exhibit 2040, about the data on the archived classes and what users like to do is not evidence of why they purchase a bike and I'm confused by that statement. How is evidence of what a user prefers not evidence of why someone would buy a bike?

MR. WEIDER: Because there is a certain experience you get. They advertise about taking a live class, you get shout-outs by instructors. It has a certain energy to it. If you're offering a system that doesn't even make, you know, it doesn't -- I mean the extent of which that fuels what it is that a lot of people buy. So, for example, I mean they said in the prior proceeding that notable contributors would benefit of having both class types so, you know, there happens to be a live class going, when I want to take it I get all those benefits associated with the live class and if I want to take an on-demand class, then the only thing else I would say, Your Honor, with respect to that document, you know, that's a technical document that was prepared. What it actually shows I'm not really clear about but I don't think that’s the mere fact that people take on-demand classes more. Ultimately their leaderboard, to the extent they have a nexus they have to show that these things arise from the users’ perceptions about why the classes include a leaderboard and then that generates it and, you know, and by the way these on-demand classes

contain all the unclaimed features that we've talked about. They include the music, they include the instructors, they include the content, all the other reasons why people take those classes and they haven't -- there's no survey evidence, there's nothing to show what the view is of those features and so many of the documents that we cite to, you know, barely mention the leaderboard. We cited a number of admissions from their annual report that talked about the importance of music, the importance of instructors, the importance of the whole architecture they've constructed and it has like, you know, one sentence about a leaderboard and essentially all the stuff that they've submitted if you read through it none of what's stated, even walk through Your Honors, all of them tout various other features and reasons why people take the class, they love the bike, they love other aspects too.

If I have any time left, I just want to check with my colleagues to see if there's something else. All right. I have nothing further, Your Honors.

JUDGE MARSCHALL: Okay. Thank you very much.

MR. STRANG: Thank you, Your Honors. Whenever you're ready.

JUDGE MARSCHALL: Whenever you're ready. Thank you.

MR. STRANG: Thank you, Your Honor. I just want to make a couple of points. I'll be very brief. The first one is I just heard opposing counsel say the Petition was not limited to instantaneous. That alone is dispositive. The Petition is not limited to anything. As we went over when I first stood up here many times, the Petition says it would be obvious and it doesn’t tell you anything beyond that. According to Petitioner all I need to say is any parameter for any reason, we don't need to tell you what the parameters are, we don't need to tell you what the reasons are, that's

obviousness. That's not good enough. You know, bottom line is, here there's no motivation to make the combinations.

I just heard opposing counsel say, well, Hurwitz talks a lot about all this. Well, Hurwitz doesn't have a leaderboard, doesn't have archived classes and it doesn't bring anything to, for example, to Watterson. Watterson already has a live-on-live competition and describes the exact same display. But even if you combine, you still don't have the dynamically updating ranked list, the numerically ordered list, the leaderboard or claim 1, you still don't have that and we have nothing there but Dr. Jeffay's say so.

I also heard, on that point, I heard Petitioner say that there wasn't sufficient testimony in the record to rebut the points they first made in their Reply. Well, we couldn't redesign, Your Honor, we did what we could and I think the record is pretty clear.

The last point I want to make is I just heard Petitioner say for the first time that there is a leaderboard in the record. I didn't catch where that exhibit is but this is just another example of bringing up new arguments way too late. I'm not even sure what exhibit it is, Your Honors, so I can't address it. If Your Honors know what exhibit it is I'd love to talk about it. Subject to your questions, Your Honors, that's all I have.

JUDGE FINAMORE: If I may, this is Judge Finamore. I'd like to ask a question about the record and I appreciate that you might not have it in front of you so if you can't answer I understand. But you're talking a lot about the Petition and Petitioner's obviousness analysis in the Petition and specifically the lack thereof and I am empathetic to your position that it seems very light at best in the Petition and arguably somewhat unclear. That

being said though, Petitioner did get a Reply in this case and in particular I'm looking at pages 11 and 12 where it seems to me that they do bolster that obviousness analysis regarding how to arrange certain dynamic displays on Hurwitz's leaderboard in Figure 15. So although I take Patent Owner's position regarding what's in the Petition, I would like to get your thoughts on the analysis set forth on these pages in Petitioner's Reply.

MR. STRANG: Thank you, Your Honor. I think it was Judge Daniels who said earlier that the display would be chaotic if you tried to order it by instantaneous parameters such as cadence or power output and that's exactly right. Petitioner complains we didn't talk about that enough in Mr. Rutberg's Declaration or we didn't see it until the Reply. We'll make sure we're very clear on that in the '521 of course. But Judge Daniels was exactly right. It would be a chaotic display and Dr. Jeffay just demonstrates how little he understands about the exercise arts and why effectively a layman should not be guessing at these things and can't just say everything's obvious and let's take that a step further. The person of ordinary skill in the art is presumably of a lower skill level than Dr. Jeffay. If Dr. Jeffay can't get it right, how can a person of ordinary skill in the art. Unless there's any other questions, Your Honors, that's all I have.

JUDGE MARSCHALL: I was wondering if you could respond to Petitioner's argument that Patent Owner should have done more to show that the archived classes were the driver for a purchaser's decision, either through survey evidence or some other evidence, rather than just after-the-fact use information by users.

MR. STRANG: Thank you, Your Honor. I think the evidence speaks

for itself and the fact that one economist would call reveal preferences. People might answer a survey and say, you know, yes, I love chocolate ice cream because they're afraid to admit that they really like pineapple ice cream which sounds a little freaky but if you look at sales data you know what they like so you know what they're really doing and I think that's the case here. The reveal preferences of the consumers of the Bike and Bike+ overwhelmingly show that they buy the Bike and Bike+ for the archived exercise classes offered by Peloton. Subject to your questions, Your Honors, that's all I have.

JUDGE DANIELS: Mr. Strang, would it bolster your point to also consider the fact that, I guess we don't have any data on it, but the Peloton users stay and continue to purchase the app and then the service because of those archived classes?

MR. STRANG: It would, Your Honor, and I think we made that point a bit in the Patent Owner Response. But to really focus the Board on what mattered and where we had our strongest nexus, I was focusing on the actual sales of the Bike and Bike+ alone because that takes away all of the issues with, well, the app also offers yoga classes.

JUDGE DANIELS: Right.

MR. STRANG: Well, you don't take yoga classes on the Bike so we know what users buy the Bike and Bike+ for and they buy the Bike and Bike+ for archived classes and competition on a leaderboard.

JUDGE DANIELS: Thank you.

MR. STRANG: Thank you, Your Honor.

JUDGE MARSCHALL: Thank you. If I could ask the other Judges,

do you have any further questions for either party? Hearing none, I think that concludes the hearing. Thank you very much for your presentations. They were very helpful and if you could stay on the line after we go off the record here so the court reporter can ask for any clarifications that may be necessary, that would be helpful. Thank you.

**(Whereupon, at 2:35 p.m., the oral hearing was concluded.)**

PETITIONER:

Barry J. Schindler
Heath J. Briggs
James L. Ryerson
GREENBERG TRAURIG, LLP
schindlerb@gtlaw.com
briggsh@gtlaw.com
ryersonj@gtlaw.com

PATENT OWNER:

Jonathan M. Strang
Lawrence J. Gotts
Dale Chang
Joseph C. Akalski
Kimberly Q. Li
LATHAM & WATKINS LLP
jonathan.strang@lw.com
lawrence.gotts@lw.com
dale.chang@lw.com
joe.akalski@lw.com
kimberly.li@lw.com

# EXHIBIT 8

[redacted]



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PELOTON INTERACTIVE, INC., )
)
Plaintiff, )
)
vs. ) Case No. 20-CV-662-RGA
)
IFIT, INC., )
)
Defendant. )

CERTIFIED COPY

REMOTE ZOOM VIDEOTAPED DEPOSITION OF: TOM CORTESE
(ATTORNEYS' EYES ONLY)

MARCH 3, 2022

8:17 A.M. MOUNTAIN TIME

Reporter: Vickie Larsen, CCR/RMR
Utah License No. 109887-7801
Nevada License No. 966
Notary Public in and for the State of Utah

[redacted]



APPEARANCES
(All parties present by Zoom)
For the Plaintiff:

Steven N. Feldman
Joseph Akalski
Emilie Schwarz
LATHAM & WATKINS, LLP
1271 Avenue of the Americas
New York, New York 10020
212.906.1200
Steve.feldman@lw.com
Joe.akalski@lw.com
Emilie.schwarz@lw.com

For the Defendant:

Ruben J. Rodrigues
FOLEY & LARDNER, LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
617.502.3228
Rrodrigues@foley.com

Also Present:
Lance Harrison, videographer

-oOo-



I N D E X


| TOM CORTESE | Page |
|---|---|
| MR. RODRIGUES | 7 |


-oOo-

E X H I B I T S


| No. | Description | Page |
|---|---|---|
| Exhibit 1 | United States Patent No. 10,486,026 B2 | 42 |
| Exhibit 2 | United States Patent No. 10,639,521 B2 | 54 |
| Exhibit 3 | Notice of 30(b)(6) Deposition of Peloton Interactive, Inc. | 55 |
| Exhibit 4 | Email from John Foley to Hisao Kushi dated October 17, 2011, with attachment (Bates Number PELOTON_ICON-ECHELON_00259988-260004) | 114 |
| Exhibit 5 | Email from Allison Greenwell to Tom Cortese dated March 13, 2012, with attachment (Bates Number PELOTON_ICON-ECHELON_00223290-223322) | 124 |
| Exhibit 6 | Photographs of whiteboard sketches (Bates Number PELOTON_ICON-ECHELON_00263565-263566) | 126 |
| Exhibit 7 | Photograph of a whiteboard (Bates Number PELOTON_ICON-ECHELON_00265043) | 128 |
| Exhibit 8 | Email from John Foley to Tom Cortese dated June 26, 2012 (Bates Number PELOTON_ICON-ECHELON_00054122) | 132 |
| Exhibit 9 | Email from Tom Cortese dated December 13, 2012, with attachment (Bates Number PELOTON_ICON-ECHELON_00099378) | 135 |
| Exhibit 10 | Email from Tom Cortese dated May 16, 2012 (Bates Number PELOTON_ICON00008666) | 144 |
| Exhibit 11 | [redacted] | |
| Exhibit 12 | Peloton Cycle Customer Satisfaction Wave 2 Results (Bates Number PELOTON_ICON-ECHELON_00002325-2378) | 154 |
| Exhibit 13 | [redacted] PELOTON_ICON-ECHELON_003158) | |
| Exhibit 14 | [redacted] (Bates Number PELOTON_ICON-ECHELON_00021209-21223) | |
| Exhibit 15 | FY 2021 Operational Planning, March 2020 (Bates Number PELOTON_ICON-ECHELON_00256382-256391) | 172 |
| Exhibit 16 | Market Map: Phase II, January 22, 2018 (Bates Number PELOTON_ICON-ECHELON_00021102-21129) | 179 |
| Exhibit 17 | [redacted] November 2020 (Bates Number PELOTON_ICON-ECHELON_00245041-256063) | |






-oOo-

[redacted]



March 3, 2022 8:17 a.m.

P R O C E E D I N G S

THE VIDEOGRAPHER: We're on record. My name is Lance Harrison. I'm the videographer. The court reporter is Vickie Larsen. We represent JD Legal Support located in Lehi, Utah.

The time and date indicated on the Zoom feed is 8:17 a.m. Mountain Time, March 3rd, year 2022.

This is the case of Peloton Interactive, Inc., versus iFIT, Inc. Case Number 20-662-RGA in the United States District Court for the District of Delaware.

Counsel will now introduce themselves and the court reporter will swear in the witness.

MR. RODRIGUES: This is Ruben Rodrigues of Foley & Lardner, LLP, on behalf of defendants, iFIT, Inc.

MR. FELDMAN: Steve Feldman of Latham & Watkins on behalf of Peloton.

TOM CORTESE,

called as a witness, having been duly sworn, was examined and testified as follows:



EXAMINATION

BY MR. RODRIGUES:

**Q. Good morning, Mr. Cortese.**

A. Good morning, Mr. Rodrigues.

**Q. Could you just please state your name for the record.**

A. Sure. My name is Tom Cortese.

**Q. And where do you live? City and state would be fine.**

A. I currently live in Summit, New Jersey.

**Q. Have you ever been deposed before?**

A. Yes, sir.

**Q. How many times?**

A. A handful of times.

**Q. When's the most recent time you recall being deposed?**

A. Six or nine months ago.

**Q. Do you know what case that was in?**

A. I don't recall.

**Q. Was the matter involving Peloton?**

A. Yes, yeah.

**Q. Prior to that deposition, do you recall what the prior deposition was?**

A. I apologize, I don't -- I don't -- I didn't come prepared with the list of -- of



depositions, but -- but I've been involved in a handful of depositions for Peloton over -- over the last couple years.

**Q. Understood.**

**Are there any particular matters you do recall that you've been deposed in?**

A. It was a -- they've been patent litigation related issues and I believe one trademark -- a trademark issue.

**Q. Besides cases involving patents or trademarks, have you been deposed in any other legal matters?**

A. I believe they all related to patents and trademarks. There's one in particular I'm thinking of, Villency Design Group that was, I believe, patent related but maybe was also a broader dispute. I don't remember the legal scope.

**Q. Understood.**

**Besides Villency, do you recall any of the other parties involved in the litigations that you were deposed in?**

A. Sure, yeah. Well, there's ICON, Flywheel, Villency, and I believe the trademark one was called Move -- Move Press.

**Q. You say Move Crest? Sorry, your audio**



**trailed off at the end there.**

A. Sorry. Move Press, like a publication.

**Q. Have you ever been deposed in any matters not involving Peloton?**

A. No.

**Q. Well, it sounds like you've got some experience with the deposition process, but I'm just going to go over the ground rules to make sure we're all on the same page.**

**I'll ask questions today and I'll expect that you provide full, honest, truthful answers today. Your attorney may object, but unless he instructs you not to answer, I expect an answer to the question.**

**Does that make sense?**

A. It does. Thank you.

**Q. If you don't understand a question I ask, will you let me know? Otherwise, I'll assume that you understood the question.**

A. I will.

**Q. And do you understand you're under oath here today? Do you understand the obligations of your oath to provide full, truthful, and honest testimony here?**

A. Absolutely, I do.

**Q. And do you -- is there anything that**

[redacted]

Page 66

correct.
**Q. Okay. So are you saying that the leaderboard technologies are what led to the consumer -- the commercial success of the products?**
MR. FELDMAN: Objection. Calls for a legal conclusion and expert testimony.
But you can answer.
THE WITNESS: Okay. So, I mean, the -- one of the -- one of the awesome things of that leaderboard technologies is that ability in a class, from the convenience of home, just to be able to, you know, feel the presence of these other folks riding or running with you.
To, you know, to be able to know that you aren't participating in the activity alone. For some people to be able to be pushed by the notion of competition. For other people to be able to be cradled by the positivity of being together.
You know, all of that emotion and feeling that, you know, was a huge unlock for consumer success -- you know, consumer success in -- in, you know, call it, you know, in fitness that we think was very unique success, you know, all of that comes from this implementation of these -- these leaderboard technologies.

Page 67

**Q. BY MR. RODRIGUES: And how do you know that implementation of leaderboard technologies drove commercial success for the Peloton products?**
MR. FELDMAN: Object to the extent it calls for a legal conclusion and expert testimony, and lacks foundation.
THE WITNESS: Well, one, it was -- it was unique to us at the time, and Peloton, you know, took off in a segment of fitness that hadn't seen the level of consumer adoption that we were able to garner and continue to be able to attract and maintain. I'd say that's sort of a -- one of the biggest indicators that we have.
**Q. BY MR. RODRIGUES: Are you aware of any surveys that demonstrate consumer demand for the leaderboard technologies as implemented by Peloton?**
A. [redacted]
**Q. When you say [redacted] can you just explain what you mean by that?**
A. [redacted]

Page 68

**Q. Do these surveys typically have some sort of name within Peloton?**
A. One I'm thinking of in particular is I believe we do an [redacted], and then there may be other surveys that are conducted throughout the organization from time to time.
**Q. And what is the [redacted] called? Is it just called [redacted]**
A. I believe that is correct.
**Q. And what's the purpose of those [redacted]?**
MR. FELDMAN: Lacks foundation.
THE WITNESS: [redacted]
**Q. BY MR. RODRIGUES: Besides the unique features that you described when the Peloton product was released and the user adoption, and potential surveys that Peloton has conducted, are you aware of anything else that would demonstrate the commercial -- that the commercial success of the Peloton products is related to the leaderboard technologies?**
MR. FELDMAN: Calls for expert testimony. Lacks foundation.

Page 69

THE WITNESS: Again, I think the -- the -- the -- I think one of the clearest -- the clearest example was that, you know, we were able to bring product to market with this unique feature and -- and, you know, drive not-before-seen consumer adoption.
[redacted].
**Q. BY MR. RODRIGUES: Anything else you can think of?**
A. Those are the main -- those are the main things.
**Q. Okay. Turning back to Exhibit 3, I'd like to go on to Topic Number 5, which reads, "The Certificates of Correction, Petitions Under 37 CFR Section 1.324 to Correct Inventorship of a Patent, and/or Request For Correction in a Patent Application Relating to Inventorship or an Inventor Name, or Order of Names, Other Than in a Reissue Application, filed by Peloton with the USPTO related to the Peloton Asserted Patents, including the purpose, reasoning, decision, or any analysis, that Messrs. Cortese, Feng," Sira, "and Sira should no longer be listed as inventors of the Peloton Asserted Patents."**

[redacted]



product line that -- that, you know, we wanted to release now and could think up to release -- release later, and that is why we -- that is why we came to this agreement.

**Q. BY MR. RODRIGUES: And are you aware of any documents that reflect that firm belief?**

A. I mean, just this one.

MR. RODRIGUES: I'd like to mark as Exhibit 12 a document produced by Peloton with Bates Number Peloton_ICON-Echelon_00002325.

(Exhibit 12 was marked for identification.)

MR. RODRIGUES: And I'll share this on the screen as well.

**Q. And, Mr. Cortese, let me know when you've got this up on your screen.**

A. Okay. I've got it up.

**Q. Okay. And looking at the front page of this document, can you tell me what it is?**

A. Well, I can tell you [redacted]. I mean, it appears to be a -- it appears to be a [redacted].

**Q. And what is Directions Research?**

A. I -- I don't -- I don't know them directly, I'm sorry.



**Q. All right. Are you familiar with the results of this survey?**

A. I -- I have a vague recollection of see- -- of seeing --

MR. FELDMAN: Hold on a sec.

Calls for speculation.

THE WITNESS: Sorry. I have a vague recollection of seeing this, or something like this.

**Q. BY MR. RODRIGUES: Let's -- I'd like to turn to Page 13, though if you want to look at any other pages as we get there on your local copy or if you want me to give you control of the screen, I'm happy to do that.**

A. Yep, I got the local one here.

**Q. And I'm looking at Page 13, which I believe is --**

MR. FELDMAN: Hold on. Ruben, he's reviewing the whole document.

THE WITNESS: Sorry, sorry, sorry.

MR. FELDMAN: Why don't you let him finish reviewing the document.

MR. RODRIGUES: Sure, I was just going to note for the record the page I'm on, but that's fine. I don't want to forget.

THE WITNESS: Okay. I haven't gone



through the whole thing, but I don't know, yeah, I got it.

MR. RODRIGUES: Okay.

THE WITNESS: There's a lot -- a lot in here.

**Q. BY MR. RODRIGUES: Yeah, I'm going to ask you not about everything in here, but obviously if I ask you something you feel like you need to flip through, go for it.**

A. Okay.

**Q. So on Bates number ending in 337, and I appreciate that what I have here on the screen here has two different Bates numbers. I'm going to read the -- the bolded top Bates number, because I believe that's the correct one, and I'm not sure how that other one ended up here.**

**But Page 13 of the PDF, Bates Number 337.**

**Do you see that page?**

A. Yes.

**Q. Do you know what's being demonstrated on this page or this presentation?**

A. Oh, boy.

MR. FELDMAN: Lacks foundation. Calls for speculation.

THE WITNESS: So it appears to be showing



the -- the answers -- compiled answers to two survey questions sent to a small subset of [redacted] And the questions were "What are all the reasons you rated recommending Peloton Cycle to a friend or colleague, A, insert response from Q.1a" -- shoot, that was -- sorry.

Yeah, so in response to this one question, [redacted] compiled here, "What are all the reasons you rated recommending" -- "recommending Peloton Cycle to a friend or colleague A" blank.

So I guess in a previous question the -- the member was asked -- in a previous question the member was asked to rate recommending Peloton Cycle to a friend or colleague, and then they would have rated it something.

And then we're now asking them a follow-up question that says, "What are the reasons you gave it that rating?" Okay. So that's the left side.

And then the right side is 51 -- oh, boy, it's a touchscreen. Sorry. Right side is [redacted]. "Why aren't you using the bike?" and the compiled answers to those

[redacted]



[redacted]
So on the left side [redacted] responding to what are the top reasons you gave a rating to a previous question about recommending Peloton Cycle to a friend or colleagues, and then this is their reasons.
And then on the right side, [redacted], a more straightforward question, why do you no longer use your Peloton Bike. All right. I got it.
**Q. BY MR. RODRIGUES: Okay. On this page that we've been looking at ending in Bates Number 337, none of the [redacted]?**
MR. FELDMAN: Misstates the document.
THE WITNESS: I believe that is incorrect.
**Q. BY MR. RODRIGUES: How so?**
A. Based on everything I know about Peloton, Peloton Bike, our consumers and the consumers love specifically things like, you know, community, environment are a -- community and environment is the most clear and obvious callout to the -- to the leaderboard.
It's often -- I mean, it's -- this is



what I've been talking about all day with you, right, it's -- it's often how folks perceive that -- that leaderboard.
It's the ability to see -- you know, see and I keep saying feel the presence of others in the class, which, once again, that unlock of -- you know, the unlock that we were able to deliver to the market where all of a sudden you have the feeling of the group in the privacy and convenience of home.
And then, you know, beyond that, that one being the very obvious one that is -- that is how our folks talk about the leaderboard or one of the clear ways that folks talk about the leaderboard.
You know, then just beyond that, like, when you go deeper with consumers it's like, well, you know, why was it a great workout?
Well, part of the reason why it was a great workout is because I was engaged.
Well, why did you feel so engaged?
Well, interestingly, part of the reason I felt so engaged is because of that feeling of the presence of others and the -- the motivate -- the motivating factor of, you know, the group as illustrated in -- you know, in -- in the leaderboard.
Oh, you think it's convenient? Why do



think it's convenient?
Oh, well, that's simple, because I used to go to these very inconvenient group boutique workouts outside of my home, and I now have a very convenient group workout inside my home.
Why do you think it's -- why do you think it's fun?
Oh, it's fun because, you know, I love the class environment.
Oh, what do you love about the class environment?
Oh, I love the fact that you transported the feeling of the community and the group in -- into my home.
It's sort of an interesting thing as you talk to Peloton consumers and you see the -- you see the way it's talked about and you see the way the reviews get written, the -- the -- the -- the press articles, the -- the community that's developed around it, right, it's all that stuff is just like hitting at the heartstrings of the consumer in a way that just, dude, did not happen before Peloton.
**Q. You would agree that the page in front of you [redacted]?**
A. Absolutely. And I'm explaining to you



that that -- that that is just a word.
**Q. Scroll down to Page 17.**
**Have you seen this page before of this document?**
A. Well, I was just looking through the document before so I -- I think I saw this page.
**Q. Okay. And I'm referring specifically to the Bates Number 2341.**
**Do you see that?**
A. Yeah.
**Q. This page is entitled "[redacted]**
**Do you see that?**
A. I do.
**Q. Okay. And the top item at the top says "[redacted]."**
**Do you see that?**
A. Yes.
**Q. And then if you scroll down -- further down, the last item in, I guess, teal says, [redacted]"**
**Do you see that?**
A. Yep.
**Q.** [redacted]

[redacted]



**[redacted]?**

MR. FELDMAN: Misstates the document.

THE WITNESS: Hang on while I read the subtext.

Again, first of all, really clear the [redacted] You know, uniqueness of that on-demand class offering, you know, being that it's a group class and the convenience of home.

And then just taking so many different elements from here. [redacted]

**Q. BY MR. RODRIGUES: Are you aware of any surveys that specifically discuss the leaderboard [redacted]**

A. Again, I mean, just the -- the way in which community, you know, weaves itself through the Peloton experience and -- and drives consumer delight and consumer delight drives word-of-mouth passalong,



which drives -- which drives the demand. Whether or not -- whether or not folks explicitly call it out the phrase "leaderboard," it is -- it is clear and obvious through our success in the market the -- the descriptions of -- of in-customer reviews and press reviews that the value of the group class that is -- that comes through our broad leaderboard technology is -- is a massive differentiator that created a -- a real unlock, drove a -- drove an excited member base who then drove -- drove crazy word-of-mouth and -- and spread of -- of Peloton and the -- the demand we were able to create that the industry hadn't previously created.

**Q. My question was a little more simple than that, which is simply: Are you aware, one way or the other, are you aware of any surveys conducted after this that specifically asked about the leaderboard? So where the survey itself asked about the leaderboard like this one did.**

A. I -- I don't recall.

**Q. Okay. If we go to what is Page 19 of the PDF at Bates Number 2343.**

A. Yep.

**Q. This is titled [redacted]**



[redacted]

Do you see that?

A. Yep.

**Q. Have you seen this -- this, you know, quadrant chart before?**

A. Like I said before, I -- I have a vague memory of this -- of this survey and -- and having seen this survey back in the day.

**Q. Do you see a listing of [redacted] It's not a listing, but do you see a dot associated with [redacted] in sort of a yellowish-green font?**

A. Yep.

**Q. Okay. What quadrants is that dot in?**

A. That quadrant is on the bottom left quadrant.

**Q. Okay. And is that the quadrant associated with [redacted] and [redacted]?**

A. It is on this grid, yes.

MR. RODRIGUES: And let's take this one down.

I'd like to mark as Exhibit 13 a document produced by Peloton with Bates Number 31- -- sorry, I



need to open this before I read the Bates number on it.

MR. FELDMAN: Why don't we take a five-minute break since it's been about an hour and 15 minutes.

MR. RODRIGUES: Yeah, that sounds good.

MR. FELDMAN: How much longer do you think you have left?

MR. RODRIGUES: Let's go -- let's go off the record and then the videographer can tell us the time.

THE VIDEOGRAPHER: Going off record. The time is 3:13 Mountain Time.

(There was a break taken.)

THE VIDEOGRAPHER: Back on record. The time is 3:28 Mountain Time.

MR. RODRIGUES: So I'm sharing in the chat what I've marked as Exhibit 13. I'll share this on my screen as well.

(Exhibit 13 was marked for identification.)

THE WITNESS: I see it twice in the chat. I assume it's the same file?

MR. RODRIGUES: Yeah, I think I just -- I dragged it twice because it was slow.

THE WITNESS: I just wanted to make sure.

# EXHIBIT 9

# Peloton Cycle

[redacted]




Brad Olsen

October 30th, 2017

PELOTON

DIRECTIONS RESEARCH

[redacted]

PELOTON_ICON-ECHELON_00002325
PELOTON_ICON-ECHELON_00002325

# Actives recommend Peloton because it is [redacted] Inactives are no [redacted]

*I absolutely LOVE my Peloton bike, I rave about it to every person who seems interested in wellness. I love that the bike rides so smooth and streams effortlessly. I love that it tracks my metrics... game changer. I also love the instructors and getting to choose based on the mood I'm in.*

## TOP Reasons Recommend Peloton

[redacted]

Active Peloton bike owners recommend Peloton for many reasons:

[redacted]

*It's an amazing workout that you can do in the comfort of your own home.*

*Convenience; it is a great exercise machine which you can share with family members; Great Peloton community and coaches.*

*I love the bike and the classes. The instructors are so much fun and motivating. And although its hard I cant wait for my next ride.*

## Reasons No Longer Use

[redacted]

Inactive Peloton [redacted]r

[redacted]:

[redacted]

*I am very busy with work and kids. Need to find the time.*

*Laziness. No motivation to exercise.*

*Summer has been busy with outside exercise. Now that Fall has arrived I expect to get back on the bike 2-3 times a week.*

*I used the bike 3-4 times a week from January to June then fell off the wagon. I'm trying to get myself back on it but motivating myself is hard.*

*Recovering from third degree AC separation / shoulder dislocation.*

PELOTON

Q1b. What are all of the reason your rated "recommending Peloton Cycle to a friend or colleague" a "[INSERT RESPONSE FROM Q.1a]"? Open End
Q1c. Why do you no longer use your Peloton Bike? Open End



[redacted]

# Feature Importance and Satisfaction



[redacted]

ACTIVE

# [redacted] are most important overall, followed by several [redacted]

## Importance of Feature in Overall Peloton Experience

Category
- Choosing the Right Class
- In-Class Experience
- Reviewing Performance
- Interacting with Members

[redacted]




| % Extremely Satisfied | % PT GAP |
| --- | --- |
| 49% | -17 |
| 46% | -13 |
| 33% | -21 |
| 32% | -21 |
| 46% | -5 |
| 29% | -19 |
| 37% | -2 |
| 41% | 7 |
| 29% | 6 |
| 29% | 6 |
| 27% | 14 |
| 27% | 14 |
| 27% | 16 |
| 21% | 13 |
| 16% | 13 |
| 16% | 14 |
| 15% | 13 |

Women find the following more important:
- *Finding an On Demand Class*

Men find the following more important:
- *Tracking your metrics*
- *Tracking your progress over time*
- *Looking at your details of a specific workout*

Base: W2 Active Peloton Users, 429
Q22. How important are each of the following features to you in your overall Peloton experience? [5 pt scale: 1=Not At All Important / 5=Extremely Important]
Q23. How satisfied are each of the following features in your overall Peloton experience? [5 pt scale: 1=Not At All Satisfied / 5=Extremely Satisfied]



[redacted]

[redacted] is an area for enhancement. [redacted] ACTIVE
[redacted] (in general, [redacted] are Peloton strengths.




Base: W2 Active Peloton Users, 429
Q22. How important are each of the following elements to you in your overall Peloton experience? [5 pt scale: 1=Not At All Important / 5=Extremely Important]
Q23. How satisfied are you with each of the following elements of your overall Peloton experience? [5 pt scale: 1=Not At All Satisfied / 5=Extremely Satisfied]



[redacted]

# EXHIBIT 10

Trials@uspto.gov
571-272-7822

[redacted]

Paper 54
Date: March 2, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ECHELON FITNESS MULTIMEDIA, LLC
Petitioner,

v.

PELOTON INTERACTIVE, INC.,
Patent Owner.

---

IPR2020-01541
Patent 10,486,026

---

Before SCOTT A. DANIELS, RICHARD H. MARSCHALL, and ALYSSA A. FINAMORE, *Administrative Patent Judges.*

MARSCHALL, *Administrative Patent Judge*.

JUDGEMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

ORDER
Denying-In-Part and Dismissing-In-Part Petitioner's Motion to Exclude
*37 C.F.R. § 42.64(c)*
Granting Patent Owner's Motion to Seal and for Entry of Protective Order;
Granting Petitioner's Motions to Seal
*37 C.F.R. §§ 42.14 and 42.54*

 [redacted]

INTRODUCTION

Echelon Fitness Multimedia, LLC ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1–20 of U.S. Patent No. 10,486,026 B2 ("the '026 patent") (Ex. 1001). Pet. 1. Peloton Interactive, Inc. ("Patent Owner") filed a Preliminary Response (Paper 10). Based on the Petition and Preliminary Response, we granted institution of an *inter partes* review of claims 1–20. Paper 16 ("Inst. Dec."), 2.

During trial, Patent Owner filed a Response (Paper 29, "PO Resp."). Petitioner filed a Reply (Paper 37, "Reply"), and Patent Owner filed a Sur-reply (Paper 45, "Sur-reply").

Petitioner filed a Motion to Exclude Evidence (Paper 47, "Mot."; Paper 48 (redacted version)). Patent Owner filed an Opposition to that Motion (Paper 50), and Petitioner filed a Reply (Paper 51). The parties also filed three separate unopposed motions to seal, including Patent Owner's Unopposed Motion to Seal and for a Protective Order (Paper 31), Petitioner's Unopposed Motion to Seal its Reply and a Reply Declaration (Paper 39), and Petitioner's Unopposed Motion to Seal its Motion to Exclude (Paper 46).

Oral argument took place December 2, 2021. We reviewed a transcript of the argument, which will be entered as part of the record.

This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we conclude Petitioner has not proven by a preponderance of the evidence that any of claims 1–20 of the '026 patent are unpatentable.

BACKGROUND

*A. Real Parties-in-Interest*

Petitioner identifies the real parties-in-interest as: itself; North Castle Partners, LLC; Echelon Fitness, LLC; Viatek Consumer Products Group Inc.; Echelon Studio LLC; Echelon Holdings, LLC; NCP-Echelon, LLC; Special Situations Investing Group II, LLC; StoneBridge 2020, L.P.; Fitness 2020 Offshore, Inc.; GF PYCR; Primo Secondo LLC; The Albright Family Rev. Trust; and Echelon Management 2, LLC. Pet. 1; Paper 7, 1–2; Paper 11, 1–2. Patent Owner identifies itself as the real party-in-interest. Paper 4, 2.

*B. Related Matters*

Petitioner and Patent Owner identify the following related matters involving the ’026 patent:

> *Peloton Interactive, Inc. v. Echelon Fitness, LLC*, No. 1:19-cv-01903-RGA (D. Del. filed Oct. 8, 2019);
>
> *Peloton Interactive, Inc. v. ICON Health & Fitness, Inc.*, 20-cv-662-RGA (D. Del. filed May 15, 2020); and
>
> *Peloton Interactive Inc. v. Flywheel Sports, Inc.*, No. 2:19-cv-00317-JRG-RSP (E.D. Tex.; dismissed Feb. 6, 2020).

Pet. 1–3; Paper 4, 2.

The parties identify the following patents and patent applications as related matters: U.S. Patent No. 9,174,085 B2; U.S. Patent No. 9,233,276 B1; U.S. Patent No. 9,861,855 B2; U.S. Patent No. 10,022,590 (challenged in IPR2020-01187); U.S. Patent No. 10,322,315 B2 (challenged in IPR2020-01186); and U.S. Patent No. 10,639,521 B2. Pet. 2; Paper 4, 2–3. Patent Owner further identifies the following patents and patent applications as

related matters: U.S. Patent Application No. 16/866,499 and U.S. Patent Application No. 16/902,195. Pet. 2–3; Paper 4, 3.

Petitioner also identifies other proceedings involving related patents as related matters. Pet. 2–3

### *C. The ’026 Patent*

According to the ’026 patent, “the invention relates to a system and method for providing streaming and on-demand exercise classes.” Ex. 1001, 1:31–33. The invention “comprises networked exercise systems and methods whereby one or more stationary exercise bicycles . . . are equipped with an associated local system that allows the user to fully participate in live instructor-led or recorded cycling classes from any location that can access a suitable communications network.” *Id.* at 4:9–15. Figure 1, reproduced below, shows a local exercise system.

[redacted] Ex. 2002 ¶¶ 185–186. We find this testimony credible because the documents support it. Petitioner asserts that Dr. Houh's reference to [redacted] *See* Reply 24. Petitioner also does not explain how a mix of live and archived user data on a leaderboard can be ranked without some sort of synchronization of the data. Based on our review of the record, Patent Owner establishes adequately that its Bike product synchronizes archived data with user data as required by claims 1 and 11.

The parties also dispute whether the claims are sufficiently coextensive with the Bike product to trigger a presumption of nexus, but we need not reach that issue because we find that Patent Owner sufficiently establishes a nexus to commercial success even in the absence of a presumption of nexus. As noted above, a nexus exists between the objective indicia and the claimed invention when "the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. "To determine whether the patentee has met that burden, we consider the correspondence between the objective evidence and the claim scope." *Henny Penny*, 938 F.3d at 1332.

Claim 1[15] recites limitations directed to an exercise device, and a computer configured to: present available archived classes, receive data related to a selected archived class, receive performance data from a sensor on the exercise device, generate a performance parameter based on the user data, receive archived performance data, synchronize the archived data with the current user data, and display a dynamically updating ranked list of the of the user performance parameter along with some of the archived user performance parameters. *See* Ex. 1001, 15:40–16:19. As discussed above, we find that Patent Owner's Bike product contains all of these limitations and the similar limitations in claim 11.

Patent Owner's nexus argument focuses on the on-demand nature of the claimed archived classes, in combination with other claim limitations such as the synchronized, archived performance data, which fuels the success of its Bike product. PO Resp. 63–64. Patent Owner also touts the ability to display synchronized performance data on a dynamically updating ranked list (the "leaderboard" shown in the screenshots above) as fostering the kind of competition and interaction that drives the success of the product. *Id.* at 64–65. In short, Patent Owner maintains that the claimed invention is a combination that provides on-demand classes simulating the competition of a live class with a dynamically updated ranked list of a performance parameter, and that this combination has driven the success of its Bike product. *See id.* at 63–64 ("The claimed invention, embodied by the Peloton Bike and Bike+, offers the convenience of being able to take a class at any time, on-demand, with all of the synchronized, archived performance data

[15] The parties continue to argue claims 1 and 11 together in their nexus analysis; we focus on the language in claim 1 for ease of reference.

from those who have previously taken the class to simulate the competition of an in-studio class." (citations omitted)), 65–66 ("By displaying synchronized, archived performance data, Peloton allows the user to compete against real people, but at any time and from home." (citations omitted)).

Patent Owner supports its arguments with documentation attesting to the importance of the on-demand, archived classes simulating the competition of live classes to the success of the product. For example, Patent Owner's evidence indicates that users buy the Bike product primarily to use archived classes because the vast majority of on-bike workouts are in archived classes. Ex. 2040, 4 [redacted] 7 [redacted]. On demand rides offer convenience for home users to workout on their own schedule"); PO Resp. 65; Sur-reply 25. Patent Owner's evidence also includes industry literature touting the on-demand nature of the archived classes. *See, e.g.*, Ex. 2066 at 35 ("Peloton is often credited with kick-starting the trend of connected fitness: streamed, on-demand home workouts that aim to replicate a traditional studio experience, including live group workouts, the ability to follow a favorite instructor, and a built-in community, but without the stress of scheduling and commuting."); Ex. 2058 at 12 ("A truly disruptive product …. It is the first in-home exercise cycle to offer LIVE streaming and on-demand classes in the comfort of riders' home."). Other literature touts the leaderboard. *See, e.g.*, Ex. 2053 at 4 ("The leaderboard … provides a shared social board of information that weaves together riders from all over the world."); Ex. 2082 at 2 (stating that leaderboard helps foster sense of

 [redacted]

community). Based on all of this evidence taken together—the claim limitations, the Bike product features tracking those limitations, and the importance of the claimed features to customers' use of the Bike product—we find Patent Owner's argument and evidence sufficiently persuasive to establish a nexus between claims 1 and 11 and the commercial success.

Petitioner's arguments against a nexus are limited, and unavailing. *See* Reply 33–34. First, Petitioner argues, without further elaboration, that "[i]n view of the significant unclaimed features discussed above, Patentee cannot" establish a nexus absent a presumption. *Id.* at 33. That analysis does not establish the degree to which those unclaimed features drive commercial success in a manner that would undermine Patent Owner's argument and evidence that the commercial success is the direct result of the merits of the claimed combination. Just as the mere presence of an unclaimed feature in a product does not negate a presumption of nexus, the presence of unclaimed features does not impugn an argument that the commercial success of a product is the result of the claimed invention. *See Teva Pharm. Int'l GmbH v. Eli Lilly and Co.*, 8 F.4th 1349, 1361 (Fed. Cir. 2021) (finding that Board erred "to the extent the Board announced a bright-line rule that the presumption of nexus does not apply if any unclaimed feature materially affects the functioning of a product that is alleged to be coextensive"); *WBIP*, 829 F.3d at 1329 ("The presumption of nexus is rebuttable: a patent challenger may respond by presenting evidence that shows the proffered objective evidence was 'due to extraneous factors other than the patented invention.' . . . However, a patent challenger cannot successfully rebut the presumption with argument alone—it must present evidence." (citations omitted)).

unopposed nature of the Motion, we find that good cause exists to grant Petitioner's Motion to Seal.

We remind the parties of the public's interest in maintaining a complete and understandable file history, and of the general expectation that information will be made public when a final written decision indicates that the information exists. *See* TPG 19–22. We also note that confidential information subject to a protective order ordinarily becomes public 45 days after final judgment in a trial. *See id.* at 21–22. After final judgment, a party may file a motion to expunge confidential information from the record prior to the information becoming public.[18] *See id.* at 22 (citing 37 C.F.R. § 42.56).

## CONCLUSION

For the reasons above, Petitioner has not proven, by a preponderance of the evidence, that any of claims 1–20 of the '026 patent would have been obvious.

---

[18] The confidential documents filed in this proceeding will remain under seal at least until the time for filing a notice of appeal has expired or, if an appeal is taken, the appeal process has concluded. The records for these proceedings will be preserved in their entirety, and the confidential documents will not be expunged or made public, during any appeal.

| **Claims** | **35 U.S.C. §** | **References** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–20 | 103 | Watterson, Hurwitz | | 1–20 |
| 1–19 | 103 | Hurwitz, Garcia, Martens | | 1–19 |
| 20 | 103 | Hurwitz, Garcia, Martens, Loveland | | 20 |
| **Overall Outcome** | | | | 1–20 |

ORDER

In consideration of the foregoing, it is:

ORDERED that claims 1–20 of the ’026 patent have not been shown to be unpatentable;

FURTHER ORDERED that Petitioner’s Motion to Exclude is denied-in-part and dismissed-in-part;

FURTHER ORDERED that Patent Owner’s Unopposed Motion to Seal and for Protective Order (Paper 31) is granted;

FURTHER ORDERED that Petitioner’s Unopposed Motion to Seal its Reply and Reply Declaration (Paper 39) is granted;

FURTHER ORDERED that Petitioner’s Unopposed Motion to Seal its Motion to Exclude (Paper 46) is granted; and

FURTHER ORDERED that, as this is a Final Written Decision, a party seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Barry J. Schindler
Heath J. Briggs
James L. Ryerson
GREENBERG TRAURIG, LLP
schindlerb@gtlaw.com
briggsh@gtlaw.com
ryersonj@gtlaw.com

FOR PATENT OWNER:

Jonathan M. Strang
Lawrence J. Gotts
Dale Chang
Joseph C. Akalski
Kimberly Q. Li
LATHAM & WATKINS LLP
jonathan.strang@lw.com
lawrence.gotts@lw.com
dale.chang@lw.com
joe.akalski@lw.com
kimberly.li@lw.com

# EXHIBIT 11

Trial@USPTO.GOV
571-272-7822

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

**LIBERTY MUTUAL INSURANCE COMPANY**
Petitioner,

v.

**PROGRESSIVE CASUAL INSURANCE COMPANY**
Patent Owner,

---

Case CBM2012-00003 (JL)
Patent 8,140,358

---

Before JAMESON LEE, JONI Y. CHANG, and MICHAEL R. ZECHER, *Administrative Patent Judges*.

LEE, *Administrative Patent Judge*.

## ORDER
## (DENIAL OF GROUNDS -- 37 C.F.R. § 42.208(b))

### INTRODUCTION

This petition for covered business method patent review of Patent 8,140,358 ('358 patent) was filed on September 16, 2012. Petitioner has asserted four hundred and twenty two (422) grounds of unpatentability against the 20 claims of the '358 patent, averaging more than 21 grounds per claim. The Patent Owner has not yet filed a preliminary response. In this order, we deny one hundred and ninety six (196) of the asserted grounds as not meeting the threshold for institution of

trial. *See* 37 C.F.R. §§ 42.208(b) and 300(a). In any response to be filed by the Patent Owner, the denied grounds need not be addressed.

There are two types of grounds being denied.

The first type includes those grounds which rely on the disclosure in Kosaka (Japanese Published Application H4-182868, Published June 30, 1992, Ex. 1003) of a wireless transmitter on the gear of a diver, which transmits an emergency signal to an aid boat or buoy when evaluation in real-time of the diving data indicates an extremely high risk situation, to meet the claim limitation of "a wireless transmitter configured to transfer the selected vehicle data retained within the memory to a distributed network and a server" without any reference's disclosing wireless transmission of selected vehicle data for subsequent evaluation.

For the first type, the grounds of obviousness are, for independent claim 1:

over Kosaka,
over Kosaka and Bouchard

The grounds are, for dependent claims 2-20, over Kosaka and over Kosaka and Bouchard, plus at least one more reference relied on by the Petitioner to meet the additional features recited in dependent claims 2-20.

The second type includes those same grounds as in the first type, but modified to substitute the wireless transmitter of Kosaka with a more sophisticated wireless transmission system disclosed in another reference to provide or convey "different types of data more efficiently to better determine driver performance." (Pet. 38:5-9; 40:4-8; 42:16 to 43:5).

For the second type, the grounds of obviousness are, for claim 1:

over Kosaka and Scapinakis
over Kosaka,, Bouchard, and Scapinakis
over Kosaka and Eisenmann
over Kosaka, Bouchard, and Eisenmann
over Kosaka and Stanifer
over Kosaka,, Bouchard, and Stanifer

The grounds of obviousness for claims 2-20 are the same as those listed above for claim 1, but with the addition of at least one more reference relied on by the Petitioner to account for the additional features recited in dependent claims 2-20.

Using the system of designating asserted grounds of unpatentability as revealed in the chart on pages 17-22 of the petition, we identify the denied grounds for instituting trial as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1:2 | 2:2 | 3:2 | 4:2 | 5:2 | 6:2 |
| 1:4 | 2:4 | 3:4 | 4:4 | 5:4 | 6:4 |
| 1:6 | 2:6 | 3:6 | 4:6 | 5:6 | 6:6 |
| 1:7 | 2:7 | 3:7 | 4:7 | 5:7 | 6:7 |
| 1:10 | 2:10 | 3:10 | 4:10 | 5:10 | 6:10 |
| 1:11 | 2:11 | 3:11 | 4:11 | 5:11 | 6:11 |
| 1:14 | 2:14 | 3:14 | 4:14 | 5:14 | 6:14 |
| 1:15 | 2:15 | 3:15 | 4:15 | 5:15 | 6:15 |
| 7:2 | 8:2 | 9:2 | 10:2 | 11:2 | 12:2 |
| 7:4 | 8:4 | 9:4 | 10:4 | 11:4 | 12:4 |
| 7:6 | 8:6 | 9:6 | 10:6 | 11:6 | 12:6 |
| 7:7 | 8:7 | 9:7 | 10:7 | 11:7 | 12:7 |

CBM-2012-00003
Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 7:10 | 8:10 | 9:10 | 10:10 | 11:10 | 12:10 |
| 2 | 7:11 | 8:11 | 9:11 | 10:11 | 11:11 | 12:11 |
| 3 | 7:14 | 8:14 | 9:14 | 10:14 | 11:14 | 12:14 |
| 4 | 7:15 | 8:15 | 9:15 | 10:15 | 11:15 | 12:15 |
| 5 | 13:2 | 14:2 | 15:2 | | | |
| 6 | 13:4 | 14:4 | 15:4 | | | |
| 7 | 13:6 | 14:6 | 15:6 | | | |
| 8 | 13:7 | 14:7 | 15:7 | | | |
| 9 | 13:10 | 14:10 | 15:10 | | | |
| 10 | 13:11 | 14:11 | 15:11 | | | |
| 11 | 13:14 | 14:14 | 15:14 | | | |
| 12 | 13:15 | 14:15 | 15:15 | | | |
| 13 | 16:2 | 17:2 | 18:2 | | | |
| 14 | 16:4 | 17:4 | 18:4 | | | |
| 15 | 16:6 | 17:6 | 18:6 | | | |
| 16 | 16:8 | 17:8 | 18:8 | | | |
| 17 | 17:11 | 18:11 | 17:20 | 18:20 | | |
| 18 | 17:13 | 18:13 | 17:22 | 18:22 | | |
| 19 | 17:15 | 18:15 | 17:24 | 18:24 | | |
| 20 | 17:17 | 18:17 | 17:26 | 18:26 | | |
| 21 | 19:2 | 20:2 | 19:19 | 20:19 | 19:36 | 20:36 |
| 22 | 19:4 | 20:4 | 19:21 | 20:21 | 19:38 | 20:38 |
| 23 | 19:6 | 20:6 | 19:23 | 20:23 | 19:40 | 20:40 |
| 24 | 19:7 | 20:7 | 19:24 | 20:24 | 19:41 | 20:41 |

| | | | | | |
|---|---|---|---|---|---|
| 19:10 | 20:10 | 19:27 | 20:27 | 19:44 | 20:44 |
| 19:11 | 20:11 | 19:28 | 20:28 | 19:45 | 20:45 |
| 19:14 | 20:14 | 19:31 | 20:31 | 19:48 | 20:48 |
| 19:15 | 20:15 | 19:32 | 20:32 | 19:49 | 20:49 |

## The claimed invention

The ’358 patent discloses a data logging device that tracks the operation of a vehicle or operator behavior. (Spec. 1:33-34). A processor reads data from an automotive bus that transfers data from vehicle sensors to other components and stores the data into memory. (Spec. 1:40-45). A communication device links the data logging device to a network of computers. (Spec. 1:44-45).

Claim 1 is the only independent claim, and is reproduced below:

> 1. A system that monitors and facilitates a review of data collected from a vehicle that is used to determine a level of safety or cost of insurance comprising:
>
> a processor that collects vehicle data from a vehicle bus that represents aspects of operating the vehicle;
>
> a memory that stores selected vehicle data related to a level of safety or an insurable risk in operating a vehicle;
>
> a wireless transmitter configured to transfer the selected vehicle data retained within the memory to a distributed network and a server;
>
> a database operatively linked to the server to store the selected vehicle data transmitted by the wireless transmitter, the database comprising a storage system remote from the wireless transmitter and the memory comprising records with operations for searching the records and other functions;

> where the server is configured to process selected vehicle data that represents one or more aspects of operating the vehicle with data that reflects how the selected vehicle data affects a premium of an insurance policy, safety or level of risk; and
>
> where the server is further configured to generate a rating factor based on the selected vehicle data stored in the database.

Thus, the claimed invention is about collecting sensed vehicle data from a vehicle bus, storing in memory that sensed vehicle data which pertains to level of safety or insurable risk in operating the vehicle, and wirelessly transmitting that stored data to a distributed network and a server. A database is operatively linked to the server to store the wirelessly transmitted vehicle data, and that database is remote from the wireless transmitter and the memory providing the data for wireless transmission. Also, the server receiving the wirelessly transmitted vehicle data performs two functions: (1) processes the vehicle data with data that reflects how the vehicle data affects an insurance policy premium, safety, or level of risk; and (2) generates a rating factor based on the vehicle data stored in the database.

The wireless transmitter transmits vehicle data already stored in a memory to a distributed network and a server, and a database linked to the server in turn stores the wirelessly transmitted data. That database is remote from the wireless transmitter and the memory. Thus, according to the claim, at least the database operatively linked to the server is not onboard the vehicle.

Each of claims 1-10, 14, 16, 19, and 20 depends directly on claim 1. Each of claims 11-13 depends directly on claim 10. Claim 15 depends directly on claim 14, claim 17 directly on claim 16, and claim 18 directly on claim 17.

Kosaka

In this opinion, specific references to the content of Kosaka are to the English translation of the original Japanese Unpublished Application, that is contained in Exhibit 1003. Kosaka discloses a combination risk evaluation device and insurance premium determination device that makes use of the risk evaluation device. (Kosaka 2:col.1:53 to 2:col.2:3). The risk evaluation device evaluates risk in moving bodies such as vehicles or insurance customers. (*Id.*) With regard to prior art, Kosaka describes that pre-existing conventional insurance premium determination systems have determined rates based on static attributes of the customer. (Kosaka 2:col.2:15-19). For instance, Kosaka describes that in pre-existing systems, it is normal for there to be no insurance premiums between operators who always operate safely, and operators who occasionally take risks, and that it is therefore unfair to apply the same insurance premium to both. (Kosaka 2:col.2:36-42). It is a stated objective of Kosaka that insurance premiums can be increased or decreased by “continually” determining insurance premium changes through the detection of states that lead to risk. (Kosaka 2:col.2:42-52).

Figure 1 of Kosaka is reproduced below, which illustrates a high level block diagram of Kosaka's device:

Fig. 1




Fig.1 shows a block diagram of Kosaka's device

External sensor 1 and internal sensor 2 detect data about the vehicle or insurance customer to provide as input to fuzzy logic part 3 (FLU 3). (Kosaka 4:col.2:4-20). The FLU 3 determines the comprehensive risk based on the input sensor data, making use of risk evaluation values stored in fuzzy memory 4 (FLM 4). (Kosaka 4:col.2:20-26). The premium calculation part 6 (CAL 6) performs temporal integration and computation of risk evaluation values, and thereby calculates insurance premiums. (Kosaka 4:col.2:26-31). A system clock CLK 5 supplies a timing signal to CAL 6, and CAL 6 is connected to an output interface MRW 7. (Kosaka 4:col.2:31-35). MRW 7 includes an electronic currency transfer request means or a prepayment amount erasing means, making use of MEM 8, a monetary amount file part including memory that stores a prepayment balance or a transfer-side currency on-line system. (Kosaka 4:col.2:36-38).

Kosaka discloses specific use of its device of Figure 1 in two application embodiments. In the first, the device is incorporated within a diving watch to be worn by a diver while diving. (Kosaka 4:col.2:39-41). In the second, the device is installed on a vehicle. (Kosaka 6:col.2:3-6). The vehicle embodiment employs as a sensor a doppler radar, or alternatively ultrasound waves, to detect the operating speed of the vehicle. (Kosaka 6:col.2:7-11). For the diver embodiment only, Kosaka discloses that an electromagnetic wave antenna 18 is attached to a fin 17 that is worn on the foot of the diver, and that the antenna transmits an emergency signal to a buoy or an aid boat if the logical output of the device reaches an emergency level. (Kosaka 5:col.1:13-18). In the alternative, an ultrasonic wave generator may be provided instead of the antenna 18 to send the emergency signal. (Kosaka 5:col.1:18-21).

Kosaka describes an effect of its invention as follows (emphasis added)(Kosaka 9:col.1:27-34):

> Moreover, by using the risk evaluation device employing a risk evaluation part that operates by fuzzy logic together with an insurance premium determination system, change in insurance premiums in accordance with **continually** varying risk evaluation values can be settled in real time, thereby allowing insurance to be more equitable.

## ANALYSIS

When promulgating the regulations of Part 42, Code of Federal Regulations, Title 35, the Board considered "the effect of the regulations on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings" as mandated by 35 U.S.C. § 326(b). It is provided in 37 C.F.R. § 42.1(b) that: "[t]his part shall be construed

to secure the just, speedy, and inexpensive resolution of every proceeding." Furthermore, the Petitioner has the burden of proof to establish that it is entitled to the requested relief. 37 C.F.R. § 42.20(c). Thus, we will address only the basis, rationale, and reasoning put forth by the Petitioner in the petition, and resolve all vagueness and ambiguity in Petitioner's arguments against the Petitioner.

As noted above, claim 1 requires for storage both a local memory and a database remote from the local memory. Sensed selected vehicle data is first stored in the local memory and then sent by a wireless transmitter to a distributed network and a server. A database remote from the wireless transmitter and the local memory is operatively linked to the server and stores the wirelessly transmitted vehicle data. The server processes the wirelessly transmitted selected vehicle data with data that reflects how that vehicle data affects a premium of an insurance policy, safety, or level of risk, and generates a rating factor based on the selected vehicle data stored in the database.

For both the local memory and the remote database, Petitioner asserts inherent disclosure based on the disclosure in Kosaka that risk evaluation values and insurance premiums "may" be determined subsequently. It is true that while Kosaka discloses that its risk evaluation means and insurance premium change determination means operate "in real time" (Kosaka 3:col.2:9-12;19-21; 4:col.1:30-34;45-47), it also indicates that the calculations "may" be performed subsequently as is noted by Petitioner. However, in order to preserve data values to be processed later, the selected sensed vehicle data need only be stored in one location. Petitioner's inherency argument cannot carry the day for both the local memory and the remote database.

More importantly, the only wireless data transmitter disclosed in Kosaka is that in the diver embodiment for sending a distress signal to an aid boat or a buoy when the evaluated data indicates an extremely hazardous condition. Claim 1 requires a wireless transmitter that transmits the vehicle data stored in the local memory to a distributed network and a server and specifies that the server which receives the wireless transmission makes the risk evaluation. Petitioner has not identified any disclosure, in Kosaka's vehicle embodiment, that sensed vehicle data is wirelessly transmitted to any component anywhere. Even in Kosaka's diver embodiment, what is wirelessly transmitted is a distress signal and not sensed data. Also, an aid boat or a buoy is not a distributed network or a server.

In that regard, Petitioner's argument is as follows (Pet. 30:9-15):

> POSITA would have found obvious, based on Kosaka's disclosure of transferring selected vehicle data (e.g., states that contribute to risk, such as speed) to a risk evaluation unit, including sending signals via an antenna to a remote receiver, to implement the system of Kosaka to comprise a wireless transmitter configured to transfer the selected vehicle data to the risk evaluation unit via a distributed network for a more rapid transmission of data. See Ex. 1025, Andrews Dec. ¶¶ 23-24.

The argument has numerous infirmities. As noted above, Kosaka does not disclose wireless transmission of sensed vehicle data to any component anywhere. The wireless transmission in Kosaka's diver embodiment transmits only a distress signal after the collected risk data has been evaluated and determined as invoking an emergency situation. Petitioner has not advanced a credible rationale why wireless transmission of an emergency distress signal after risk data has been evaluated and determined as invoking an emergency situation would have

suggested wireless transmission of the raw data before risk evaluation to a distributed network and a server which performs the evaluation. Furthermore, focusing on the above-quoted text, we regard Petitioner's stated reasoning of applying wireless transmission of data from the sensing unit to the risk evaluation unit, through a distributed network, for the purpose of achieving more rapid transmission of data to be unsupported by the record and simply unpersuasive.

In Kosaka, the data sensing component and the risk evaluation component are both parts of the same device worn by the diver or positioned onboard the vehicle. The declaration of Andrews, in the cited paragraphs 23 and 24, contains no testimony to the effect that the speed of data transmission from Kosaka's sensing component to risk evaluation component, both being parts of the same onboard device, would be improved by using wireless transmission through a distributed network. We note that for such an assertion, even if there is testimony presenting that opinion, the testimony should also provide a detailed explanation.

For all of the foregoing reasons pertaining to the local memory, the remote database, and the wireless transmission to a distributed network and a server, we conclude that Petitioner has not demonstrated that it is more likely than not that claim 1 of the '358 patent is unpatentable over Kosaka.

Petitioner has also asserted that claim 1 of the '358 patent is unpatentable over the combined teachings of Kosaka and Bouchard (US Patent 5,465,079). Bouchard, however, is applied by the Petitioner only for its teachings with regard to claim 1's requirement of a vehicle bus from which sensed vehicle data is collected, and does not cure the deficiencies of Kosaka with regard to the other features of claim 1 as discussed above. Accordingly, we conclude that Petitioner

has not demonstrated that it is more likely than not that claim 1 of the ’358 patent is unpatentable over Kosaka and Bouchard.

Based on the asserted grounds relying on Kosaka alone and Kosaka in combination with Bouchard, Petitioner: (1) adds Scapinakis to form two more grounds against claim 1 based on Kosaka and Scapinakis, and Kosaka, Bouchard, and Scapinakis; (2) adds Eisenmann to form two more grounds against claim 1 based on Kosaka and Eisenmann, and Kosaka, Bouchard, and Eisenmann; and (3) adds Stanifer to form two more grounds against claim 1 based on Kosaka and Stanifer, and Kosaka, Bouchard, and Stanifer.

In adding each of Scapinakis, Eisenmann, and Stanifer, to Kosaka and to Kosaka and Bouchard, Petitioner simply states that one with ordinary skill in the art would have recognized that Kosaka’s device would be enhanced by incorporating more sophisticated wireless telematics system discussed in Scapinakis, Eisenmann, and Stanifer to convey different types of data more efficiently to better determine driver performance. (Pet. 38:5-9; 40:4-8;43:1-5). However, as we discussed above, Petitioner has not persuasively argued even that one with ordinary skill has reason to wirelessly transmit any vehicle data to anywhere. Thus, Petitioner’s argument that Kosaka’s wireless transmission of data would benefit by enhancement via adoption of a more sophisticated telematics wireless transmission system is unpersuasive. Indeed, it would appear that to send vehicle data from Kosaka’s data collection component to Kosaka’s data evaluation component, both parts of the same onboard device, the more sophisticated the telematics the more inefficient it would be. And as noted above, Petitioner’s witness Mr. Andrews provides no explanation as to why that is not so.

Even without the problem relating to any need for a more sophisticated telematics system, Petitioner still has not cleared the problems relating to a local memory and a remote database, notwithstanding the addition of Scapinakis, Eisenmann, or Stanifer. For all of the foregoing reasons, we conclude that Petitioner has not demonstrated that it is more likely than not that claim 1 of the ’358 patent is unpatentable over: (1) Kosaka and any one of Scapinakis, Eisenmann, and Stanifer; and (2) Kosaka, Bouchard, and any one of Scapinakis, Eisenmann, and Stanifer.

Based on all the asserted grounds against claim 1 as discussed above, for each dependent claims 2-20, Petitioner adds one or more additional references to account for the features added by the dependent claims. The additional reference or references do not cure the deficiencies noted above with regard to the features of independent claim 1. We conclude that Petitioner has not demonstrated that it is more likely than not that claims 2-20 of the ’358 patent are unpatentable over any one of the above-discussed grounds with the addition of one or more references relied on by the Petitioner to account for the features of the dependent claims.

As is stated above at the beginning of the analysis, we address only the basis, rationale, and reasoning put forth by the Petitioner and resolve all vagueness and ambiguity in Petitioner’s arguments against the Petitioner. If there is any other way Scapinakis, Eisenmann, and Stanifer can be combined with Kosaka and yield a better combination, it is the responsibility of the Petitioner to clearly articulate it. It would be unfair to expect the Patent Owner to conjure up arguments against its own patent and just as inappropriate for the Board to take the side of the Petitioner to salvage an inadequately expressed ground proposing an alternative rationale.

We recommend that all petitioners clearly express and explain their positions, especially on precisely how the teachings of multiple references are used in combination to meet a claim feature. We also recommend that all petitioners clearly state what the differences are between the subject matter claimed in a claim alleged as obvious over prior art, and the prior art. Here, Petitioner has not clearly identified the differences between claim 1 and Kosaka, and the Petitioner's reasoning on adding Scapinakis, Eisenmann, or Stanifer to the basic combination of Kosaka or Kosaka and Bouchard is vague and ambiguous at best.

## CONCLUSION

It is

**ORDERED** that each of the one hundred ninety six (196) alleged grounds of unpatentability based in whole or in part on Kosaka and identified in the Introduction section of this opinion is *denied* as a basis for instituting trial;

**FURTHER ORDERED** that no trial will be instituted based on those one hundred ninety six (196) grounds of unpatentability; and

**FURTHER ORDERED** that the Patent Owner shall not, in any response, address the merits of any of the one hundred and ninety six (196) denied grounds of unpatentability for instituting trial.

CBM-2012-00003
Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.

By Electronic Transmission

Attorney for Petitioner Liberty Mutual Ins. Co.:

J. Steven Baughman, Esq.
Ropes & Gray LLP
steven.baughman@ropesgray.com

Attorneys for Patent Owner Progressive Casualty Ins. Co.:

Calvin P. Griffith, Esq.
James L. Wamsley, III, Esq.
John V. Biernacki, Esq.
Jones Day
cpgriffith@jonesday.com
jlwamsleyiii@jonesday.com
jvbiernacki@jonesday.com

# EXHIBIT 12

[redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CERTIFIED COPY

PELOTON INTERACTIVE, INC.,
Plaintiff/Counter-Defendant,

-vs- Case No. 20-662-RGA

iFIT, INC.,
Defendant/Counter-Plaintiff.
______________________________________/

VIDEOTAPED DEPOSITION
CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPONENT: 30(b)(6) - PELOTON INTERACTIVE, INC.
(RYAN DILLON-CURRAN)
DATE: Thursday, January 27, 2022
TIME: 8:45 a.m. Mountain Time
LOCATION: VIA ZOOM VIDEOCONFERENCE
REPORTER: Karen Fortna, CRR/RMR/RPR/CSR
VIDEO: Lance Harrison
JOB NO: 7764

[redacted]

APPEARANCES:

LATHAM & WATKINS, LLP
By: Mr. Matthew S. Salerno
1271 Avenue of the Americas
New York, New York 10020
212.906.4738
matthew.salerno@lw.com
Appearing on behalf of
Plaintiff/Counter-Defendant

FOLEY & LARDNER, LLP
By: Mr. Jonathan E. Moskin
Ms. Melange Gavin
90 Park Avenue
New York, New York 10016
212.338.3572
jmoskin@foley.com
mgavin@foley.com
Appearing on behalf of
Defendant/Counter-Plaintiff

FOLEY & LARDNER, LLP
By: Ms. Hannah L. Andrews
Mr. Robert T. Stewart
299 South Main Street, Suite 2000
Salt Lake City, Utah 84111
801.401.8906
handrews@foley.com
rtstewart@foley.com
Appearing on behalf of the
Defendant/Counter-Plaintiff

ALSO PRESENT: Ms. Pauline Oostdyk
Ms. Jennifer Berry

[redacted]

# I N D E X

W I T N E S S

RYAN DILLON-CURRAN PAGE

Examination by Mr. Moskin 9

[redacted]

Thursday, January 27, 2022
Via Zoom videoconference
8:45 a.m. Mountain Time

* * *

(All participants appearing via Zoom videoconference.)

VIDEOGRAPHER: We are on record. My name is Lance Harrison; I'm the videographer. The court reporter is Karen Fortna. We represent JD Legal Support, located in Lehi, Utah. The time and date indicated on the Zoom feed is January 27, 2022. The time is 8:45 a.m.

This is the case of Peloton Interactive, Inc. versus iFIT, Inc., Case No. 20-662-RGA, United States District Court for the District of Delaware.

Counsel will now introduce themselves and the court reporter will swear in the witness.

MR. MOSKIN: This is Jonathan Moskin of Foley & Lardner for the defendant and counter-claimant, iFIT.

MR. SALERNO: Good morning. This is Matthew Salerno of Latham & Watkins on behalf of Peloton Interactive, Inc.

* * * *

RYAN DILLON-CURRAN,

having first been duly sworn, was examined and

[redacted]

testified as follows:

EXAMINATION

BY MR. MOSKIN:

**Q. Good morning, Mr. Dillon-Curran. I'll just ask you, as a formality, if you would please state your full name for the record.**

A. Ryan Dillon-Curran.

**Q. And where do you reside?**

A. In New York.

**Q. Okay. And let me ask you, have you ever been deposed before?**

A. I have.

**Q. You have. Okay. And how many times?**

A. I've been deposed three times.

**Q. Okay. I may come back to ask you a little bit about those, but for now, I just want to go over with you the ground rules with which you may be familiar, particularly since we're doing this remotely in view of the COVID-related new reality.**

**First of all, are you -- where are you physically now?**

A. I'm in New York.

**Q. At what address; at your home, at an office?**

A. In an office.

**Q. Okay. What office?**

[redacted]

highlighted as being extremely important to the overall [redacted].

**Q. Okay. So consistent with what you said earlier, I believe, that music is integral to the class experience that Peloton offers?**

MR. SALERNO: Objection. Mischaracterizes the witness' statement.

THE WITNESS: I think what I stated is music is really important to any fitness class experience and that's true of Peloton members, too, [redacted]

(Marked for identification: Deposition Exhibit No. 42.)

BY MR. MOSKIN:

**Q. I'm showing you what's being marked as Exhibit 42, which is a document entitled, [redacted]." And I would just ask if you can identify this.**

A. I'm going to take a moment if that's okay.

**Q. Sure.**

A. Okay.

**Q. And what is this?**

[redacted]

A. It appears to be another survey of existing Peloton members from 2018.
**Q. And if you go to page 41 -- well, who is Brad Olsen?**
A. Brad Olsen is currently the chief business officer of Peloton.
**Q. Does Peloton do an [redacted]?**
A. I can't speak to every year, [redacted]
**Q. Okay. So as I was saying, if you go down to page 4134.**
A. Yep.
**Q. Did this confirm that Peloton customers identified [redacted]?**
A. Just to make sure we're looking at the right slide, this is the slide with the word bubble that says, "[redacted]?"
**Q. Right.**
A. I think if I would characterize this slide, it is a [redacted].

[redacted]

**Q. And including that customers wanted [redacted]?**

MR. SALERNO: Objection to the use of customers. Vague.

MR. MOSKIN: Did I say music customers? I thought I said more music choices.

MR. SALERNO: I think you're classifying them as customers. I think this is [redacted]. And I'm not going to testify. I'll make my objection.

MR. MOSKIN: Thank you.

BY MR. MOSKIN:

**Q. But again, this reference [redacted] correct?**

A. How I would characterize this is there are five buckets of [redacted]. One of those buckets includes -- [redacted].

There's also other slides in here that suggest [redacted]

[redacted]

[redacted].

(Marked for identification:
Deposition Exhibit No. 43.)

BY MR. MOSKIN:

**Q. Okay. I would like to show you another document we'll mark as Exhibit 5 -- excuse me, 43. And similar question, if you could just identify it for me.**

A. And I'll take a moment if that's okay.

MR. SALERNO: Mr. Moskin, I'm going to make the same request with respect to this under Section 12, just redesignating this particular Bates document to attorneys' eyes only, but that doesn't affect the question at all. Thank you.

BY MR. MOSKIN:

**Q. Let me know when you're ready to identify what this is.**

A. One moment. Okay. I'm familiar with it.

**Q. What is the document?**

A. I didn't author this document, but it appears to be a [redacted]